**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD J. SILVERBERG | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DUPONT DE NEMOURS, INC. | : | NO. |
| -and- | : | |
| DOW, INC. | : | |
| -and- | : | |
| CORTEVA, INC. | : | |
| -and- | : | |
| INTERNATIONAL FLAVORS AND | : | |
| FRAGRANCES, INC. | : | |
| -and- | : | |
| AVANTOR, INC. | : | |
| -and- | : | |
| LIBERTY MUTUAL GROUP, INC. | : | |
| -and- | : | |
| THE VANGUARD GROUP, INC. | : | |
| -and- | : | |
| WILLIAM PENN FOUNDATION | : | |
| -and- | : | |
| CITY OF PHILADELPHIA | : | |
| -and- | : | |
| BALLARD SPAHR LLP | : | |
| -and- | : | |
| GELLERT SCALI BUSENKELL | : | |
| & BROWN LLC | : | |
| -and- | : | |
| EDWARD BREEN | : | |
| -and- | : | |
| ANDREW LIVERIS | : | |
| -and- | : | |
| RAJIV GUPTA | : | |
| -and- | : | |
| ANDREAS FIBIG | : | |
| -and- | : | |
| DAVID H. LONG | : | |
| -and- | : | |

TIMOTHY BUCKLEY                          :
          -and-                          :
JANET HAAS, M.D.                         :
          -and-                          :
JOSHUA ROBERTS                           :
          -and-                          :
DANIEL ANDERS                            :
          -and-                          :
JAMES KENNEY                             :
          -and-                          :
MARCEL S. PRATT, ESQUIRE                 :
          -and-                          :
DIANA CORTES, ESQUIRE                    :
          -and-                          :
MARISSA O'CONNELL, ESQUIRE               :
          -and-                          :
BRIAN R. CULLIN, ESQUIRE                 :
          -and-                          :
GARY F. SEITZ, ESQUIRE                   :
          -and-                          :
JOHN DOE NOS. 1-15                       :
                                         :
          Defendants                     :

## CIVIL ACTION

### Preliminary Statement

"Eventually, you reap what you sow."

Jack McCoy

### PARTIES

1.     Plaintiff, Richard J. Silverberg, is an individual with a principal address in Philadelphia, Pennsylvania.

2.     Defendant, DuPont de Nemours, Inc. (DuPont), is a Delaware corporation with a principal place of business in Wilmington, DE.

3.     Defendant, Dow, Inc. (Dow), is a Delaware corporation with a principal place of business in Midland, MI.

4.     Defendant, Corteva, Inc. (Corteva), is a Delaware corporation with a principal place of business in Indianapolis, IN.

5.     Defendant, International Flavors & Fragrances, Inc. (IFF), is a New York corporation with a principal place of business in New York, NY.

6.     Defendant, Avantor, Inc. (Avantor), is a Delaware corporation with a principal place of business in Radnor, PA.

7.     Defendant, Liberty Mutual Group, Inc. (Liberty Mutual), is a manufacturer and provider of insurance products and services and/or owns/holds companies that provide such

products/services, including Liberty Life Assurance Company of Boston (Liberty Life) prior to its sale to Lincoln Financial Group, with a principal place of business in Boston, MA.[1]

8.      Defendant, The Vanguard Group, Inc. (Vanguard), is a manufacturer and provider of financial products and services with a principal place of business in Malvern, PA.

9.      Defendant, William Penn Foundation (William Penn), is a private nonprofit charitable organization with a principal place of business in Philadelphia, PA.

10.      Defendant, City of Philadelphia (City), is a municipal corporation with a principal place of business in Philadelphia, PA.

11.      Defendant, Ballard Spahr LLP, is a duly organized law firm with a principal place of business in Philadelphia, PA.

12.      Defendant, Gellert Scali Busenkell & Brown LLC (Gellert Scali), is a duly organized law firm with a principal place of business in Philadelphia, PA.

13.      Defendant, Edward Breen, is an individual with a principal address in Wilmington, DE.

14.      Defendant, Andrew Liveris, is an individual with a principal address in Newark, CA.

15.      Defendant, Rajiv Gupta, is an individual with a principal address in Newtown Square, PA.

---

[1] For purposes of the instant Civil Action, all references to Liberty Life should be treated as references to Liberty Mutual.

16.     Defendant, Andreas Fibig, is an individual with a principal address in New York, NY.

17.     Defendant, David H. Long, is an individual with a principal address in Boston, MA.

18.     Defendant, Timothy Buckley, is an individual with a principal address in Malvern, PA.

19.     Defendant, Janet Haas, M.D., is an individual with a principal address in Philadelphia, PA.

20.     Defendant, Joshua Roberts, is an individual with a principal address in Philadelphia, PA.

21.     Defendant, Daniel Anders, is an individual with a principal address in Philadelphia, PA.

22.     Defendant, James Kenney, is an individual with a principal address in Philadelphia, PA.

23.     Defendant, Marcel S. Pratt, Esquire, is an individual with a principal address in Philadelphia, PA.

24.     Defendant, Diana Cortes, Esquire, is an individual with a principal address in Philadelphia, PA.

25.     Defendant, Marissa O'Connell, Esquire, is an individual with a principal address in Philadelphia, PA.

26.     Defendant, Brian R. Cullin, Esquire, is an individual with a principal address in Philadelphia, PA.[2]

27.     Defendant, Gary F. Seitz, Esquire, is an individual with a principal address in Philadelphia, PA.

28.     Defendants, John Doe Nos. 1-15, are officers, directors, executives, managers, administrators, attorneys, and other officials, representatives, and/or employees of the corporate defendants, the City, William Penn, and/or the law firms.

29.     At all times relevant and material hereto, plaintiff was a licensed attorney, the former sole principal at Richard J. Silverberg & Associates, P.C., a law firm, and a former member of ELS Realco LLC, a former Delaware multi-member limited liability company.

30.     At all times relevant and material hereto, defendant Breen was Chairman and Chief Executive Officer and/or Executive Chairman of DuPont, and Chief Executive Officer of DowDuPont.

31.     At all times relevant and material hereto, defendant Liveris was Chairman and Chief Executive Officer of Dow, and Executive Chairman of DowDuPont.  Defendant Liveris currently is Chairman of Lucid Motors Group, a member of the Board of Directors of IBM, Novonix, and Saudi Aramco, and a Special Advisor to the Saudi Sovereign Wealth Fund (PIF) and the Crown Prince of Saudi Arabia.

---

[2] For purposes of the instant Civil Action, unless otherwise stated, references to the "City Defendants" are to defendants City, Kenney, Pratt, Cortes, O'Connell, and Cullin.

32.     At all times relevant and material hereto, defendant Gupta was Chairman, President, and Chief Executive Officer of Rohm and Haas Company, Chairman of Avantor, and a member of the DuPont and Vanguard Board of Directors.

33.     At all times relevant and material hereto, defendant Fibig was Chairman and Chief Executive Officer of IFF.

34.     At all times relevant and material hereto, defendant Long was Chairman, President, and Chief Executive Officer of Liberty Mutual.

35.     At all times relevant and material hereto, defendant Buckley was Chairman and Chief Executive Officer of Vanguard.

36.     At all times relevant and material hereto, defendant Haas was Board Chair of William Penn.

37.     At all times relevant and material hereto, defendant Roberts held the position title of judge, Court of Common Pleas, Philadelphia County.

38.     At all times relevant and material hereto, defendant Anders held the position title of judge, Court of Common Pleas, Philadelphia County.

39.     At all times relevant and material hereto, defendant Kenney was Mayor of the City of Philadelphia and the City's highest-ranking policymaking official.

40.     At all times relevant and material hereto, defendant Pratt was Chair, Litigation Group (August 2016-March-2018), for the City's Law Department, and City Solicitor (March 2018-December 2020) for the City of Philadelphia and the City's highest-ranking policymaking

official in the City's Law Department, and had ultimate supervisory authority for all City of Philadelphia legal matters, including the tax/PUFTA matters.

41.     At all times relevant and material hereto, defendant Cortes was Chair, Litigation Group, for the City's Law Department and City Solicitor (December 2020-present) for the City of Philadelphia and the City's highest-ranking policymaking official in the City's Law Department, and had ultimate supervisory authority for all City of Philadelphia legal matters, including the tax/PUFTA matters.

42.     At all times relevant and material hereto, defendant O'Connell was Divisional Deputy City Solicitor, Tax and Revenue Unit, for the City's Law Department and had oversight and supervisory responsibility in connection with the tax/PUFTA matters.

43.     At all times relevant and material hereto, defendant Cullin was a Deputy City Solicitor, Tax and Revenue Unit, for the City's Law Department and had direct responsibility in connection with the tax/PUFTA matters.

44.     At all times relevant and material hereto, defendant Seitz was an attorney, and pursuant to the City's Petition for Appointment of Sequestrator and the Order of October 29, 2021, was appointed Sequestrator by Judge Roberts.

45.     At all times relevant and material hereto, unless otherwise stated herein, the individual defendants acted within the course and scope of their employment and in furtherance of their respective employers' business and interests.  Alternatively, the individual defendants acted solely in their individual capacities.  To the extent that an agency relationship existed or may have existed between any of the entities or persons identified herein, or it is determined that

an agency relationship existed, the entities/persons acted outside the scope of and/or exceeded said agency.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that plaintiffs have brought the instant civil action pursuant to, *inter alia*, 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.  This Court exercises supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

47.     Venue properly lies in the United States District Court for the Eastern District of Pennsylvania since the alleged violations of plaintiff's federal and state law rights occurred within the geographical boundaries of the Eastern District of Pennsylvania.

## FACTUAL ALLEGATIONS

### The Proxy War - A Brief Introduction

48.     On or about April 22, 2016, plaintiff sent an email to counsel for certain parties including, among others, Dow, DuPont, and Liberty Mutual, in connection with a prior litigation in which they and/or their affiliates were parties which stated, in pertinent part:

> It seems like a good time to let you and others know that I will
> soon be completing my book concerning the Jackson odyssey.[3] As

---

[3] The "Jackson odyssey" referred to a series fraud and racketeering cases that Mark Jackson, a former Rohm and Haas Company (R&H) employee, had brought against R&H, Liberty Mutual, and others, in both Pennsylvania state and federal courts.  *See gen'lly Mark A. Jackson v. Rohm & Haas Company et al.*, Philadelphia Court of Common Pleas, June Term 1999, No. 1906; *Mark*

> I expected, this project has generated great interest since the cases
> are a window into a complex and disturbing aspect of corporate
> America, the conduct of corporate officials and corporate counsel,
> and our broken justice system. While the book examines the
> underlying conduct it also explores the business judgment, legal
> and strategic decisions, individual actions, and judicial proceedings
> that cumulatively led to and killed-off multiple causes of action.

49.     Since that time, the City of Philadelphia (the City) has filed and/or actively pursued two tax-related matters:  a) a business tax claim against plaintiff's former law firm (which closed in 2008) and plaintiff as principal;[4] and b) a fraudulent transfer claim against plaintiff and a limited liability company (LLC) with which plaintiff formerly was associated.[5] According to the City, the purpose of filing/pursuing the tax/PUFTA claims was to recover past-due taxes that supposedly were due and owing.

50.     In fact, since at least 2017-present, the City has utilized the tax/PUFTA matters as part of an illegitimate "proxy war" on behalf (and for the benefit) of certain third parties including Dow, DuPont, Corteva, and Liberty Mutual, their predecessors/successors, affiliates, certain individuals, and/or others, the purpose of which has been to, *inter alia*, delay, deter, dissuade, and/or prevent the publication of plaintiff's anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities.

---

*A. Jackson v. June McCrory*, Philadelphia Court of Common Pleas, June Term 1999, No. 3824. *See also Mark Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Nos. 03-5299, 05-4988, and 06-3682.

[4] *See City of Philadelphia v. Richard J. Silverberg & Assoc., et al*., Philadelphia Court of Common Pleas, March Term 2008, No. 1510 (the "tax" case).

[5] *See City of Philadelphia v. ELS Realco LLC, et al*., Philadelphia Court of Common Pleas, September Term 2019, No. 3805 (the "PUFTA" case).

51.     To that end, at all times relevant and material hereto, the City has not filed/pursued the tax/PUFTA matters for purposes of recovering past due taxes that supposedly are due and owing, but rather to: a) harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff in connection with his anticipated book and related activities; and b) retaliate against plaintiff for engaging in protected activity.

52.     The proxy war also has included a vicious smear campaign, predicated upon knowing and/or manufactured falsehoods, intended to damage/destroy plaintiff's professional and personal reputation, and which has included the filing of baseless Complaints with the Disciplinary Board of the Supreme Court of Pennsylvania.

53.     To understand the reasons for the proxy war, there first must be an understanding of the wrongful/unlawful actions that are the subject of the anticipated book, the potential consequences of those actions, defendants' beliefs/perceptions concerning the related risks/exposures, and the relationship(s) between those who determined to undertake the proxy war and those who actually participated in it.

<u>**The Reasons for the Proxy War**</u>[6]

**Reason #1:**
**<u>The Original Case Against Rohm and Haas Company</u>**

54.     On or about June 26, 1998, Mark Jackson, a former accountant at Rohm and Haas Company (R&H), and June McCrory, another former R&H employee, went on a date. At the

---

[6] For organizational purposes, the reasons for the proxy war generally are set forth in chronological order. Accordingly, the order of presentation is not intended to suggest or convey the significance or importance of particular events.

end of the evening, the two returned to Jackson's apartment where they engaged in consensual sex.

55.     Approximately two weeks later, Nigel Spence, another former R&H employee and friend of McCrory, after hearing McCrory relate some account of her evening with Jackson, took it upon himself to contact David Gartenberg, a former R&H Human Resources Representative.

56.     Spence asked Gartenberg what an R&H employee should do if "something bad" happened involving another R&H employee, Gartenberg responded "the person (meaning McCrory) should be encouraged to come forward," and thereafter Spence returned to Gartenberg's office with McCrory and possibly one other R&H employee.[7]

57.     McCrory was interviewed by Gartenberg, Royce Warrick (former in-house employment counsel for R&H), and Celia Joseph (former Assistant General Counsel, Corporate EEO/Diversity Manager, and Employment Law Manager for R&H), who arrived while the interview was in progress.  According to the Company, during the interview McCrory reported that Jackson had raped her.

58.     Jackson subsequently was interviewed by Michael McLaughlin (former in-house counsel for R&H) and Wayne Davis (former Director of Corporate Security for R&H).[8]  Although company officials claimed they were conducting an investigation into a claim of sexual harassment, McLaughlin and Davis only questioned Jackson about the events occurring in

---

[7] McCrory herself had made no prior complaint or report to the Company concerning Jackson or their evening together.
[8] Prior to his position at R&H, Wayne Davis was Special Agent-in-Charge of the Philadelphia Office of the Federal Bureau of Investigation.  Based upon his review and analysis of the facts, Davis testified that he did not believe that McCrory had been sexually assaulted.

Jackson's apartment, which included extensive and detailed questioning about the intimate, physical details of the sexual encounter between Jackson and McCrory.

59.     On or about June 17, 1999, Jackson filed suit against R&H and certain individuals (hereinafter the "R&H defendants") claiming that his privacy was invaded when company officials interrogated him, under the implicit threat of termination, about the intimate, physical details of the June 1998 consensual sexual encounter between Jackson and McCrory occurring at Jackson's apartment.[9]

60.     At trial, McCrory testified that she never informed anyone at R&H that Jackson had raped her, that no R&H official ever asked her whether Jackson had sexually assaulted her, and that she was not even thinking about the events in those terms.

61.     On October 19, 2001, following a three-week trial, the jury found that R&H had invaded Jackson's privacy and awarded damages in the amount of $150,000.

62.     On April 10, 2002, the Philadelphia Court of Common Pleas (Collins, J.) granted judgment notwithstanding the verdict (JNOV) on the ground that Jackson's state law tort claims against R&H were barred by the exclusivity provision of the Pennsylvania Worker's Compensation Act ("WCA"), 77 P.S. § 1.[10]/[11]

---

[9] At all times relevant and material hereto, plaintiff represented Jackson in the state and federal cases described herein.

[10] At trial, Davis testified the matter was work-related because Jackson and McCrory had left the workplace together.

[11] The decision subsequently was affirmed by a 3-judge panel of the Pennsylvania Superior Court in an unpublished decision, and thereafter, review by the Pennsylvania Supreme Court was denied.

**Reason #2:**
**The Implications of the Original Case Against Rohm and Haas Company**

63.     R&H's defense in the original state case was predicated upon the knowing falsehood that June McCrory had reported to the Company that Mark Jackson had raped her.

64.     Even after McCrory testified that she did not report to R&H (or anyone else) that Jackson had sexually assaulted her, and that R&H investigators had not even asked her whether she had been assaulted, R&H maintained the litigation position that McCrory had reported a rape and that the Company was investigating a claim of sexual harassment.[12]

65.     Accordingly, in an effort to protect the Company in connection with its botched and otherwise wrongful/unlawful internal investigation, the Company manufactured a rape allegation by one employee against another employee, falsely claiming that McCrory had accused Jackson of committing a heinous crime.

66.     The determination to make knowingly false allegations that Jackson had attacked McCrory, and to offer altered and manufactured documentary evidence and perjured testimony to support its position (as discussed more fully herein), reflected a policy/practice, operating strategy, and approach to corporate governance which was to take whatever action(s) were necessary to achieve the desired outcome and/or the Company's objectives more generally, regardless of the actual facts and/or prevailing legal standards.

67.     The policies, practices, strategies, and tactics utilized by R&H in the original state case are part of a years-long pattern and practice of wrongful/unlawful conduct by defendants

_____

[12] Even if McCrory had reported a sexual assault, such a claim would not have been the proper subject of a sexual harassment investigation, but rather would have been a police matter.

and/or others whereby litigation-related decisions/activities, and business-related decisions/ activities more generally, are not based upon the actual facts and relevant legal/regulatory/ administrative standards, but rather upon whatever is required for the company, organization, entity, and/or individual to achieve the desired outcome and/or their objectives more generally.

**Reason #3:**
**The Rohm and Haas Company Long-Term Disability Plan**
**was Funded from the General Assets of the Corporation**

68.     The Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., requires that employee welfare benefit plans meet certain requirements, which include a proper funding source.  A disability benefits plan that is funded from the "general assets" of the corporation, and which is not insured, is not a welfare plan within the meaning of ERISA and is not governed by the statute, regardless of how the plan is characterized by the employer.

69.     During the litigation, Jackson became disabled and was placed on disability.  The 2003 R&H Summary Plan Description (SPD) revealed that while R&H characterized its long-term disability benefits plan as a welfare plan within the meaning of ERISA, it also represented that "Benefits under the Program are self-funded from the general assets of Rohm and Haas and are not guaranteed through an insurance contract."

70.     Based upon the plain language of the 2003 R&H SPD, the rights and remedies prescribed by ERISA, which ordinarily are exclusive in nature, were not applicable and/or were not the exclusive rights and remedies available to Jackson and/or others who were eligible for disability benefits.  As a provider of insurance products and services, both R&H (as Plan

Administrator) and Liberty Life[13] (as Claims Administrator) knew/should have known the R&H

plan was not a disability plan within the meaning of ERISA, and therefore that their actions

violated the relevant legal and/or standards governing such plans.

71.     On April 25, June 28, and August 1, 2002, and March 10, 2006, R&H and/or

Liberty Life sent letters to Jackson with respect to his disability benefits in which the companies

represented the long-term disability plan as an ERISA-governed plan - representations the

companies knew were false and/or were in reckless disregard for whether they were true or false.

72.     From at least 2002-2008, both R&H and/or Liberty Life intentionally and

repeatedly misrepresented to numerous employees, plan participants and/or others that R&H's

disability plan was a welfare plan within the meaning of ERISA when they knew/should have

known that the plan was not an ERISA-governed plan.  In so doing, R&H and/or Liberty Life

intentionally and/or recklessly misled those same persons into believing that ERISA was their

exclusive remedy for the harm suffered, that they had no tort remedies, and/or otherwise for

purposes of improperly limiting R&H's liability and conserving R&H's resources.

73.     Both R&H and Liberty Life intentionally and repeatedly misrepresented the

disability plan as an ERISA-governed plan to numerous state and Federal courts for purposes of

limiting liability and conserving resources, a position which repeatedly was relied upon and

accepted by those same courts.

---

[13] Liberty Life Assurance Company of Boston provided R&H certain insurance-related products and services, including in connection with R&H's long-term disability policy, and was a defendant in Jackson II and III.  On January 19, 2018, Lincoln Financial Group announced that it had entered into a definitive agreement to acquire Liberty Life from Liberty Mutual Insurance Group.  The transaction closed on May 1, 2018.

74.     Jackson relied upon the misrepresentations of R&H and Liberty Life, as did the

Courts which dismissed Jackson's various tort claims on the ground of ERISA exclusivity.  The

dismissal of Jackson's tort claims based upon ERISA exclusivity/pre-emption, when those

claims were not pre-empted, directly caused Jackson the loss of the claims.


**Reason #4:**
**The Implications of The Rohm and Haas Company Long-Term**
**<u>Disability Plan Being Funded from the General Assets of the Corporation</u>**

75.     While R&H had certain legal obligations to R&H employees as their employer,

the Company (which was self-insured) had separate obligations as an insurer, including a

fiduciary duty to act in the best interests of the insured.  For its part, Liberty Life had both a

business relationship with R&H and a fiduciary duty to R&H employees to whom Liberty Life

provided insurance-related products/services.


76.     Whether wittingly or not, not only did Liberty Life not administer an ERISA-

governed plan, the Company misrepresented to R&H employees the legal basis for their

disability benefits, the effect of which was to protect R&H against tort claims and to harm R&H

employees to whom Liberty Life owed a fiduciary duty.  In effect, Liberty Life not only placed

its business interests above its fiduciary duty to plan participants, the Company conspired with

R&H to deprive R&H employees of their rights/remedies.

**Reason #5:**
**The First Federal Case Against the Rohm and Haas Defendants (Jackson I)**

77.    On or about September 19, 2003, Jackson filed a Complaint against R&H,

Morgan Lewis & Bockius LLP (MLB),[14] Conrad O'Brien Gellman and Rohn P.C. (COGR),[15]

certain individual MLB and COGR lawyers, and certain other individuals involved in the

representation of R&H in the state court case, in the United States District Court for the Eastern

District of Pennsylvania alleging, *inter alia*, violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.[16]

78.    The *Jackson I* case was based upon the conduct of the *Jackson I* defendants

during the original state court case.  In particular, but not by way of limitation:  a) David

Gartenberg, Celia Joseph, and Royce Warrick all took handwritten notes during the interview of

June McCrory, but Gartenberg and Joseph subsequently claimed their notes were either lost or

shredded, leaving Warrick's notes as the only documentary evidence of the McCrory interview;

b) pursuant to a discovery request that Warrick's original notes be produced for inspection and

copying, a photocopy of Warrick's notes was produced at Warrick's November 2000 deposition;

c) upon inspection, the notes contained numerous irregularities including, *inter alia*, substantial

additions and redactions (which, in some instances, were inconsistent with the flow of the

interview), numerous and unusual cross-outs and write-overs, and at least two different types of

---

[14] MLB represented R&H in the original state case.

[15] COGR represented June McCroy in the state case, although COGR's fees were paid by R&H.

[16] *See Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 03-5299 (as amended February 18, 2004)(Jackson I).  Named as defendants were Rohm and Haas Company, Morgan Lewis & Bockius LLP, Conrad O'Brien Gellman & Rohn, P.C., Robert Vogel, Esquire, Celia Joseph, Esquire, Royce Warrick, Esquire, Michael McLaughlin, Esquire, Wayne Davis, David Gartenberg, Ellen Friedell, Esquire, Jane Greenetz, James D. Pagliaro, Esquire, Paul J. Greco, Esquire, P. Daffodil Tyminski, Esquire, Aretha Delight Davis, Esquire, Nancy Gellman, Esquire, William O'Brien, Esquire, Kelly G. Huller, Esquire, and June McCrory.

handwriting suggesting the handwriting of more than one person, all of which suggested that the notes had been altered from their original form; d) despite repeated requests, R&H failed/refused to produce the original interview notes for inspection and copying, forcing Jackson to obtain a Court Order, dated January 31, 2001, requiring R&H to do so; and e) shortly thereafter, R&H produced an affidavit from Warrick, dated February 9, 2001, claiming for the first time that the original notes purportedly could not be located but that Warrick had "reviewed a copy of [her] notes (a copy of which [was] attached as an Exhibit) and [] determined they are identical to [her] original notes," which was the same version produced at Warrick's November 2000 deposition.

79.     As the trial approached, Jackson's counsel notified R&H's counsel that Jackson would be seeking an adverse inference instruction at trial based upon spoliation due to R&H's failure to produce Warrick's original notes.

80.     Sixteen days later, but more than four months after the expiration of fact and expert discovery, the MLB attorneys notified Jackson that the alleged original notes had been located and now were available for inspection and copying at MLB's offices.

81.     On or about May 23, 2001, the alleged original notes were produced to Jackson for inspection and copying at MLB's offices.  However, the document that was produced, which consisted of handwritten notes on white notebook paper written in red felt-tip pen, did not appear to be the true original of Warrick's interview notes, or at least not the true original of the copy of the notes produced at Warrick's November 2000 deposition, but instead appeared to be a fraud. In particular, but not by way of limitation: a) the writing on the red felt-tip pen version was smoother and bolder (consistent with something written with a felt-tip pen) while the writing on the photocopy produced at the deposition was thinner and more jagged (consistent with something written with a ball point pen); b) the horizontal lines on the two documents did not

match; and c) a character-by-character comparison revealed numerous differences and/or discrepancies between the individual letters in the words, and the way in which the letters/words were written.

82.     The purported "original" notes that were produced for inspection and copying at MLB's offices were not the true original, but rather were a complete fraud.[17]  In fact, it was apparent to the naked eye that white notebook paper simply had been laid over the version of the notes produced at Warrick's November 2000 deposition, and then simply "traced" with a red felt-tip pen - the use of a felt-tip pen was an apparent effort to account for the "edges" of a ball point pen.

83.     At trial, although R&H and MLB knew the Warrick notes were not legitimate and Warrick's testimony that the documents were authentic was untruthful, they still claimed the documents/testimony were authentic/truthful and advanced/relied upon them throughout the litigation, including in post-trial motions and on appeal.

84.     On June 30, 2005, the district court dismissed the *Jackson I* Amended Complaint on the ground that Jackson lacked RICO standing, and declined to exercise supplemental jurisdiction over the pendent state law claims.


**The R&H Defendants' Handwriting "Experiment"**

85.     At the state court trial, the R&H defendants presented the results of a photocopying "experiment," which had been undertaken in the middle of the trial by

---

[17] The true original notes could not be produced in discovery because it would have been apparent that they had been altered.

representatives of R&H and MLB at MLB's offices because, according to Royce Warrick, "we recognized that there was some question about the copies of the notes . . ."

86.     Notwithstanding the highly improper nature of an unqualified non-expert (i.e., defendants' counsel) undertaking a non-scientific handwriting authentication exercise in the middle of a trial, the experiment was an effort to demonstrate that repeated photocopying was the reason the two versions of the notes (i.e., the copy produced at the November 2000 deposition and red felt-tip pen version produced in May 2001) did not appear identical - a recognition by R&H and its counsel that, in fact, the documents *did not appear identical*.

87.     Not only could (repeated) photocopying not have explained certain discrepancies, the exercise actually demonstrated it was impossible that the version of the notes introduced at Warrick's deposition was a photocopy of the alleged original.  In fact, following cross-examination, R&H and MLB abandoned any further use of (or reference to) the experiment for the duration of the proceedings.

**Jackson's Handwriting Expert**

88.     Jackson hired Robert J. Phillips, a forensic document examiner, to prepare a report to support Jackson's petition to re-open discovery following notice that the "original" notes had been located.

89.     On June 4, 2001, Phillips issued a preliminary report stating that, contrary to Warrick's deposition testimony and affidavit, the two versions of the interview notes were not identical. Specifically, Phillips stated that based upon a visual examination of the copies of the notes produced at the deposition and of the alleged original, he could determine that: a) certain

portions of the document were materially different from other portions, suggesting that they were written at a different time; b) portions of the document may have been intentionally cut off; c) the copy introduced at the deposition was materially different than the alleged original; d) the large blank spaces on certain pages suggested that certain information was covered or removed so as to not be copied; and e) contrary to Warrick's claim that all of the writing was hers, "strong differences in the appearance of the writing suggest multiple authorship."

90.     While R&H's lawyers conducted a mid-trial photocopying "experiment" in an effort to defend the Company's use of altered/manufactured documents, Jackson's expert actually engaged in a forensic analysis of the challenged writings.

**Reason #6:**
**The Implications of The First Federal Case**
**Against the Rohm and Haas Defendants (Jackson I)**

91.     R&H's defense in the original state case was predicated upon the knowing falsehood that Mark Jackson had sexually assaulted June McCrory.

92.     Even after McCrory testified that she did not report to R&H (or anyone else) that Jackson had assaulted her, and that R&H investigators had not even asked her whether she had been assaulted, R&H still maintained the litigation position that McCrory had reported a rape and that the Company was investigating a claim of sexual harassment.

93.     It was Jackson's position that the reason the photocopy of Royce Warrick's notes of her interview of June McCrory (produced at her November 2000 deposition) had been altered, and the "original" (produced in May 2001 at MLB's offices) was a manufactured document, was

because the true original did not support R&H's litigation position that McCrory reported to R&H that Jackson had sexually assaulted her.[18]

94.     Accordingly, R&H manufactured a claim of sexual assault by one employee against another employee, and then manufactured documentary evidence (and offered related perjured testimony) to support the manufactured claim, all in an effort to protect a botched internal investigation, and the Company's financial and other interests more generally.

95.     Significantly, the R&H Defendants determination to conduct the "experiment" was an acknowledgment (if not an admission) by R&H that the versions of the notes did not appear identical, regardless of the actual outcome of the exercise.

96.     This represented the second case in which the R&H defendants presented altered/manufactured documentary evidence and related perjured testimony, again violating numerous legal and ethical standards, all in an effort to defeat a liability claim.  This is consistent with an overarching policy/practice, operating strategy, and approach to corporate citizenship and corporate governance, which was to take whatever action(s) are necessary to achieve the desired outcome and the objectives of the Company more generally, regardless of the actual facts and/or prevailing legal standards and/or despite them - precisely the same policy/practice and strategy that has permeated the entirety of these proceedings.

---

[18] It was Jackson's position the true original could not be produced because it would have been apparent it had been altered, thereby leading R&H to fabricate a document (i.e., the red felt-tip pen version) which the Company then claimed was the original.

**Reason #7:**
**The Second Jackson Federal Case (Jackson II)**

97.     On or about September 19, 2005, Jackson filed a separate Complaint against the

Jackson I defendants, their counsel in Jackson I, and Liberty Life alleging, *inter alia*, violations

of RICO and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et

seq.[19]

98.     In short, the Amended Complaint challenged the litigation conduct of the Jackson

I defendants, as well as the conduct of R&H and Liberty Life during the litigation with respect to

plaintiff's disability insurance benefits, specifically:  a) the R&H defendants' improper use of the

altered/manufactured Warrick notes and related testimony in defending themselves; b) that R&H

and Liberty Life improperly interfered with Jackson's disability insurance benefits, and breached

their fiduciary duties, in an effort to harm Jackson and to gain an advantage in the litigation; and

c) that the Jackson I defendants conspired to violate the various statutes, all in violation of

various provisions of RICO and ERISA.

99.     On September 13, 2007, the district court granted in part and denied in part the

Jackson II defendants' respective Motions to Dismiss the Amended Complaint, permitting

Jackson's claims pursuant to RICO (predicated upon mail/wire fraud), RICO (conspiracy),

---

[19] *See Jackson v. Rohm and Haas Company*, United States District Court for the Eastern
District of Pennsylvania, Civil Action No. 05-4988 ("Jackson II").  Named as defendants were
Rohm and Haas Company, Morgan Lewis & Bockius LLP, Conrad O'Brien Gellman & Rohn,
P.C., Harkins Cunningham LLP, Liberty Life Assurance Company of Boston, Robert Vogel,
Esquire, Celia Joseph, Esquire, Royce Warrick, Esquire, Michael McLaughlin, Esquire, Wayne
Davis, David Gartenberg, Ellen Friedell, Esquire, Jane Greenetz, James D. Pagliaro, Esquire,
Paul J. Greco, Esquire, P. Daffodil Tyminski, Esquire, Aretha Delight Davis, Esquire, Nancy
Gellman, Esquire, William O'Brien, Esquire, Kelly G. Huller, Esquire, June McCrory, John G.
Harkins, Jr, Esquire, Eleanor Morris Illoway, Esquire, Steven A. Reed, Esquire, and Colleen
Healy Simpson, Esquire.

ERISA (breach of fiduciary duty), ERISA (breach of co-fiduciary duty), and ERISA (denial of benefits) to proceed.

**Reason #8:**
**The Third Jackson Federal Case (Jackson III)**

100.     On or about August 18, 2006, Jackson filed a separate Federal Complaint against R&H, Liberty Life, Raj Gupta, and others alleging, *inter alia*, violations of RICO, ERISA, and the Americans with Disabilities Act, 29 U.S.C. § 1001 et seq.[20]  The Jackson III proposed Third Amended Complaint alleged that the conduct of the Jackson III defendants with respect to Jackson's employment and the litigation, including the termination of Jackson's employment, constituted violations of RICO (predicated upon obstruction of justice and mail/wire fraud), RICO conspiracy, 18 U.S.C. 1513(e)(retaliation in violation of the Sarbanes-Oxley Act of 2002), ERISA (retaliation), ERISA (breach of fiduciary duty), ERISA (breach of co-fiduciary duty), the Americans with Disabilities Act, the Pennsylvania Human Relations Act, and Pennsylvania state tort law, including fraud and abuse of process.

101.     On or about September 5, 2007, the district court granted in part and denied in part defendants' various motions to dismiss, permitting claims pursuant to ERISA (Section 510), fraud, and negligent misrepresentation to proceed, and dismissed the RICO claims based on the pattern element.

---

[20] *See Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 06-3682 ("Jackson III").  Named as defendants were Rohm and Haas Company, Liberty Life Assurance Company of Boston, Raj L. Gupta, Robert A. Lonergan, Esquire, Ellen Friedell, Esquire, Marilyn Orr, and Lori Hamlin.

102.     On May 21, 2008, the district court consolidated Jackson II and Jackson III, directed Jackson to file a Consolidated Amended Complaint on or before June 11, 2008, and further directed defendants to file any response by July 2, 2008.

103.     On June 11, 2008, Jackson filed a Consolidated Amended Complaint ("CAC").

**Reason #9:**
**The Disappearance of the "Original" Warrick Notes and the R&H "Experiment"**

104.     On or about March 1, 2006, plaintiff wrote counsel for R&H stating that Jackson intended to inventory the file from the original state court case (which was located at City Hall) on March 6, 2006, have the file transported to Records Management Corporation for safekeeping, and have the red felt-tip pen notes delivered to Jackson's expert for evaluation.

105.     On or about March 3, 2006, counsel for the R&H defendants sent a letter to Charles Sofia, Supervisor, Old Records Department, City of Philadelphia, formally requesting that no one be permitted to take any records from the state court file "off site."

106.     On or about March 3, 2006, counsel for R&H wrote plaintiff's counsel stating that plaintiff has "not cited anything that has happened to the record since the end of the state court litigation that would raise any legitimate concern about the record remaining in the state court . . . and see no reason to remove the record . . .," and that "Any effort by [Jackson] to remove the record unilaterally will be tampering . . ."

107.     On or about March 6, 2006, plaintiff appeared at Room 975 City Hall, Philadelphia, PA to inventory the original state court file, where he discovered that the red felt-tip pen version of the notes and original "experiment" were missing from the case file.

108.     Plaintiff contacted counsel for R&H who claimed to have no knowledge or information that the documents were missing from the file, who may have removed them, and/or where they were located.

**Reason #10:**
**The Answers to the JI, JII, and JIII Complaints: Those Persons**
**With Direct Knowledge of Royce Warrick's Handwriting Denied**
**That the Documents Produced to Jackson and Advanced in the State**
**Court Proceedings Were Warrick's True Interview Notes or a Copy Thereof**

109.     In the various Jackson I, II, and III Complaints, Jackson alleged, *inter alia*, that the photocopy of Royce Warrick's interview notes (produced at her November 2000 deposition) had been altered and the "original" (produced in May 2001 at MLB's offices) was a manufactured document.

110.     On September 20 (Jackson III), 26 (Jackson I), and 27 (Jackson II), 2007, the various Jackson Defendants filed Answers to the Jackson I-III Complaints.

111.     David Gartenberg, Celia Joseph, Wayne Davis, and Michael McLaughlin all were participants in R&H's internal investigation of the McCrory matter and had direct knowledge of Warrick's original notes.  In particular, but not by way of limitation:  a) Gartenberg was in the room while McCrory was being interviewed by Warrick; b) Joseph also was in the room during the interview, sat across the table from Warrick and had an unobstructed view of Warrick's notepad (which Warrick had placed on the table in front of her) as Warrick took the notes; c) Davis reviewed Warrick's notes in preparation for his deposition in the original state case; and d) Warrick testified that she gave her notes to Michael McLaughlin prior to McLaughlin and Davis interviewing Jackson.

112.     Although Gartenberg, Joseph, Davis, and McLaughlin all had direct knowledge concerning the authenticity of Warrick's true original notes, all filed Answers to the Complaints in Jackson I, Jackson II, and Jackson III stating that they were "without knowledge or information sufficient to form a belief" as to whether the versions of Warrick's notes produced to Jackson during discovery were authentic, and denied the allegations on that basis.

113.     On the other hand, in each of the Answers filed by R&H (and certain of the other R&H defendants, including Warrick herself), the Company expressly represented Royce Warrick's interview notes as legitimate (and her testimony concerning their authenticity as truthful), offered them for their truth, and asked plaintiff and the Court to rely upon them for their truth.  For instance, in the Answer to the Jackson II Corrected Second Amended Complaint, R&H stated:

> Rohm and Haas admits . . . that the original notes that were produced on May 23, 2001 are the same as the copy of the notes that was produced at Warrick's November 22, 2000 deposition, except that the copy produced on November 22, 2000 contained a few minor additions made by Warrick after the interview, as she testified, and that the notes produced on May 23, 2001 and marked as Rohm and Haas Exhibit 64 are not a fraud and are in fact the original notes taken by Warrick at the McCrory interview, and that Warrick's testimony at trial was truthful and not perjured[.]

114.     Accordingly, the Company's Answers to the Jackson Complaints (swearing that the versions of Warrick's interview notes produced to Jackson were authentic) cannot be reconciled with the Answers of its own in-house lawyers and Director of Corporate Security - persons who had first-hand knowledge and who denied those same documents were Warrick's true interview notes.

28

**Reason #11:**
**The Implications of the Second and Third Jackson Federal Cases,**
**The Circumstances Surrounding the Haas Family Trusts' Decision**
**to Divest Their Holdings in Rohm and Haas Company, and the Related**
**Sale of Rohm and Haas Company to the Dow Chemical Company**

115.    According to reports and regulatory filings, in November 2007, representatives of the Haas Family Trusts informed Raj Gupta (Chairman and CEO of Rohm and Haas Company) of the Trusts' decision to divest their holdings in R&H, which constituted approximately of 33% of all outstanding shares of R&H, and to do so within 12-18 months.[21]

116.    The Trusts contacted Gupta approximately sixty days after the district court's decision in Jackson II and III permitting Jackson's RICO and ERISA claims to proceed.  While R&H had fought the state and federal cases for many years, it was the first time that a federal district court had determined that Jackson had stated claims against R&H and/or R&H company officials for violations of RICO and ERISA.

117.    Upon information and belief, the Haas Family Trusts determined that Jackson's RICO and/or ERISA claims were both significant and presented an unacceptable risk/exposure to R&H and/or the Trusts' financial interests.

118.    Gupta and R&H's advisors initially considered several options, including the sale or purchase of at least some of the Trusts' holdings, as well as the outright sale of the Company.

119.    In or around early June 2008, Gupta had discussions with three chemical companies concerning the possible sale/purchase of the Company.  In particular, Gupta reached

---

[21] The time-period of 12-18 months was consistent with the then-anticipated discovery period and trial date in Jackson II.

out to Andrew Liveris, Chairman and CEO of Dow, at or around the same time as the June 11, 2008 filing of the Consolidated Amended Complaint.

120.    On or about June 16, 2008, just five days after the filing of the CAC, Dow made an all-cash offer of $74/share to purchase R&H.

121.    Because the Jackson claims/cases never were properly disclosed in R&H's regulatory filings, the decision of the Haas Family Trusts divest the entirety of their holdings in R&H (shortly after the dismissal decisions in Jackson II and III permitting Jackson's RICO, ERISA and other claims to proceed) constituted unlawful insider trading by the Trusts and/or those individuals/entities on whose behalf the Trusts acted.

122.    Because Raj Gupta knew and/or should have known that the Jackson claims/cases were material and should have been disclosed, and therefore knew/should have known that the Haas Family Trusts were unlawfully trading on inside information, Gupta should not have participated in and/or facilitated any such unlawful transaction(s) which violated, *inter alia*, multiple provisions of the Sarbanes-Oxley Act (SOX) of 2002, 15 U.S.C. § 7201 et. seq.[22]

123.    Similarly, upon information and belief, R&H/Gupta violated SOX in connection with the sale of R&H to Dow.  In particular, but not by way of limitation:  a) R&H never

---

[22] The Sarbanes-Oxley Act (SOX) of 2002, 15 U.S.C. § 7201 et. seq., was passed in 2002 with bi-partisan Congressional support.  A primary objective was to prevent company management from interfering with an independent financial audit.  Further, Section 302 requires public companies to adopt internal procedures for ensuring the accuracy of financial statements and makes the Chief Executive Officer (CEO) and Chief Financial Officer (CFO) directly responsible for the accuracy, documentation, and submission of the financial reports and internal control structure.  *See* 15 U.S.C. § 7241.  Importantly, in response to the Enron matter, Congress sought to regulate certain types of public disclosures.  *See e.g.,* Section 401 (Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. §78m)(re: required disclosures)(specifically addressing deceptive accounting/disclosure practices in connection with losses and whistleblower protections).

disclosed the Jackson claims/cases in any SEC Form 8-K, Form 10-Q, Form 10-K, relevant

proxy materials, and/or other regulatory filing(s), even though the claims/cases were material and

such disclosures otherwise were required; and b) Gupta/R&H never otherwise disclosed the

Jackson claims/cases to Liveris/Dow prior to Dow's offer to acquire R&H, Dow's agreement to

acquire R&H, and/or at any other time as required by SOX and/or then-prevailing legal/

regulatory standards.

124.    To the contrary, prior to the sale of R&H to Dow, Gupta/R&H filed knowingly

false Certifications concerning the status and condition of R&H.  For example, but not by way of

limitation, Gupta/R&H filed the following Certifications:

a.      The Form 10-K filed on February 21, 2008 which included,

pursuant to 18 U.S.C. § 1350 as adopted pursuant to § 906 of the Sarbanes-Oxley

act of 2002, the following Certification, signed by Raj. L. Gupta (Chairman,

President and Chief Executive Officer) and Jacques M. Croisetiere (Executive

Vice-President and Chief Financial Officer):

> In connection with the quarterly report of Rohm and Haas
> Company ("Rohm and Haas") on Form 10-K for the period ended
> December 31, 2007, as filed with the Securities and
> Exchange Commission on the date hereof (the "Report"), the
> undersigned Chief Executive Officer and Chief Financial Officer
> of Rohm and Haas hereby certify, pursuant to 18 U.S.C. Section
> 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley
> Act of 2002 that, based on their knowledge: (1) the Report fully
> complies with the requirements of Section 13(a) or 15(d) of the
> Securities Exchange Act of 1934, and (2) the information
> contained in the Report fairly represents, in all material respects,
> the financial condition and results of operations of Rohm and Haas
> as of and for the periods covered by the Report.

b.     The Form 10-K filed on February 21, 2008 also included the

following Certifications by Gupta and Croisetiere:

> Rohm and Haas' other certifying officer(s) and I have disclosed,
> based on our most recent evaluation of internal control over
> financial reporting, to Rohm and Haas' auditors and the audit
> committee of Rohm and Haas'' board of directors (or persons
> performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in
> > the design or operation of internal control over financial reporting
> > which are reasonably likely to adversely affect Rohm and Haas'
> > ability to record, process, summarize and report financial
> > information; and
> > (b) Any fraud, whether or not material, that involves
> > management or other employees who have a significant role in
> > Rohm and Haas' internal control over financial reporting.

c.     The Form 10-K filed on February 21, 2008 included Exhibit Nos.

31.01 and 31.02 in which the Chairman and Chief Operating Officer certified:

> Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this report[.]

d. In Item 9(a) of the Form 10-K, it states:

> In 2007, our CEO also certified, without qualification, to the New
> York Stock Exchange (NYSE) that he was not aware of any
> violation by the Company of NYSE corporate governance
> standards.

Such Certifications were directly contrary to the Jackson I-III cases.[23]  "Materiality" was not a defense to the nondisclosure since, as the Company's Conduct Standards stated, "The Securities and Exchange Commission and the New York Stock Exchange require prompt public disclosure of material information about the Company; that is, information that could affect the market price or investor decisions about our securities."

125.    Accordingly, Gupta/R&H not only violated SOX based upon, *inter alia*, R&H's conduct in connection with the sale/purchase of R&H to Dow as well as R&H's role in facilitating the Haas Family Trusts' sale of their interest in R&H, Gupta/R&H filed knowingly false Certifications which affirmatively misled shareholders, regulators, and others concerning the true status/condition of R&H.[24]

126.    On or about April 1, 2009, the sale of Rohm and Haas Company to the Dow Chemical Company closed.

**Reason #12:**
**Judge William Manfredi**
**Failure to Follow Facts/Prevailing Legal Standards**
**<u>Tampering with Official Court Records</u>**

   **<u>The Hearing of January 8, 2008</u>**

127.    On January 8, 2008, a hearing was held in the Philadelphia Court of Common Pleas on Jackson's Motion for Sanctions for the Jackson I defendants' violation of the Order of

---

[23] The Certifications in the Form 10-K filed on February 21, 2008 are consistent with those filed in previous Forms 10-K, 10-Q, and 8-K during the relevant time period.

[24] With respect to the sale to Dow, such Certifications necessarily were relevant to various communications, regulatory filings, financing and/or other transactions, approvals by regulators, and approvals by shareholders.

December 4, 2007 to produce at least six normal course of business writing samples for Royce Warrick.

128.     Jackson's motion sought both compliance with the Order of December 4, 2007 and sanctions.  Further, because the motion represented the third time that Jackson was being forced to move to obtain handwriting evidence from Royce Warrick, and because there already had been two prior sanctions Orders against the Jackson I Defendants (connected to the same discovery requests), Jackson was seeking a default judgment.

129.     At the hearing, the following colloquy took place:

THE COURT:
How many samples do you have?

MR. SILVERBERG:
According to the [defendants], three.

MR. HARKINS:[25/26]
No, eleven.

THE COURT:
He just said eleven.

MR. SILVERBERG:
No, according to their own letter to me, it's three.  The letter of December 14 says two, and then if you go to Exhibit G - -

THE COURT:
All right.  Mr. Harkins, you are stating for the record here today as an officer of the Court that you have provided eleven handwriting exemplars to counsel; correct?

---

[25] John G. Harkins, Jr., Esquire, and the law firm Harkins Cunningham LLP, represented the various Jackson I-III defendants.

[26] In her letter of December 14, 2007, Eleanor Morris Illoway, Mr. Harkins' co-counsel, conceded that the seven pages being produced did not constitute the six samples that defendants were required to produce pursuant to the Order of December 4, 2007, and promised to produce additional documents if "other samples" were located.  Yet, at the hearing of January 8, 2008, Mr. Harkins represented to Judge Manfredi that eleven "pages" equaled eleven "samples."  These positions cannot be reconciled.  Rather, faced with the prospect of a default judgment, Mr. Harkins knowingly misrepresented what was produced in order to defeat Jackson's motion.

MR. HARKINS:
Absolutely, and the order says samples.  We said - - yes, they are documents, but the documents had, the first one, seven different pages, and the second one, four different pages; so he's got eleven.

MR. SILVERBERG:
A page is not a document, Your Honor.

MR. HARKINS:
Well, it's not a document that's ordered, Your Honor, it's a sample.

MR. SILVERBERG:
That's like saying a word is a document.  A word is not a sample, Your Honor.

    In their letter of December 14, which is Exhibit "F" they say they are providing two; and in their letter of December 17th, which is Exhibit "H" they say they are providing one more.  So according to them, they have provided three.  Now he says they are providing eleven.  Even they represent to us they are not compliant, which is why we are here.

    They know a normal-course writing is not a word and it's not a page, it's a document.  That's what they represented to us, which is why we're here

........................................

He is characterizing each page as a document.  There is no authority for that, and he's not providing any authority for that.

........................................

THE COURT:
Anything else?

MR. SILVERBERG:
No, other than we're accepting their representations, for purposes of this motion, which we've included as exhibits, Your Honor.

THE COURT:
You're accepting his representation that he gave you eleven samples - -

MR. SILVERBERG:
No, no, I'm accepting his representation - -

THE COURT:
No, I'm accepting it and I'm placing it on the record.

MR. SILVERBERG:
Okay.

THE COURT:
Mr. Harkins has stated on the record today as an officer of the Court that they provided you eleven samples as required by Judge Panepinto's order.

MR. SILVERBERG:
Okay.

THE COURT:
Alright?  This motion is denied.

130.     Accordingly, contrary to both the documentary evidence and the legal standard governing normal-course writings, Philadelphia Court of Common Pleas Judge William Manfredi denied Jackson's Motion based solely on John Harkins' "representation" that eleven "samples" were produced and his status as an officer of the court.

131.     Since plaintiff also made "representations" and was/is an officer of the court, Judge Manfredi did not explain why Mr. Harkins' representations/status were sufficient for purposes of denying the Motion but plaintiff's were insufficient for purposes of granting the Motion, notwithstanding that such "reasoning" was not a proper basis to decide the Motion in the first instance.

132.     Because Ms. Illoway admitted that R&H had not complied with Judge Panepinto's Order, it was manifest that the documents that *were* produced did not meet the standard for normal-course writings, and because Judge Manfredi did not rely upon (or even address) the facts/legal standard in denying Jackson's Motion, it was apparent that the Court was determined to deny the Motion regardless of the facts/legal standards.

133.    Upon information and belief, and based upon Judge Manfredi's failure to apply (or even address) the facts/prevailing legal standards, Judge Manfredi's actions were intended to benefit/protect R&H and/or interfere with Jackson's claims against the Company/Company officials.  In particular, but not by way of limitation, Jackson already had stated claims against R&H for violations of RICO and ERISA, the Haas Family Trusts already had determined to divest their holdings in R&H, and R&H was sold to Dow approximately six months after the January 8, 2008 hearing.

134.    Accordingly, a default judgment (in January 2008) against the Jackson I defendants in a case-fixing case that was material but never disclosed in R&H's regulatory filings would have been especially significant, and potentially devastating, to R&H's effort to sell the Company.

**Tampering with Official Court Records**

135.    In Pennsylvania, tampering with public records or information is a misdemeanor of the second degree unless the intent of the actor is to defraud or injure, in which case the offense is a felony of the third degree.[27]

---

[27] Section 4911 - Tampering with public records or information, provides:

   **(a) Offense defined.**--A person commits an offense if he:
      **(1)** knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;
      **(2)** makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or

136.    On or about October 20, 2008, following remand to state court, Jackson

voluntarily dismissed the single remaining claim which concluded the case in the trial court.

137.    Rather than file an Order of Dismissal, Judge Manfredi, the assigned trial judge,

filed no Order at all.  Instead, the docket reflected the following entry:

> THE COURT HAVING BEEN ADVISED THAT THE WITHIN
> CASE HAS BEEN SETTLED, THE CASE SHALL BE
> MARKED "DISCONTINUED" ON THE PROTHONOTARY'S
> DOCKET AND REMOVED FROM THE APPLICABLE LIST
> AND INVENTORY OF PENDING CASES.  …  BY THE
> COURT: MANFREDI, J.  10-20-08

138.    On or about October 22, 2008, the following entry appeared on the docket:

> 08-08085008 CASE SETTLED

Control No. 08-08085008 corresponded to defendants' Motion for Summary Judgment.  Under

"Docket Type," the docket indicated "MTWAM - MOTION/PETITION WITHDRAWN

MOOT."  Further, no "Filing Party" was indicated.

139.    On October 23, 2008, plaintiff sent a letter to Steven A. Reed, counsel for the

R&H defendants, concerning whether he had informed the Court that the case had been settled

and/or the Motion for Summary Judgment withdrawn, which he denied.

---

**(3)** intentionally and unlawfully destroys, conceals, removes or otherwise
impairs the verity or availability of any such record, document or thing.
**(b) Grading.**--An offense under this section is a misdemeanor of the second
degree unless the intent of the actor is to defraud or injure anyone, in which case
the offense is a felony of the third degree.

18 Pa. C.S. § 4911.

140.    On November 4 and 12, 2008, plaintiff sent letters to Judge Manfredi notifying the Court the case had not been settled and requesting that the docket be corrected, but received no response.

141.    On November 19, 2008, plaintiff sent a letter to the Hon. Ronald Castille, then-Chief Justice of the Pennsylvania Supreme Court, with a copy to Judge Manfredi, detailing Judge Manfredi's improper actions.  In response to the letter to Justice Castille, Judge Manfredi took immediate corrective action which confirmed:  a) the docket entries were, in fact, improper/incorrect; b) the actions were intentional, as was his failure to respond to plaintiff's letters; and c) he had no intention of taking corrective action until forced to do so.

142.    This represented the second time that Judge Manfredi had taken action specifically to benefit R&H and/or to interfere with Jackson's case-fixing claims against the Company.  While no explanation was provided concerning how/why the improper/incorrect entries were made in the first place, (mis)representing the case-fixing case as settled greatly benefited R&H since, *inter alia*:  a) the case, which was material, never was properly disclosed in any of the Company's regulatory filings; and b) R&H was seeking to conclude its acquisition by Dow in early 2009.

**Reason #13:**
**The Implications of the Sale of Rohm and Haas**
**Company to the Dow Chemical Company**

143.    The 2008 agreement to sell R&H to Dow began a chain of events that continues through to the present day.

39

144.    The initial determination by the Haas Family Trusts, unlawfully trading upon inside information, to divest their holdings in R&H and the related sale of R&H to Dow whereby R&H, Dow, and R&H/Dow together, failed to make full and proper disclosures, individually and/or collectively, resulted in a sale/purchase of securities that violated multiple legal, regulatory, and fiduciary standards.

145.    Because of the wrongful/unlawful actions of R&H and Dow, shareholders of both companies did not receive information to which they were entitled, which prevented them from making informed decisions concerning their investments, including whether to vote for or against the proposed transactions.  Further, the failure to make full and proper disclosures prevented shareholders and/or others from exercising their rights in connection with transactions, including possible legal or other action(s) to protect their interests and/or those of the companies.

146.    Because R&H and Dow intentionally failed to make required disclosures, the companies failed/refused to provide regulators with required information, which prevented regulators from properly evaluating the transaction and avoided a possible adverse decision/ action(s) by regulators.

147.    Similarly, because R&H and Dow intentionally failed to make required disclosures, the companies also failed/refused to provide banks, financial institutions, and/or other lenders/investors with required information, which prevented them from conducting proper due diligence, and/or otherwise from properly evaluating the transaction prior to determining whether to provide financing and/or the terms/conditions of any such financing.

148.    Since Dow engaged in legal/regulatory violations in purchasing R&H, the acquisition infected each subsequent transaction by Dow and/or others involving the

assets/liabilities of R&H.  For example, when Dow merged with DuPont to form DowDuPont,

Dow's valuation was based, in substantial part, upon the valuation of R&H by Dow even though

R&H had not been properly valued (or legitimately acquired) by Dow in the first instance.  In

turn, the overall Dow-DuPont transaction received shareholder and regulatory approval based, in

substantial part, upon the valuation and legitimacy of the overall transaction, which included the

"full value" of R&H.

149.    To this day, it remains unknown whether a sufficient number of R&H and/or Dow

shareholders, or regulators, would have approved the sale/sale price of R&H to Dow had the

companies made full and proper disclosures, and otherwise complied with the relevant legal,

regulatory, and fiduciary standards.


**Reason #14:**
**Dow Chemical Company's Failure to Conduct Proper (or Any) Due**
**<u>Diligence Concerning the Acquisition of Rohm and Haas Company</u>**

150.    As of June 2008, R&H was nearly 100-years old, was showing no outward signs

of distress, and had never expressed an interest in selling itself.  Therefore, the unexpected

decision by the Haas Family Trusts to divest and subsequent overtures by R&H to potential

buyers should have raised a red flag(s) for any potential suitor.

151.    Dow offered to purchase R&H within days of Raj Gupta's initial conversation

with Andrew Liveris concerning a possible deal.  Publicly-available information and the

precipitous sequence of events indicate that, *inter alia*:  a) Gupta exerted pressure on Liveris to

act "swiftly," the intent/practical effect of which was to discourage if not prevent Liveris/Dow

from engaging in proper due diligence; and b) in fact, Liveris/Dow did not conduct proper (or

any) due diligence, and was not aware that R&H had failed to make full and proper disclosures,

and/or otherwise had failed/refused to comply with relevant legal, regulatory, and/or fiduciary standards.

152.    On or about July 10, 2008, Dow announced that it had agreed to purchase R&H for $78/share, or $18.8 billion (including debt), a 74% premium to R&H's closing price of $44.83/share the previous day.

153.    At the time of the purchase, Liveris exuded great enthusiasm for R&H, even characterizing it as a "jewel" and "beachfront property," at the same time R&H and its principals were facing racketeering claims connected to case-fixing.  Although he noted the economy had been weakening Liveris stated, "[The purchase of R&H] didn't happen because Rohm & Haas was distressed."

154.    Once Liveris/Dow knew or came to know about the true condition of R&H, including the undisclosed liabilities, there was only one correct path concerning disclosure; Dow simply did not choose it.  For Liveris and Dow, it is apparent that acquiring the brand was paramount even though the perception of R&H and its actual condition were very different.

155.    Once the sale of R&H to Dow was announced, and R&H's liabilities still were not fully/properly disclosed (as required by SOX) in R&H's regulatory filings, Dow's regulatory filings, and/or R&H/Dow's joint regulatory filings, Dow/Liveris became part of an overall effort to prevent shareholders/stakeholders from ever having full, complete, and accurate information concerning the true condition of R&H, its value, Dow's decision to acquire R&H, the purchase price, and the overall transaction.  This was especially important since it was widely believed that Dow overpaid for R&H, and did so at a time of great economic uncertainty that even Liveris characterized as "treacherous," reportedly putting Dow's bond rating and even Dow itself at risk.

**Reason #15:**
**The Creation of DowDuPont and the "Spins"**
**Dow, DuPont, and DowDuPont Failed to Make Full and Proper Disclosures**

156.    The Dow acquisition of R&H was consummated during the Great Recession, which roughly spanned from December 2007-June 2009, and placed a tremendous financial burden on Dow, a burden that was exacerbated by the fact that Dow/Liveris had not engaged in proper due diligence (understanding that R&H had not made the disclosures required of it), did not fully/properly understand the true condition of the Company at the time Dow/Liveris agreed to purchase it, and had overpaid for R&H in any event.

157.    Upon information and belief, subsequent to Dow's purchase of R&H, Dow/Liveris sought to mitigate both the strategic decision and financial burden associated with the R&H acquisition.  In particular, but not by way of limitation, Dow had secured $13 billion in debt financing from Citigroup, Merrill Lynch and Morgan Stanley, as well as equity investments from Berkshire Hathaway and the Kuwait Investment Authority in the form of convertible preferred securities for $3 billion and $1 billion respectively.

158.    On or about October 5, 2015, DuPont announced that Edward Breen would become interim CEO, and on or about November 9, 2015, permanently named him to the position.[28]

---

[28] From 2002 to 2012, Edward Breen was CEO of Tyco International and oversaw what DuPont has described as "a highly successful restructuring, including two breakups of the company resulting in the spin-offs of Covidien, Tyco Connectivity, and ADT Corp. and the merger of Tyco Flow Control with Pentair."  Breen took over Tyco after the company declared bankruptcy and former CEO L. Dennis Kozlowski was found guilty of embezzling approximately $600 million from the company.

159.    Within days of Breen's appointment, Andrew Liveris contacted Breen concerning a potential tie-up between Dow and DuPont.

160.    Upon information and belief, Liveris sought to persuade Breen the then-present circumstances were a unique opportunity to merge the two companies when, in fact, a primary motivating factor(s) for Liveris/Dow was to mitigate the risks/exposures of Dow and/or others in connection with Dow's ill-advised purchase of R&H.  Alternatively, upon information and belief, Breen knew R&H and/or Dow had not made full/proper disclosures and that Dow's acquisition of R&H did not meet legal, regulatory, and/or fiduciary standards but agreed to pursue a tie-up as between Dow and DuPont anyway, determining the benefits of a proposed Dow-DuPont deal outweighed the risks/exposures associated with Dow's illegitimate acquisition of R&H.[29]

161.    On or about December 11, 2015, Dow and DuPont issued a joint Press Release announcing that their respective Boards of Directors unanimously had approved a definitive agreement under which the companies would combine in an all-stock "merger of equals" which would be named DowDuPont and have an initial combined market capitalization of $130 billion. Upon completion of the transaction, Andrew Liveris would become Executive Chairman of the Board of Directors and Edward Breen would become Chief Executive Officer.

162.    According to the Press Release, the newly-created company intended to separate into three independent, publicly-traded companies through tax-free spin-offs:  a) a global "pure-

---

[29] As the former CEO of Tyco International, Breen was intimately involved in the aftermath of the events that led to the passage of SOX.  Accordingly, such actions would represent a raw display of both individual and corporate antipathy.

play" Agriculture company; b) a global "pure-play" Material Science company; and c) a

Specialty Products company.

163.    At the time the merger was first announced, Liveris stated, "This transaction is a

game-changer for our industry and reflects the culmination of a vision we have had for more than

a decade to bring together these two powerful innovation and material science leaders. … This

transaction is a major accelerator in Dow's ongoing transformation, and through this we are

creating significant value and three powerful new companies. This merger of equals significantly

enhances the growth profile for both companies, while driving value for all of our shareholders

and our customers."

164.    For his part, Breen stated, "This is an extraordinary opportunity to deliver long-

term, sustainable shareholder value through the combination of two highly complementary

global leaders and the creation of three strong, focused, industry-leading businesses. Each of

these businesses will be able to allocate capital more effectively, apply its powerful innovation

more productively, and extend its value-added products and solutions to more customers

worldwide.  For DuPont, this is a definitive leap forward on our path to higher growth and higher

value.  This merger of equals will create significant near-term value through substantial cost

synergies and additional upside from growth synergies."[30]

---

[30] Breen also stated, "Longer term, the three-way split we intend to pursue is expected to unlock
even greater value for shareholders and customers and more opportunity for employees as each
business will be a leader in attractive segments where global challenges are driving demand for
these businesses' distinctive offerings."

165.     On or about September 1, 2017, Dow and DuPont issued a joint Press Release announcing the successful completion of the "merger of equals" between Dow and DuPont, effective August 31, 2017.

166.     On or about June 1, 2019, DowDuPont was dissolved, resulting in the creation of three independent, publicly-traded companies:  Dow, Inc., DuPont de Nemours, and Corteva Agriscience (collectively the "spins").

**Reason #16:**
**The implications of the Creation of DowDuPont and the "Spins"**
**Dow, DuPont, and DowDuPont Failed to Make Full and Proper Disclosures**

167.     As alleged herein, since Dow engaged in legal/regulatory violations in purchasing R&H, the acquisition infected each subsequent transaction by Dow and/or others involving the assets/liabilities of R&H.  Accordingly, when Dow merged with DuPont to form DowDuPont, Dow's valuation was based, in substantial part, upon the valuation of R&H by Dow even though R&H had not been properly valued (or legitimately acquired) by Dow in the first instance.

168.     The overall valuation of the proposed Dow-DuPont merger and the transaction more generally, was based in substantial part, upon the full value of R&H's assets, a company that was not properly valued and/or legitimately acquired by Dow in the first place, which Dow, DuPont, and their respective Boards/executives knew/should have known.  Instead of taking the steps necessary to address the legal/regulatory violations in connection with Dow's illegitimate acquisition of R&H and/or its impact on the Dow-DuPont tie-up, the companies and their leadership proceeded with the merger anyway.

169.     In effect, the merger of Dow-DuPont and the subsequent spin-off of three

independent, publicly-traded companies were restructurings, the purpose or effect of which was

to wrongfully/unlawfully: a) transfer assets/liabilities, including from predecessor to successor

companies; b) mitigate risks/exposures in connection with the companies' wrongful/unlawful

conduct; and c) otherwise improperly shield the companies/company officials and/or others from

any legal, regulatory and/or other consequences/action(s) concerning their wrongful/unlawful

conduct.

**Reason #17:**
**Raj Gupta's Appointment to the Board of DuPont**

170.     On or about July 23, 2018, DowDuPont issued a Press Release announcing that

Raj Gupta, the former Chairman and CEO of Rohm and Haas Company, was named to the

Advisory Committee of its Specialty Products Division (the new DuPont).

171.     In or around November 2018, Gupta was named to the DuPont Board.

172.     Under ordinary circumstances, such an appointment likely would not be

considered (and simply would make no sense) since the Company required that Board members

retire by age 72 and Gupta turned age 73 the following month.  Nevertheless, despite the

disruption created by appointing a Board Member who only could serve one year, Gupta was

appointed anyway.

173.     Upon information and belief, whatever the true circumstances leading to Gupta's

appointments may have been, Liveris, Breen and/or Gupta wanted to achieve at least two

objectives:  a) create a formal relationship as between DowDuPont, its principals, and Gupta,

with reciprocal legal, regulatory, and fiduciary requirements and obligations; and b) create the

appearance that the three executives were unified, on good terms, and that there were no

past/present disputes as between them, including with respect to the sale of R&H to Dow and/or

the merger of Dow and DuPont.

174.    This was especially important in the event any action was taken to challenge

either the R&H-Dow and/or Dow-DuPont transactions - transactions that, *inter alia*, Liveris,

Breen, and Gupta knew were a subject of plaintiff's anticipated book and/or possible legal

action.


**Reason #18:**
**The Merger of International Flavors and Fragrances, Inc.**
**with DuPont's Nutrition and Biosciences Business**

175.    On or about December 15, 2019, DuPont and IFF issued a joint Press Release

announcing the companies had entered into a definitive agreement for the merger of IFF and

DuPont's Nutrition & Biosciences (N&B) business in a Reverse Morris Trust transaction.  The

deal valued the combined company at $45.4 billion on an enterprise value basis, reflecting a

value of $26.2 billion for the N&B business based on IFF's share price as of December 13, 2019.

176.    Under the terms of the agreement, which was unanimously approved by both

Boards of Directors, DuPont shareholders would own 55.4% and IFF shareholders would own

44.6% of the shares of the new company.  Upon completion of the transaction, DuPont would

receive a one-time $7.3 billion "special" cash payment, subject to certain adjustments.  The

Release stated that Andreas Fibig would become Chairman and CEO, Ed Breen would become

Lead Independent Director, and that the Board would be comprised of Directors from both IFF

and DuPont.

177.     Upon information and belief, a primary purpose of the merger was to "package" and transfer certain assets/liabilities from DuPont to IFF, including those connected with the R&H transaction.

178.     Accordingly, the merger of IFF and DuPont's N&B business was substantially similar to the Dow-DuPont merger, and/or occurred for substantially similar reasons.  In effect, the merger was a restructuring, the purpose or effect of which was to wrongfully/unlawfully: a) transfer assets/liabilities, including from predecessor to successor companies; b) mitigate risks/exposures in connection with the companies' wrongful/unlawful conduct; and c) otherwise improperly shield the companies/company officials and/or others from any legal, regulatory and/or other consequences/action(s) concerning their wrongful/unlawful conduct.

179.     For the same reasons the companies did not make proper disclosures in connection with the Dow-DuPont merger and/or other transactions, the companies did not make proper disclosures in connection with the IFF-DuPont/N&B merger.

**Reason #19:**
**The Financing Transactions**

180.     All of the above-described transactions involved some form of financing.

181.     To obtain the financing required for such transactions, parties are required to prepare detailed loan applications and make detailed disclosures concerning their liabilities so that lenders can properly assess their creditworthiness.  For example, but not by way of limitation, with respect to Dow's purchase of R&H, Dow secured $13 billion debt financing from Citigroup, Merrill Lynch and Morgan Stanley, as well as equity investments by Berkshire

Hathaway and the Kuwait Investment Authority in the form of convertible preferred securities for $3 billion and $1 billion respectively.

182.     Upon information and belief, Dow, DuPont, and/or IFF did not make full and/or proper disclosures in connection with the financing related to their respective transactions because they did not do so in the regulatory filings in connection with the transactions themselves.  In turn, this prevented financial institutions from taking the necessary and appropriate actions required of them in determining whether to approve, and/or the terms/conditions in connection with, any such financing.

**Reason #20:**
**The Actions of The Vanguard Group, Inc.**

183.     Vanguard is a major institutional investor, including with respect to certain other defendants and/or companies with which individual defendants have been/are affiliated.  Further, Raj Gupta, the former Chairman and CEO of Rohm and Haas Company and former Board Member of DuPont, is a former member of Vanguard's Board of Directors.

184.     On October 2, 2019, the day after the City filed the PUFTA Complaint, the City filed (in the related tax case) a Writ of Execution addressed to Vanguard (the Vanguard Writ) which encumbered plaintiff's individual retirement account (IRA).

185.     By their terms, such Writs expire 90 days from the date they are filed.  Thereafter, the filing party must re-issue the Writ in order to maintain its interest but the City never did so, and therefore the Vanguard Writ expired in January 2020.

186.     Although the Vanguard Writ expired in in January 2020, Vanguard continued to restrict the IRA until June 2021, or for another 17 months.  During that time, despite plaintiff's repeated notifications to the Company that there was no legitimate basis to restrict the account and requests that the account be released, Vanguard representatives repeatedly advised plaintiff that the restriction could not be removed unless plaintiff obtained a Court Order (authorizing the account to be released) or the City withdrew its claim.

187.     Plaintiff's repeated requests to speak to a Vanguard attorney were refused even though plaintiff was/is both a Vanguard client and an attorney representing a party in the dispute.

188.     On June 23, 2021, the City filed a Praecipe discontinuing the attachment.  While Vanguard removed the restriction that same day, the entire exercise was a sham - the Writ had expired 17 months earlier.

189.     Vanguard knew or should have known the City's actions were wrongful/unlawful, as well as its own actions.  In particular, but not by way of limitation:  a) even a cursory review of the record would have revealed significant irregularities, shown that the City was not acting in good faith, and that the cases had not been filed/pursued for a proper/lawful purpose; b) the fact that the City sought to restrict an IRA should have raised multiple red flags and resulted in immediate pushback from Vanguard pursuant to the relevant legal standards; c) the City never actually levied the Vanguard account and/or attempted to do so, suggesting the Vanguard Writ was not filed for a proper/lawful purpose; d) the Vanguard Writ expired in January 2020 and never was re-issued, yet Vanguard continued to restrict the account for an additional 17 months; and e) the Company knew and/or should have known that, under the circumstances of this case, it never would be permissible to restrict an account for this length of time.

190.     Once the Vanguard Writ expired, there was no legal process of any kind (legitimate or otherwise) concerning the Vanguard IRA, yet Vanguard still restricted the account, and continued to do so for an additional 17 months.

191.     Vanguard's actions were for purposes of the proxy war.  In particular, although Vanguard had a fiduciary duty to plaintiff, Vanguard took wrongful/unlawful actions against plaintiff and that were favorable to the Enterprise Defendants/other defendants, including defendant Gupta, its former Board member.  By unlawfully restricting plaintiff's IRA, and doing so for 19 months, Vanguard caused plaintiff significant damage and harm.

**The April 22, 2016 Email**

192.     On or about April 22, 2016, plaintiff sent an email to counsel[31] for certain parties including Dow, DuPont, and Liberty Mutual, which stated, in pertinent part:

> It seems like a good time to let you and others know that I will
> soon be completing my book concerning the Jackson odyssey.[32] As
> I expected, this project has generated great interest since the cases
> are a window into a complex and disturbing aspect of corporate
> America, the conduct of corporate officials and corporate counsel,
> and our broken justice system. While the book examines the
> underlying conduct it also explores the business judgment, legal
> and strategic decisions, individual actions, and judicial proceedings

_____

[31] The email stated, "I am contacting each of you because although this is no longer a litigation matter, I assume you remain in a position to contact the former defendants and any other interested persons."  These same lawyers became part of a mailing list for purposes of subsequent communications.

[32] *See gen'lly Mark A. Jackson v. Rohm & Haas Company et al.*, Philadelphia Court of Common Pleas, June Term 1999, No. 1906; *Mark A. Jackson v. June McCrory*, Philadelphia Court of Common Pleas, June Term 1999, No. 3824.  *See also Mark Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Nos. 03-5299, 05-4988, and 06-3682.

that cumulatively led to and killed-off multiple causes of action.

193.    The purpose of the April 2016 email was to offer the parties the opportunity to acquire the publishing rights/intellectual property in advance of the anticipated completion of the book, but there was no response to plaintiff's overture.

194.    On August 15, 2016, March 6, 2017, and October 23, 2017, plaintiff sent three follow-up emails but again received no (formal) response.

**The Proxy War**

195.    The response to the April 22, 2016 email (and follow-up emails) was both a culmination and coalescence of multiple events, interests, risks/exposures, and the collective effort of the individuals/entities associated with them.

196.    Upon information and belief, the April 22, 2016 email and follow-up emails led certain defendants, including Gupta, Breen, Liveris, Long, William Penn, and perhaps others (hereinafter the "Enterprise Defendants") to determine that action needed to be taken and to formulate a strategy concerning precisely what that action should be.

197.    In an effort to deter, dissuade, discourage, and/or prevent publication of the anticipated book, the Enterprise Defendants determined to take a series of wrongful/unlawful actions against plaintiff and a limited liability company (LLC) with which he was affiliated, and to do so by and through the City of Philadelphia, its lawyers, and the court(s).  In effect, the Enterprise Defendants determined to engage in an illegitimate "proxy war" whereby the actions

of the City and others were at the direction, on behalf, and/or for the benefit of all defendants, and/or otherwise were either authorized and/or ratified by them.

198.    The determination to engage in a proxy war - which consisted primarily of tax-related litigation and enforcement activities in connection with the filing/pursuit of the tax/PUFTA matters - reflected the Enterprise Defendants' recognition and fear concerning the true extent of their wrongful/unlawful actions, the related risks/exposures, and of the consequences of the entire pattern of conduct being revealed and explained in a meaningful way to shareholders, stakeholders, regulators, lawmakers, law enforcement, market participants, both the for-profit and non-profit sectors generally, and the public at large.

199.    Upon information and belief, the various actions of the Enterprise Defendants, and how those actions reflected upon their affiliated companies/organizations (both past and present), were a substantial motivating factor in the decision to both undertake and pursue the proxy war.  Further, those same affiliated companies/organizations have participated, either directly or indirectly, and/or otherwise have influenced the decisions and actions of the Enterprise Defendants, the City, and/or others, in connection with the proxy war.

200.    Upon information and belief, and as further alleged herein, the Enterprise Defendants sought the participation of the City/City officials based upon their belief they could be incentivized to pursue such a campaign, which the City/City officials ultimately agreed to do.

201.    For their part, under the guise of recovering past due taxes that supposedly were due and owing, the City/City officials filed/pursued two purported tax-related claims that actually had nothing to do with taxes or the City more generally, which not only was

wrongful/unlawful and a breach of fiduciary duty, but also was directly contrary to the City's own interests and those of taxpayers.

202.    Accordingly, in or around June 2017, nearly nine years after abandoning the matter but approximately three months after plaintiff's March 2017 email concerning his anticipated book, the City engaged in a "renewed" collection/enforcement effort in connection with the June 2008 judgment in the original tax case.

203.    Since that time, the City has filed/pursued the PUFTA matter, engaged in various tax-related litigation activities, including numerous execution/enforcement actions, but repeatedly has failed/refused to actually recover the funds the City has claimed are due and owing despite the legal ability (and repeated opportunities) to do so.[33]

204.    The City's various actions have revealed the City has not filed/pursued the tax/PUFTA matters for purposes of actually recovering past due taxes that supposedly are due and owing, but rather for purposes of the proxy war, specifically: a) to harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff in connection with his anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities; and b) to retaliate against plaintiff for engaging in protected activity.

205.    A primary purpose of filing/pursuing the tax/PUFTA matters, and of the proxy war itself, simply has been to entangle plaintiff in baseless litigation, which has served multiple

---

[33] Had the City actually recovered the funds, and satisfied its claims/judgments, the Enterprise Defendants/City would not have been able (to continue) to use the tax/PUFTA matters for purposes of the proxy war.

strategic/tactical purposes, all of which have constituted multiple legal, administrative, ethical and/or fiduciary violations.

206.    All actions taken by the Enterprise Defendants, the City, its lawyers, the courts, and/or others as part of the proxy war were on behalf (and for the benefit) of all defendants, and were either authorized and/or ratified by them.


**The William Penn Foundation, The City of Philadelphia,
Marcel S. Pratt, and the $100 Million Quid Pro Quo - Part 1**

207.    The decision by the Enterprise Defendants to engage the City/City officials, their lawyers, and the courts, and the City's agreement to participate in the proxy war, was the result of a series of inter-connected events, professional relationships, and incentives.

208.    The William Penn Foundation played a central role in the proxy war.  In particular, but not by way of limitation:  a) R&H was co-founded by Otto Haas, a member of the Haas Family; b) during the relevant time period, the Haas Family Trusts owned approximately 33% of all outstanding shares of R&H; c) the William Penn Foundation was founded in 1945 by Otto and Phoebe Haas, and is the philanthropic arm of the Haas Family; d) in or around 1960, John C. Haas was named Chairman of William Penn, a position he held for approximately 32 years;[34] e) in 2008, R&H was sold to Dow for $15.3 billion; and f) in or around 2009, as a result

---

[34] John C. Haas was the son of Otto and Phoebe Haas, and a former Chairman of R&H.

of the sale of R&H to Dow and the proceeds therefrom, Otto Haas donated $747 million to

William Penn,[35] which represented a significant portion of the Foundation's total assets.[36]

209.    According to its website, "The William Penn Foundation … is dedicated to

improving the quality of life in the Greater Philadelphia region[.]"  Since its inception, the

Foundation has made approximately 10,000 grants totaling more than $1.6 billion, and as of

December 2017, the Foundation's assets totaled approximately $2.5 billion.

210.    On or about November 21, 2016, William Penn announced its intention to commit

up to $100 million to Rebuild, "Mayor Kenney's bold plan to transform city parks, libraries,

recreation centers and playgrounds to enhance community life in neighborhoods across

Philadelphia[.]"

211.    According to its announcement, "The Foundation's grant mark[ed] the initiative's

largest private investment to date and the largest single grant in Foundation history."  Janet Haas,

former Chair of the Foundation's Board of Directors stated, "Today's announcement underscores

the William Penn Foundation's focus on generating new approaches for investing in under-

resourced communities, for bringing communities together through the creative use of public

space, and in providing opportunities for all of Philadelphia's citizens."

---

[35] As a further result of the sale, $500 million was donated to the newly-created Wyncote
Foundation.  According to its website, "Wyncote Foundation, based in Philadelphia, was
founded in 2009 with funds from the Otto and Phoebe Haas Charitable Trusts, at the direction
of John C. Haas."  The Board of Directors is comprised of Leonard Haas, David Haas, Duncan
Haas, and Frederick Haas.

[36] Accordingly, notwithstanding whatever tax and/or other benefits Otto Haas may have received
from making such a donation(s), a substantial portion of William Penn's total assets were
comprised of proceeds from the illegitimate sale of R&H to Dow, a sale that was illegitimate (in
part) because it was predicated upon unlawful insider trading by the Haas Family Trusts, whose
beneficiaries also greatly benefitted from the sale.

212.     William Penn's commitment was structured as a "challenge" to assist the Kenney Administration in raising the full $500 million for Rebuild, to wit:  a) in July 2016, the Foundation approved an initial grant of $4.8 million for "start-up" costs; b) upon passage of a proposed $300 million City bond issue to fund Rebuild, the Foundation would release an additional $75 million; and c) the remaining $20.2 million would be structured as a 1:2 match designed to generate additional contributions from state, federal, and other philanthropic and private sources.

213.     Mayor Kenney responded, "I am extremely grateful to the Foundation not only for this overwhelming vote of confidence in Rebuild, but also for all the insights and support they supplied along the way to get us here. This program would not be what it is without their expertise."

214.     While William Penn has made (and continues to make) significant contributions to the City, the $100 million commitment to Rebuild was larger than all previous grants by the Foundation to the City combined.

215.     Upon information and belief, William Penn's $100 million commitment to Rebuild, including how the grant was structured, was not for the stated purpose of funding the Kenny Administration's Rebuild Program, but rather was part (and for purposes) of the proxy war.  In particular, while the funds did, in fact, support the Rebuild initiative, William Penn's true motive in making the grant was to secure the agreement, cooperation, and/or assistance of the City/City Officials in carrying out the proxy war.

216.     Although William Penn formally announced the commitment to Rebuild in November 2016, the Foundation approved an initial grant to the City of $4.8 million in July 2016, only three months after the April 22, 2016 email.

**The William Penn Foundation, The City of Philadelphia,**
**Marcel S. Pratt, and the $100 Million Quid Pro Quo - Part 2**

217.     From August 2010-July 2016, Marcel Pratt was an Associate in the litigation Department at Ballard Spahr LLP.

218.     In August 2016, Pratt was hired by the City/Law Department and became Chair of the Litigation Group.  In that role, Pratt was responsible for all litigation matters in the City of Philadelphia Law Department and managed the 70-lawyer Litigation Group.  He also provided guidance to City officials and operating departments in creating legal policy and strategy.

219.     In March 2018, Pratt was named City Solicitor for the City of Philadelphia.  In that role, Pratt served as Chief Legal Officer for Philadelphia and led the 330-person Law Department, one of the largest municipal law practices in the country, a position he held until December 2020.  At age 33, he was the youngest person ever appointed to the position.

220.     In January 2021, Pratt returned to Ballard Spahr LLP, where at age 35, he was named Managing Partner of the firm's Philadelphia office.

221.     In April 2021, Pratt was named to the Board of Directors of the William Penn Foundation.

222.     Upon information and belief, since the proxy war was carried out by the City/City officials/Law Department, and specifically by and through the improper filing/pursuit of the

tax/PUFTA matters, the Enterprise Defendants knew it was critical to engage lawyers who were willing to engage in illegitimate litigation activities, as well as management-level lawyers willing to authorize/ratify those same activities.  To that end, the Enterprise Defendants, the City, Ballard Spahr, William Penn, Pratt, and/or others entered into an agreement(s) whereby Pratt was hired by the City/City officials/Law Department for purposes of executing the illegitimate proxy war.

223.    Accordingly, Pratt was hired by the City/Law Department in or around the same time as the Enterprise Defendants/City initiated the proxy war, held positions, and played a central role in authorizing/ratifying the City's illegitimate litigation activities.

224.    At all times relevant and material hereto, Pratt (and Diana Cortes, Esquire, his successor as City Solicitor) had notice of the City's wrongful/unlawful conduct in the tax/PUFTA matters, but failed to take any remedial or corrective action.  In so doing, Pratt (and Cortes) violated his oath, fiduciary duty, and multiple Rules of Professional Conduct.

225.    Upon information and belief, Pratt was incentivized at least three times to (continue to) authorize/ratify the Law Department's unlawful/unethical filing/pursuit of the tax/PUFTA matters, to wit:  a) in March 2018, he was promoted to City Solicitor; b) in January 2021, he was named Managing Partner of the Philadelphia Office of Ballard Spahr LLP, a firm that, *inter alia*, regularly represents the City and which also has represented R&H; and c) in April 2021, he was named to the Board of Directors of William Penn.

226.    Had Pratt and/or Cortes not improperly authorized/ratified the Law Department's wrongful, unlawful, and unethical activities in connection with the tax/PUFTA matters, the

Enterprise Defendants and/or others would not have been able to carry out the illegitimate proxy war, and/or been able to do so by and through the City.

**The Proxy War - Part 1 (The City's Renewed Enforcement Effort)**

227.    On or about June 15, 2017, approximately three months after plaintiff's third email to counsel concerning the anticipated book, Christopher W. Dean, Esquire, of the law firm Linebarger Goggan Blair & Sampson, LLP, outside counsel for the City, sent a letter via regular mail to plaintiff advising that his law firm had been retained by the City to collect the June 3, 2008 judgment (in the tax case) and demanded immediate payment, including accrued interest and penalties (I&P).  Otherwise, according to the letter, a recommendation would be made to the City to direct the Sheriff to "levy or seize as much of your property [sic] to satisfy this obligation."

228.    The June 15, 2017 letter to plaintiff was a shocking development since the City had abandoned the June 2008 judgment, and in fact, had taken no action to collect or enforce the judgment in the ensuing nine years.

229.    From on or about June 15, 2017 to on or about September 29, 2017, numerous email exchanges occurred between Mr. Dean and plaintiff, secondary and related to Dean's initial letter, in which Dean demanded and/or sought to recover/collect the June 2008 judgment and to obtain documents and other information related thereto.

230.    On or about July 16, 2017, plaintiff filed a Motion for Judgment of Non Pros, or in the Alternative, to Enjoin Enforcement of the Judgment, in the Court of Common Pleas of

61

Philadelphia County arguing the nine-year period of inactivity from 2008-2017 demonstrated a lack of due diligence on the part of the City in failing to proceed with reasonable promptitude.

231.    On or about August 23, 2017, the Motion was denied.  No reason(s) was provided.

232.    In or around May 2018, Mr. Dean filed a Withdrawal of Appearance.  During Dean's active participation, the City treated the June 2008 judgment as a collection matter only, and took no action against any of plaintiff's assets/accounts.

233.    On or about April 10, 2019, Kelly Diffily, a Senior Attorney for the City's Law Department, sent an email to plaintiff advising that Drew Salaman, Esquire, of the law firm Salman/Henry was "taking the lead on collecting on the judgment."

234.    On April 17, 2019, Mr. Salaman sent plaintiff a series of emails detailing the City's claims and position and stating that although total principal wage tax liability was $41,009.17, the City presently was seeking/demanding a total of $276,400.93, inclusive of fines, interest and penalties, and further stated "kindly add 6% simple annual interest" from the date of entry of the June 2008 judgment through to the present.

235.    On or about April 23, 2019, plaintiff sent an email to attorneys Salaman and Diffily and attached a draft Complaint, stating "Attached please find a draft of a Civil Action, which seeks both legal and injunctive relief in connection with the City's tax and collection policy and practices.  I expect the final version to be ready for filing either Thursday or Friday."[37]

---

[37] On or about April 24, 2019, the following day, Mr. Salaman withdrew his appearance.

236.     On or about April 29, 2019, plaintiff received an email and attached letter from

Diana P. Cortes, Chair, Litigation Group, Law Department, City of Philadelphia, stating:

> I am in receipt of your email of April 23, 2019 directed to Kelly
> Diffily of the Law Department and Drew Salaman, counsel for the
> City, enclosing a draft Civil Action which you have threatened to
> file later this week against the City and various City officials and
> others. … [P]lease be advised that we regard your draft filing as
> baseless, frivolous, and unreasonable.  Should you continue with
> your plan to file such an action, the City will vigorously contest it
> and seek sanctions from the federal court.

237.     The City did not genuinely believe the allegations/claims were "baseless,

frivolous, and unreasonable," - the draft Complaint was based upon the actual facts/prevailing

legal standards - but rather merely sought to harass, intimidate, threaten, oppress, and coerce

plaintiff in connection with the proxy war, and to retaliate against plaintiff for engaging in

protected activity.

238.     On or about May 10, 2019, also in response to the April 23, 2019 email and draft

Complaint, Brian R. Cullin, Deputy City Solicitor, began engaging in a series of escalating

execution/enforcement actions including, *inter alia*:  a) filing motions; b) serving written

discovery; c) issuing notices and subpoenas for depositions and documents; and d) making

unreasonable settlement demands, including a demand that was fourteen times the amount that

had been discussed with Mr. Dean.

239.     On or about June 14, 2019, Mr. Cullin sent plaintiff an email in which he

increased the City's demand from $175,000 to $185,000, thereby increasing the I&P component

of the demand to nearly $100,000, stating:

> Please consider the City's updated offer to resolve the tax
> judgment against you:

Lump sum payment of $185,000.00 to be made on or before August 1, 2019. This offer is on the table until 6/21/19 at 4 PM EST. After this time, the offer is withdrawn.

City's offers will continue to escalate if you continue to ignore and refuse City's very reasonable efforts to resolve. City will also push forward in seeking out information relevant to your assets from your close associates. To be clear, the City is in this for the long haul, and we will investigate and exhaust any and all paths to executing against your assets.

Look forward to hearing from you by 6/21/19 by 4 PM.

**The Proxy War - Part 2 (Silverberg v. City of Philadelphia (Silverberg I or SI))**

240.    On or about June 20, 2019, plaintiff filed a Complaint in the United States District Court for the Eastern District of Pennsylvania alleging, *inter alia*, violations of 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(1), et seq.[38]  On or about August 13, 2019, plaintiff also filed a Motion for Preliminary Injunction to enjoin certain actions by the City in connection with the tax case.

241.    The SI Amended Complaint alleged, *inter alia*, the renewed execution/enforcement effort was connected to the funding shortfall for Rebuild, a Kenney Administration political initiative.[39]  In particular, while the Program was supposed to be funded (in part) with proceeds from the Beverage Tax (another Kenney Administration political initiative), less revenue was generated than originally anticipated, leading the City to improperly

---

[38] *See Silverberg v. City of Philadelphia, et al.,* United States District Court for the Eastern District of Pennsylvania, No. 19-2691 (as amended September 3, 2019)("Silverberg I" or "SI"). Named as defendants were the City of Philadelphia, Linebarger Goggan Blair & Sampson, LLP, James Kenney, Marcel S. Pratt, Esquire, Frank Breslin, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, Kelly Diffily, Esquire, and Christopher W. Dean, Esquire.  Within the litigation, those defendants associated with the City were referred to collectively as the "City Defendants."

[39] Silverberg I was filed before the City's actions, and proxy war, came fully into focus.

re-allocate wage and business privilege taxes to fund Rebuild, further leading the City to seek to recover on outstanding wage/business tax claims.

242.     On or about August 13, 2019, plaintiff served the Silverberg I defendants with both the Complaint and Motion.[40]

243.     On or about August 15, 2019, only two (2) days after service of SI Complaint and Motion and unbeknownst to plaintiff, the City filed seven Writs of Attachment concerning seven banks in connection with the original tax case.

244.     Although plaintiff was counsel of record in the tax case, he did not receive service of the Writs and only learned of the Writs based upon an independent, unrelated inspection of the docket the following day.

245.     On or about August 29, 2019, Mr. Cullin improperly/wrongfully levied funds from plaintiff's bank account and froze the account.  Because of Mr. Cullin's wrongful/unlawful actions, plaintiff received no prior notice, and therefore, did not have the opportunity to defend against and/or oppose the City's actions, and/or otherwise to exercise his rights prior to the funds being levied.

246.     As of August 15, 2019, the City had not filed Writs of Attachment/Execution or taken enforcement action of any kind in the tax matter since October/November 2008, shortly after the June 2008 judgment.[41]

---

[40] All defendants were served except defendant Dean.
[41] In June 2013 and May 2018, the City filed a pro forma Suggestion of Non-Payment.

247.     On or about January 8, 2020, the district court dismissed the SI Amended

Complaint without prejudice based upon lack of subject matter jurisdiction, but determined the

allegations were sufficient to state claims for violations of Section 1983, stating:

> [T]he City Defendants' tax collection activities violated Plaintiff's
> free speech and due process rights under the First and Fourteenth
> Amendments, respectively.

The district court specifically referenced Count I (Section 1983 - Violation of Constitutional

Rights) and Count VII (Section 1983 - Retaliation).

248.     The City did not appeal, or otherwise challenge, the January 8, 2020 decision.

**The Proxy War - Part 3 (The PUFTA Claim)**
**Statute of Limitations, Probable Cause, Role of Vanguard,**
**Discovery, Default Judgments, Motions, Agreements to Pay**

249.     On or about October 1, 2019, approximately three weeks after service of the

Amended Complaint in Silverberg I, the City filed its Complaint in the PUFTA matter.[42]

250.     The City now alleged that certain actions in connection with the December 2011

purchase of certain real property located in Philadelphia, PA (hereinafter the "Market Street

property") constituted a fraudulent conveyance or transfer within the meaning of the

Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S.A. §§ 5105-5110.

---

[42] *See City of Philadelphia v. ELS Realco LLC, et al*., Philadelphia Court of Common Pleas,
September Term 2019, No. 3805 (filed October 1, 2019)(the "PUFTA" case).

251.     As relief, the City sought equitable remedies and damages, including $340,581.35 which represented the principal and interest the City claimed was due and owing in the tax matter, as well as an injunction against "further disposition" of the Market Street property.

252.     The City did not file the PUFTA claim based upon knowledge/information that a fraudulent transfer actually had occurred, but rather as part of the proxy war the City was waging on behalf (and for the benefit) of the Enterprise Defendants.  In fact, the City lacked probable cause to file the PUFTA claim, which was time-barred by more than four years and based upon knowingly false statements concerning, *inter alia*, the formation/structure of ELS Realco, LLC, a limited liability company with which plaintiff was affiliated and which owned the Market Street property.

**The PUFTA Claim is Time-Barred**

253.     Section 5109 of PUFTA, 12 Pa.C.S.A. § 5109(1), entitled "Extinguishment of cause of action," provides, in pertinent part:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> (1) under section 5104(a)(1)(relating to transfers fraudulent as to present and future creditors), within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant[.]

254.     Since the challenged transaction occurred on December 29, 2011, the City had four years or until December 29, 2015, to file a claim.  Therefore, the October 1, 2019 Complaint is time-barred pursuant to first part of Section 5109.

255.    The PUFTA claim also is untimely pursuant to the second part of Section 5109. In particular, but not by way of limitation:  a) the City claimed that it first learned of the challenged transaction in September 2019 and could not reasonably have discovered the matter prior to September 30, 2018 (or more than one year prior to the filing of the Complaint); b) in fact, the City has been litigating the related tax case since 2008 (of which the PUFTA case admittedly is an outgrowth); and c) therefore, through the exercise of reasonable diligence, the City knew or should have known of the challenged transaction on this basis alone.

**The City Lacked Probable Cause to File the PUFTA Complaint Which was Filed in Bad Faith, and Which is Based in Substantial Part on Allegations that are Knowingly False and/or Were Made in Reckless Disregard for Whether They Were True or False**

256.    In the PUFTA Complaint, the City alleged, *inter alia*:

4.    Defendant Silverberg was the sole member of Defendant LLC at all relevant times.

5.    Defendant Silverberg is presently the sole member of Defendant LLC.

6.    Defendant Silverberg possessed an ownership interest in Defendant LLC at all relevant times.

7.    Defendant Silverberg presently possesses an ownership interest in Defendant LLC.

13.    Defendant Silverberg established Defendant LLC.

23.    During 2011, Defendant Silverberg transferred assets then-owned and/or controlled by Defendant Silverberg, including, but not limited to, moneys, to Defendant LLC that were subsequently used by Defendant LLC to purchase [the Market Street property].

24.     Defendant Silverberg did not receive consideration from Defendant LLC that was reasonably equivalent to the value of the moneys transferred to Defendant LLC.

25.     Defendant Silverberg was insolvent or became insolvent as a result of the transfer of monies to Defendant LLC.

26.     Defendant Silverberg transferred monies to Defendant LLC with actual intent to hinder, delay and/or defraud Plaintiff.

27.     Defendant Silverberg established Defendant LLC with actual intent to hinder, delay and/or defraud Plaintiff.

28.     The transfer of monies from Defendant Silverberg to Defendant LLC was to an insider, as Defendant Silverberg was the sole member of Defendant LLC.

29.     Defendant Silverberg has resided at [the Market Street property], Philadelphia, PA 19103 from at least January 2012 through present.

30.     Defendant Silverberg retained possession and/or control over the transferred monies and the fruits of the transferred monies, namely, [the Market Street property] because Defendant Silverberg is the sole member of Defendant LLC.

31.     The transfer of monies occurring between Defendant Silverberg and Defendant LLC was of substantially all of Defendant Silverberg's assets.

33.     Defendant Silverberg concealed the transfer of monies to defendant LLC and the subsequent purchase of [the Market Street property] by Defendant LLC.

The Complaint was signed by Brian R. Cullin, Deputy City Solicitor, and included a Verification (pursuant to 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities) signed by Anina Heimann, Tax Analyst I.

257.     As a general matter, at the time the Complaint was filed, the City lacked probable cause/good faith, possessed no knowledge/information, and/or had obtained no evidence in support of any of the above-referenced allegations/claims.

258.     While allegations concerning the formation and structure of the company were central to the City's Complaint, pursuant to Delaware law such matters are determined by the LLC members and/or Operating Agreement, which were not known to the City and are not publicly available.

259.     Following the filing of the PUFTA Complaint, the City aggressively sought to obtain discovery even though the Pennsylvania Supreme Court has held that parties must have probable cause/good faith to file a Complaint, and shall not "embark upon a 'fishing expedition,' or otherwise rely on an amorphous discovery process to detect a cause of action."

**The City Admitted It Lacked Probable Cause to File the PUFTA Claim
Judge Roberts' Improper Conduct/Misconduct in Response**[43]

260.     On or about July 24, 2020, the PUFTA defendants filed a Motion to Disqualify counsel for the City, and on or about August 31, 2020, the City filed its Response.

261.     In Paragraph No. 38 of their Amended Motion, the PUFTA defendants stated, in pertinent part, "[T]he City did not have probable cause to file the instant Complaint, *which is time-barred* and based upon knowingly false allegations concerning the legal status of ELS." (emphasis in original).

262.     In its Response to Paragraph No. 38 of the Amended Motion, the City stated, in pertinent part, "When and whether the transfer was *or could have been reasonably discovered, under the particular facts of the case* prevents Plaintiff's claims from being time-barred."

---

[43] Judge Roberts' conduct also is addressed in the section "Role of the Courts."

(emphasis in original).  Accordingly, the City's position was not based upon the information it *had* discovered, but rather *could* possibly discover in the future.[44]

263.    The fact that the City contended the PUFTA claim was not time-barred because there were questions that still required answers (i.e., the "when" and "whether"), as opposed to the actual facts that the City relied upon to prepare and file its Complaint, demonstrated that the City:  a) did not have probable cause/good faith to file the Complaint in the first instance; and b) was utilizing discovery in an effort to meet its burden under the statute of limitations - a practice that is strictly prohibited by the Pennsylvania Supreme Court.

264.    This unexpected concession, signed and verified by Mr. Cullin, acknowledged the City did not have probable cause at the time the PUFTA Complaint was filed, and should have been fatal to the PUFTA claim.

265.    On or about September 4, 2020, as a result of the City's admission that it lacked probable cause at the time it filed the PUFTA claim, the PUFTA defendants filed a Renewed Motion for Protective Order and/or to Stay Discovery (Control No. 80-2009D180).[45]

266.    On or about September 9, 2020, only 4 days after it was filed, Judge Roberts denied the Renewed Motion.  In Note 1 of the Order, Judge Roberts stated:

> The Court notes that this motion is virtually identical to the
> [PUFTA] Defendants' Motion for Reconsideration (Control No.
> 20090453), which this Court denied by way of Order dated

---

[44] This was bolstered by the City placing emphasis on the word "was" when quoting the statutory language of § 5109(1) and then removing the emphasis when discussing its position in the PUFTA case.

[45] Control Numbers are assigned at the time a Motion is filed.  To ensure that the Response matches the Motion, and that any decision matches the Motion and Response, all are assigned the same Control Number.

September 8, 2020.

267.     Contrary to Note 1 of the September 9, 2020 Order, Judge Roberts issued no such

Order (or any Order) in connection with the PUFTA defendants' Motion for Reconsideration

(Control No. 20090453), and in fact, on September 9, 2020, the PUFTA defendants withdrew the

Motion for Reconsideration.

268.     In effect, Judge Roberts manufactured the basis for denying the PUFTA

defendants' Renewed Motion for Protective Order and/or to Stay Discovery (Control No. 80-

2009D180), which was especially significant since it enabled Judge Roberts to decide/deny the

Renewed Motion while simultaneously avoiding and/or failing to address the City's admission(s)

that it lacked probable cause to file the PUFTA claim in the first instance.

269.     On or about September 18, 2020, defendants filed a Renewed Motion for

Summary Judgment.  While the original Motion had been dismissed without prejudice as

premature, the grounds for dismissal (whether proper or not) no longer applied since the

pleadings were now closed and the City now had admitted that it lacked probable cause to file

the Complaint.

270.     On or about September 18, 2020, the PUFTA defendants also filed a related

Motion for Protective Order and/or to Stay Proceedings (Control No. 31-20092231) which

encompassed many of the same grounds and sought to stay the proceedings until a determination

on the Renewed Motion for Summary Judgment since, *inter alia*, if granted the proceedings

would terminate.

271.     On or about October 7, 2020, 8 Orders were entered on the docket, 7 pertaining to

the City's Motions for Sanctions and the other to defendants' Motion for Protective Order and/or

to Stay Proceedings (Control No. 31-20092231).  Although the Orders concerning the City's

Motions for Sanctions reflect a corresponding Control Number, there is no corresponding

Control Number in connection with the Motion for Protective Order.  Instead, the Control

Number only appears on the face of the Order itself, which must be separately accessed.

272.    On or about October 8, 2020, Judge Roberts *sua sponte* marked Control No. 31-

20092231 moot.  However, the Motion was decided/denied by Order dated October 6, 2020

(entered October 7, 2020).  Further, the docket entry states "See Order" but no Order is identified

and no corresponding link to the Order is included.

273.    Accordingly, a search of the docket for Control No. 31-20092231 reveals only

three entries:  the Motion, the Response, and the October 8, 2020 entry marking the Motion as

moot.  Therefore, persons searching the docket for the disposition of the Motion by its Control

Number would be led to believe it had been withdrawn or resolved by and/or between the parties

when, in fact, it had been denied without opinion by Judge Roberts.

274.    This was a particularly egregious act of deception and dishonesty on the part of

Judge Roberts since, by wrongfully marking the Motion as moot for purposes of the official

public-facing docket, Judge Roberts attempted to further shield the City from any adverse

consequences in connection with its admission that it lacked probable cause to file the PUFTA

claim in the first instance.  Because Judge Roberts tampered with public records, and did so with

the intent to defraud and/or injure another, Judge Roberts committed a felony under

Pennsylvania law.

**The Role of The Vanguard Group, Inc.**
**The Vanguard Writ**

275.     According to the plain language of the Complaints, the purpose of the tax/PUFTA claims was to recover past due taxes that supposedly were due and owing.

276.     On or about October 2, 2019, the day after the City filed the PUFTA Complaint, the City filed (in the related tax case) a Writ of Execution addressed to The Vanguard Group, Inc. in connection with an individual retirement account (IRA) plaintiff maintains at Vanguard (the Vanguard Writ).

277.     On or about June 23, 2021, 19 months after the Vanguard Writ was filed, the City discontinued the attachment and Vanguard released the funds that same day.  Although the Vanguard account contained sufficient funds to satisfy the City's claims/judgments, the City never levied the account.

278.     Accordingly, within 24 hours of filing the PUFTA Complaint, the City created the opportunity and had the ability to recover the full amount the City claimed was due and owing, but intentionally failed/refused to do so.  Therefore, notwithstanding that the City lacked probable cause to file the PUFTA Complaint, which was based upon knowingly false allegations, and which was time-barred by more than four years, every action the City took after October 2, 2019 in the tax/PUFTA matters was *not* for purposes of actually recovering on its claims/judgments, and/or actually obtaining any funds.

**The Discovery-Related Matters**

279.     On or about May 29 and June 1, 2020, the City filed 8 related Motions to Compel in connection with the PUFTA matter.

280.     On or about June 7 and 8, 2020, the PUFTA defendants filed their respective Responses.

281.     On or about July 2, 2020, PUFTA defendants filed a Motion for Protective Order (Control No. 11-2007D011).  Importantly, the Motion included, *inter alia*:  a) a detailed account of the procedural history including that PUFTA defendants had filed a Motion for Summary Judgment on the grounds the claim was time-barred (and therefore the City lacked probable cause/good faith); b) Pennsylvania Supreme Court authority that a Complaint must be based upon probable cause/good faith; c) Pennsylvania Supreme Court authority that discovery may not be used to "detect" a cause of action after-the-fact; and d) the City was attempting to utilize the discovery process in the PUFTA case in an effort to obtain documents/information the City had been unable to obtain in the tax matter.

282.     The PUFTA defendants argued that since a plaintiff must have probable cause and a good faith basis to file a Complaint, it was not possible the City could obtain information in discovery (i.e., after-the-fact) that would enable the City to overcome the bar of the statute of limitations.

283.     On or about August 13, 2020, the parties received an email from Judge Roberts notifying them that he would be handling the "outstanding discovery motions in this matter." This was the first interaction the parties had with Judge Roberts in connection with the tax/PUFTA matters.

284.     On August 25, 2020, Judge Roberts conducted a hearing via Zoom video conference on the City's various Motions to Compel.  Although the City had filed 8 Motions to Compel, the 8 Motions were assigned, and all 8 Motions were heard, the docket reflects that only 7 of the Motions actually were decided.[46]

285.     Of the 7 Orders that were signed by Judge Roberts on August 25, 2020, none of the Control Numbers match the Control Numbers assigned to the originating Motion, rendering each such Order improper, void, a nullity, unenforceable, and/or otherwise of no legal force or effect.[47]

286.     There can be no dispute that the issuance of the Orders of August 25, 2020 under incorrect Control Numbers was intentional and *not* the result of mistake or inadvertence, to wit: a) the 7 originating Motions were all discovery-related and all were filed at or around the same time; b) all 7 Motions were heard and decided at the same time; c) the Orders all were issued at the same time, and therefore, Judge Roberts had to take great care to insure the Control Numbers did *not* properly match the originating Motion and related Response; d) the Control Number was handwritten on each Order; and e) the Orders of October 6 and November 10, 2020 demonstrate

---

[46] On May 29, 2020, the City filed a Motion to Compel in connection with the City's Request for Documents addressed to ELS (Control No. 02-2006D002).  On that same date, the City also filed a Motion to Compel in connection with the City's Request for Documents addressed to Silverberg (Control No. 05-2006D005).  On August 25, 2020, with respect to ELS, an Order was signed granting the City's Motion, but under Control No. 05-2006D005.  On September 1, 2020, the Court granted the City's Motion to Compel addressed to Silverberg but the Order does not reflect a Control Number.  In fact, no Order was ever issued under Control No. 02-2006D002. Rather, on September 9, 2020, without explanation and/or notice to the parties, Judge Roberts *sua sponte* marked Control No. 02-2006D002 as moot.

[47] On or about October 6 and November 10, 2020, Judge Roberts issued a series of Orders in connection with plaintiff's various Motions for Sanctions.  In each instance, the Control Number associated with each Order corresponds with the Control Number assigned to the originating Motion and related Response.

a recognition by Judge Roberts of the meaning and significance of Control Numbers, and also that his actions in connection with the August 25, 2020 Orders were intentional.

287.    On or about October 6, 2020, Judge Roberts issued a series of Orders in connection with plaintiff's various Motions for Sanctions.  However, each such Order is predicated upon an Order of August 25, 2020 in connection with plaintiff's Motions to Compel.  Accordingly, since the August 25 Orders all are improper, void, a nullity, unenforceable, and/or otherwise of no legal force or effect, so are the Orders which are based upon them.

288.    On or about November 10, 2020, Judge Roberts issued a series of Orders in connection with plaintiff's various Motions for Sanctions.  However, each such Order is predicated upon Orders of August 25 and October 6, 2020 in connection with plaintiff's Motions to Compel and prior Motions for Sanctions.  Accordingly, since the August 25 and October 6, 2020 Orders all are improper, void, a nullity, unenforceable, and/or otherwise of no legal force or effect, so are the Orders which are based upon them.

289.    The October 6 and November 10 Orders amplify and exacerbate Judge Roberts' wrongdoing in connection with the August 25 Orders.  Put another way, the October 6 and November 10 Orders demonstrate the August 25 Orders were intentionally anticipatory and intended to serve as predicates for purposes of creating legal flaws in all of the discovery-related Orders (i.e., the Orders of August 25, October 6, and November 10, 2020), thereby rendering all such Orders of no legal force or effect.

290.    The Orders of August 25, October 6, and November 10, 2020, both individually and collectively, were intended to significantly benefit the City (and any interested/related parties and/or constituencies) and significantly prejudice and harm the PUFTA defendants, and

actually did so.  In particular, but not by way of limitation:  a) drastic sanctions were awarded in favor of the City and against the PUFTA defendants, including default judgments (discussed *infra*); b) a record has been created whereby it appears that the City's claims are legitimate and meritorious and that the PUFTA defendants have engaged in significant wrongdoing warranting severe sanctions when, in fact, the City has filed a knowingly time-barred, bad faith claim and perpetrated a fraud upon the state court; and c) the actions significantly increased the chances that any appeal would be decided based upon the trial court's actions/errors in connection with the discovery-related Orders as opposed to the City's fraud, abuse of process, and attorney misconduct.

291.    Further, Judge Roberts' improper actions also manufactured and/or created a scenario whereby all parties in the PUFTA case were incentivized to resolve the dispute on grounds other than the merits, to wit:  a) with respect to the City, knowing the trial court made errors that significantly increased the chances of a reversal on appeal, there now was a basis for the City to make a "business decision" to "amicably" resolve the matter to avoid the time and expense associated with further litigation; and b) with respect to the PUFTA defendants, an appellate decision that returned the case to the trial court but which did not address the limitations issue and/or the City's bad faith conduct would not be a favorable outcome, and arguably favored the City.

292.    However, with respect to the City Judge Roberts' actions did more than just incentivize a possible resolution, they provided the City with an opportunity and/or created an alternative basis for doing so.  In the event the City determined to settle the PUFTA matter prior to an appellate court decision, the City now could claim it was doing so for business reasons and/or to avoid further costs when, in fact, the true reason was to avoid the risk of an appellate

court decision concerning the merits of its bad faith conduct.  This would have enabled the City

to avoid even the perception that the matter had been concluded based upon the City's own

improper conduct.

293.    Accordingly, as the result of the wrongful/unlawful filing/pursuit of the PUFTA

matter, and Judge Roberts own wrongful/unlawful conduct, the City obtained drastic sanctions

including default judgments against the PUFTA defendants without demonstrating that the

PUFTA defendants had committed any violations or engaged in wrongdoing of any kind - ever.[48]

---

[48] On October 29, 2020, the PUFTA defendants filed their Responses to the City's Motion for
Sanctions in connection with the depositions of PUFTA defendants which stated, in pertinent
part:

> On or about October 12, 2020, defendants Silverberg and ELS
> filed a Complaint against the City of Philadelphia, the William
> Penn Foundation, and others alleging inter alia violations of 42
> U.S.C. § 1983 (First and Fourteenth Amendments) and the
> Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18
> U.S.C. § 1961(1), et seq., predicated upon obstruction of justice
> and mail/wire fraud, in connection with the City's filing and
> pursuit of the instant case. … In short, the Complaint alleges, inter
> alia, the City engages in a policy, practice, and/or custom of
> improperly and illegitimately utilizing the state and federal courts,
> and legal process, as a device to advance and protect the political,
> professional, and personal objectives and agendas of the City of
> Philadelphia and/or City Officials, Mayor Kenney, and the Kenney
> Administration.  In so doing, the City, by and through the Law
> Department, has engaged and is engaging in systemic fraud/fraud
> upon the courts.  The Complaint alleges the instant PUFTA lawsuit
> is part of the challenged pattern of conduct, and is itself a fraud
> upon the court.

*Response to Motion for Sanctions (Control No. 66-2010D366)*.  Judge Roberts previously had
been made aware of Silverberg I, filed June 20, 2019, involving substantially the same parties.

**The Default Judgments - Part 1**

294.     Following the filing of the PUFTA Complaint, the City propounded a series of discovery requests, including a request for nine years of plaintiff's tax records.

295.     Since the City lacked probable cause to file the PUFTA claim, and did not seek discovery for a proper/legitimate purpose, the City was not entitled to such discovery under the Pennsylvania Rules of Civil Procedure.  Further, the City was not genuinely interested in obtaining discovery for purposes of establishing its claim, or for any legitimate purpose - the City already had failed/refused to levy the Vanguard account, which would have resolved the tax/PUFTA matters in their entirety.

296.     While the PUFTA defendants served Responses to certain requests, they also had filed multiple Motions for Protective Order and to Stay Discovery challenging the legitimacy of the City's discovery requests, and the PUFTA claim more generally.

297.     On or about November 10, 2020, at a hearing concerning the City's Motion for Sanctions in connection with its requests for discovery, the following colloquy took place:

> THE COURT:  Mr. Silverberg, what I'm hearing from you, and correct me if I'm wrong, is that you never had any intention of complying with any of my orders.
>
> MR. SILVERBERG:  Not true.  We filed for protection twice or three times.  It's not that we didn't intend to comply. We sought appropriate remedies in order, one, to address the fraud, to protect ourselves from it, and to protect the Court from it.  It's not a question of not complying with your orders.  It's a question of properly addressing this fraud that's permeated this entire litigation.
>
> THE COURT:  But those motions for protective order are gone.
>
> MR. SILVERBERG:  I don't know that.  There was – we've moved for a stay.  And the last time we were here you said you were going to go back and separate out the motions for

protection from the motions for the stay.  I never heard anything back on that.

THE COURT:  Well, this is how I see it[.] … [T]he City, under all applicable rules, was entitled to pursue and seek the discovery that it was seeking. … there is nothing under the rules that prevented the City from seeking that discovery. And at that point I entered orders compelling you to comply with the City's discovery requests.  And from -- for all intents and purposes from everything I heard, you make no effort to do so. … Everything you're saying about this fraud and all these other things are ancillary to whether you made any effort to comply with my orders.

MR. SILVERBERG:  I cannot agree with that characterization. We moved for protection. There's a pending motion for summary judgement. There should be no discovery because there was no probable cause for this case in the first instance. … You're entering discovery orders. There shouldn't be discovery in this case in the first instance.

We have a fundamental disagreement about what should be occurring here.  I don't mean any disrespect to the Court about what --the position that the Court is taking, but the Pennsylvania Supreme Court is clear, there should be no discovery to detect a cause of action if there was no probable cause to file this complaint in the first instance, and there wasn't.

THE COURT:  So our rules of discovery in this Commonwealth -- and I'm going to just read a direct quote -- Discovery is liberally allowed with respect to any matter not privileged which is relevant to the cause being tried.

MR. SILVERBERG:  Not if there's a fraud.

THE COURT:  That is actually the situation where I see us.

MR. SILVERBERG:  Not if there is a fraud.  Fraud -- you have [] inherent authority at every stage of the litigation if you determine that there is a fraud on the court, at every stage of the litigation … to ferret a fraud out of the system.

THE COURT:  Mr. Silverberg, you could -- if these were the substantive arguments that you wanted to make, you could have complied with discovery and then made your arguments at the appropriate time. … [A] party's willful disregard of Court discovery orders can -- an appropriate remedy to that is a default judgment under Rule 4019. And based on the totality of this matter since it's been in front of me, I have seen no effort by yourself or yourself representing ELS to make any effort to comply with my orders, so I find that an appropriate sanction under 4019 is to enter

a default judgement against yourself and against ELS.

298.    This critical exchange was central not just with respect to the City's entitlement to discovery, but to file/pursue the PUFTA claim in the first instance since a plaintiff may not file a Complaint or obtain discovery where there is a lack of probable cause.

299.    While plaintiff repeatedly argued that the City lacked probable cause to file the PUFTA Complaint and therefore was foreclosed from discovery, Judge Roberts failed/refused to address the probable cause issue on the merits.  Instead, Judge Roberts focused on plaintiff's purported violation(s) of Court Orders - there were no violations - an issue that should not even have been reached since, *inter alia*, there should have been no Orders in the first place.

300.    Judge Roberts knew the City would be foreclosed from discovery, and required to terminate its case, if it was established that the City lacked probable cause to file the PUFTA Complaint.  In particular, because a primary purpose of the proxy war was to use legal process/proceedings for wrongful/unlawful purposes and to obtain remedies as against plaintiff to which the City was not entitled, and because Judge Roberts was a participant in the proxy war, Judge Roberts failed/refused to address the issue of probable cause, to properly decide the PUFTA defendants' Motions for Protective Order and/or to Stay Discovery, and awarded severe sanctions against the PUFTA defendants for purported discovery violations.

301.    On or about November 10, 2020, pursuant to Rule 4019(a)(1) of the Pennsylvania Rules of Civil Procedure, Judge Roberts entered default judgments against both PUFTA defendants as a sanction for purported discovery violations.  In particular, as to defendant ELS, the Court awarded sanctions included:  a) a default judgment; b) judgment in the amount of $340,581.35; c) an injunction "against any and all future and further dispositions" of [the Market

Street property]; d) an injunction "against any and all real property owned, in whole or in part, by Defendant ELS Realco, LLC;" and e) permitting the City to levy and execute against the Market Street property to satisfy the judgment.  As to plaintiff, the Court awarded sanctions included:  a) a default judgment; and d) an injunction "against any and all real property owned, in whole or in part, by Defendant Richard J. Silverberg."

302.    No Court ever made a determination on the merits of the City's PUFTA claim.[49]

**The Default Judgments - Part 2**

303.    Rule 4019(a)(1) permits a trial court to "make an appropriate order" if a party "fails to make discovery or to obey an order of court respecting discovery."  Further, Rule 4019(c)(3) expressly authorizes trial courts to "ente[r] a judgment of non pros or by default against the disobedient party[.]"

304.     Dismissal is the most severe sanction and is reserved for only extreme circumstances.  Thus, a trial court is required to balance the equities carefully and dismiss only where the violation of the discovery rules is willful and the opposing party has been prejudiced.

305.    Generally, imposition of sanctions for a party's failure to comply with discovery is subject to the discretion of the trial court, as is the severity of the sanctions imposed.

---

[49] On October 21, 2020, the PUFTA defendants' Renewed Motion for Summary Judgment was assigned to Judge Patrick, the same judge who decided the original Motion for Summary Judgment.  However, because of the Orders of November 10, 2020 awarding sanctions in favor of the City and against the PUFTA defendants, including default judgments, the Renewed Motion for Summary Judgment never was decided.

However, the trial court's discretion is not unfettered - the sanction must be appropriate when compared to the violation of the discovery rules.

306.    Here, there should have been no sanctions in the first place since City lacked probable cause/good faith and filed a knowingly time-barred claim.  Further, Judge Roberts did not award sanction based upon Rule 4019, but rather as part of the proxy war.  In fact, Judge Roberts *permanently* enjoined the disposition of *all* real property owned by both PUFTA defendants and did so without regard to the value of any such property (even though the value of the Market Street property exceeded the value of the City's claim), sanctions so extreme and oppressive that they could only have been imposed for an improper purpose.[50]

### The City's Motion to Foreclose Upon Lien
### The City's Motion to Compel Entry

307.    On or about February 19, 2021, at a hearing concerning two of the City's Motions, the following exchange took place:

> MR. CULLIN: The facts here are that ELS Realco, LLC, of which Mr. Silverberg is a member, is the owner of a significant but illiquid asset.[51] That is [the Market Street property]. Based on all information the City has available, the condo is significantly all of ELS Realco LLC's assets.[52] There is no indication that they own anything else or that the LLC owns anything else.[53] Mr. Silverberg,

---

[50] In Pennsylvania, it is error for the trial court to award remedies that exceed the scope of the relief sought by the plaintiff/movant.

[51] There was no factual basis for this statement, which was knowingly false or made in reckless disregard for whether it was true or false.  The City had no actual evidence concerning the actual ownership/equity interest of any specific individual and/or entity.

[52] There was no factual basis for this statement, which was knowingly false or made in reckless disregard for whether it was true or false. The City had no relevant evidence concerning the true extent of the Company's assets.

[53] *See note 52*.

Defendant Silverberg, resides at the property and has done so for a number of years. Defendant Silverberg is also a member of the ELS Realco, LLC. So based on these facts, it is highly unlikely that within a reasonable amount of time any liquid money will accrue to the LLC that the City would be entitled to as having a lien against the charging order against the LLC.[54] Mr. Silverberg lives in the property. It's unlikely that he will sell it any time soon, and he has control over that decision because he is a member of the LLC.[55]

THE COURT: Has Mr. Silverberg ever provided you with the operating agreement for ELS Realco?[56]

MR. CULLIN: He has not, Your Honor.

THE COURT: I know based on his response to the motion -- did he submit an affidavit; is that correct?

MR. CULLIN: Yes, Your Honor. I believe he submitted an affidavit stating that he was a member, but not the sole member.

THE COURT: You've made representations that he is the sole member and Mr. Silverberg is -- is there any evidence anywhere that it's a multiple-member LLC?[57]

MR. CULLIN: No, Your Honor.[58] There are no public documents, no documents that I've seen suggesting it's multi-member.[59]  The deed document for [the Market Street property], which is the asset of ELS Realco, LLC, only Mr. Silverberg's signatures appear on those documents. So that's an indication that he is the sole member because, again, there is no other indication of another human person or entity being a member.[60]

---

[54] At best, this statement is entirely speculative, to the extent it can be understood at all.
[55] There was no factual basis for this statement, which was knowingly false or made in reckless disregard for whether it was true or false.  The statement is also part speculative since the City possessed no information concerning authority or decision-making in connection with ELS.
[56] This question assumed there was an Operating Agreement, which is not a requirement under Delaware law.
[57] Plaintiff submitted multiple Affidavits, which are evidence, stating that ELS was a multiple-member LLC.
[58] That is a knowingly false statement.  Plaintiff submitted multiple Affidavits, which are evidence, stating that ELS was a multiple-member LLC.
[59] That is a knowingly false statement.  Plaintiff submitted multiple Affidavits, which are evidence, stating that ELS was a multiple-member LLC.
[60] Under Delaware law, a deed does not evidence membership in a limited liability company.

THE COURT: If it was a multiple-member LLC, would each individual member have had to sign? You said Mr. Silverberg is the only person who signed. Are you suggesting that if there were other members, they would have had to have signed as well?

MR. CULLIN: No, Your Honor. It's simply a data point. It's an indication that throughout these documents, all you see repeatedly over and over is Mr. Silverberg's signature and his name in connection with, again, this purchase of this substantial asset of the LLC.[61]

THE COURT: All right. So I will go ahead and so Mr. Silverberg -- again, I am going to repeat what I said earlier -- he was given an opportunity to be here today and to present any counter-argument or counter-testimony. He certainly could have been sworn under oath and provided testimony. He could have provided the City with the operating agreement which would have been the easiest solution to determining whether ELS Realco is a multiple-member LLC.[62] He has chosen not to do so, and he has chosen not to appear.[63] I will grant the City's motion.

308.    Pursuant to the Delaware Limited Liability Company Act, 6 DE Code § 18-101(9), "A limited liability company is not required to execute its limited liability company agreement[.]"  In fact, an Operating Agreement is not required.  Therefore, the Court's question to Mr. Cullin concerning whether an operating agreement had been provided, and statement that providing the operating agreement "would have been the easiest solution to determining whether ELS Realco is a multiple-member LLC," pertain to a document that is not legally required and may not exist.[64]

---

[61] *See note 60.*

[62] A party is under no obligation to volunteer evidence to enable a party-opponent establish its case.

[63] While the Court appears to penalize defendants for not participating in oral argument on plaintiff's Motion, there was no requirement that they do so.  Further, defendants responded to/contested each of the City's Motions.

[64] Such agreements, if executed, are not filed of record.

309.     Mr. Cullin's admission that the City possessed no evidence that plaintiff was the sole member of ELS (THE COURT: [I]s there any evidence anywhere that it's a multiple-member LLC?  MR. CULLIN: No, Your Honor.) was directly contrary to the judicial admissions in the PUFTA Complaint, which were central to the City's claim, and which should have resulted in Judge Roberts requiring the City to demonstrate that it had probable cause to file PUFTA Complaint - no Motion or other process was required.

310.     Judge Roberts' determination to ignore the City's admission, and that the City had contravened its own Complaint and a primary theory of liability, reflected a broader pattern of misconduct on the part of Judge Roberts that permeated the proxy war, specifically:  a) failing to follow/apply the facts/prevailing legal standards; b) consistently failing/refusing to find fault with the City's positions (no matter how factually/legally unsupported the positions may be) while consistently faulting the PUFTA defendants (no matter how factually/legally supported their positions may be); and c) otherwise repeatedly failing to be fair and impartial.[65]/[66]

311.     Following the February 19, 2021 hearing, and as a result thereof, Judge Roberts issued two Orders:  a) Order of February 19, 2021 granting the City of Philadelphia's Motion to

---

[65] Judge Roberts' statement assumed there was a (written) Operating Agreement, but the City had offered no evidence of such an Agreement.
[66] Judge Roberts' conduct also is addressed in the section "Role of the Courts."

Foreclose Upon Lien;[67] and b) Order of February 19, 2021granting the City of Philadelphia's

Motion to Compel Entry.[68]


### The Tax/PUFTA defendants Agreement to Pay the Full Amount the City Claimed was Due and Owing


312.    On or about May 17, 2021, the following email exchange took place between

attorney Silverberg and Mr. Cullin:

---

[67] The Order stated, in pertinent part:

   1)  The existing lien upon Richard J. Silverberg's interest in ELS Realco, Inc. is foreclosed;
   2)  The Sheriff's Office of Philadelphia County shall conduct a public sale of Richard J. Silverberg's interest in ELS Realco, Inc., with the proceeds of the sale payable to the Plaintiff, City of Philadelphia;
   3)  Defendant Richard J. Silverberg shall not transfer or otherwise alienate his interest in ELS Realco, LLC prior to the public sale of his interest in ELS Realco, LLC without prior court approval.

[68] The Order stated, in pertinent part:

   1) Defendant Richard J. Silverberg shall grant entry to [the Market Street property] to Philadelphia Sheriff's Office personnel for purposes of carrying out a personal property levy;
   2) Defendant Richard J. Silverberg shall not transfer or otherwise alienate his interest in any personal property located at [Market Street property] prior to the completion of the personal property levy by the Philadelphia Sheriff's Office, without prior court approval.

**From:** Richard Silverberg <rjs@rjsilverberg.com>
**Sent:** Monday, May 17, 2021 10:28 AM
**To:** Brian Cullin <Brian.Cullin@Phila.gov>
**Subject:** City v. Silverberg

Mr. Cullin –

With respect to the City's claims, what does the City claim is due and owing?

Richard Silverberg

---

**From:** Brian Cullin <Brian.Cullin@Phila.gov>
**Sent:** Monday, May 17, 2021 1:08 PM
**To:** Richard Silverberg <rjs@rjsilverberg.com>
**Subject:** Re: City v. Silverberg

Mr. Silverberg,

$345,000 to settle Tax and Fraud Transfer case, contingent on agreement that you agree to release for any and all claims against City and officers and/or employees in connection with tax collection activities or fraudulent transfer case.

Best,

Brian Cullin

---

**From:** Richard Silverberg <rjs@rjsilverberg.com>
**Sent:** Monday, May 17, 2021 2:28 PM
**To:** Brian Cullin <Brian.Cullin@Phila.gov>
**Subject:** RE: City v. Silverberg

Mr. Cullin –

Defendants will agree to pay the full $345,000 to resolve the tax and PUFTA matters, contingent upon mutually-agreeable payment terms and the City's release of the claims.

This will need to be financed.  Since banks will not consider financing until an agreement is in place and the process is removed from the apartment and the IRA, please prepare a draft agreement.  We can discuss terms and how the City can continue to protect its interests during this period.

With respect to the City's request for a release, defendants are not settling the cases; we are paying what the City claims is due and owing.  Regardless, the City cannot expect both a full payment and a release of rights/claims defendants may have.

Please advise.

Richard Silverberg

---

**From:** Brian Cullin <Brian.Cullin@Phila.gov>
**Sent:** Monday, May 17, 2021 3:56 PM
**To:** Richard Silverberg <rjs@rjsilverberg.com>
**Subject:** Re: City v. Silverberg

Mr. Silverberg,

No can do - city needs a full release from you. Non-negotiable point. We will see things through to sheriff sale (and get what we are due anyway), and are more than ready to rebuff any frivolous, blustering, new action(s)/conspiracy theories you cook up.

Best,

Brian Cullin

---

313.    The rejection of the PUFTA defendants' offer to pay the full amount the City claimed was due and owing further confirmed the City was not pursuing the matter on the basis of the allegations/claims in the PUFTA Complaint, to satisfy its claims/judgments, and/or for any legitimate purpose.  Further, the threat to have the Market Street property sold at Sheriff's Sale because of defendants' exercise (and/or anticipated exercise) of their Constitutional and other

rights/remedies (and/or their refusal to relinquish those same rights/remedies) constituted

retaliation for engaging in protected activity.[69]

314.     There are no pre-conditions to a taxpayer's legal obligation to pay taxes, nor can

the government impose any such conditions.  Otherwise, the government would be able utilize its

taxing authority for wrongful/unlawful purposes unrelated to the payment of taxes.

315.     The requirement that the PUFTA defendants release any claims before they would

be permitted to pay their taxes not only was wrongful/unlawful, but also connected the

tax/PUFTA matters and SI/SII.[70]  Further, the City specifically demanded that the PUFTA

defendants release claims in connection with the City's "tax collection activities" - the same

actions that were the subject of the district court's January 8, 2020 decision finding that claims

had been stated for Constitutional violations.

316.     On or about May 21, 2021, plaintiff sent a letter to Diana Cortes, City Solicitor,

City of Philadelphia, in connection with the May 17, 2021 email exchange.  In particular,

plaintiff informed Ms. Cortes that the PUFTA defendants had made a full offer, that the offer

was rejected based upon the PUFTA defendants' refusal to waive their rights, and that the City's

imposition of such a requirement as a pre-condition of paying their taxes was unlawful.

317.     On or about May 26, 2021, in response to the letter to Ms. Cortes, Mr. Cullin sent

plaintiff a second email in which the City changed its reasoning for rejecting the PUFTA

---

[69] Since the City cannot compel defendants to waive their rights, and since an auction of the
Market Street property would not result in such a waiver, it is unclear what purpose the City
believed was served by such a threat.

[70] *See ELS Realco LLC, et al. v. City of Philadelphia, et. al*., United States District Court for the
Eastern District of Pennsylvania, No. 5034 (filed Oct. 12, 2020)("Silverberg II" or "SII").  On
February 23, 2021, SII was voluntarily dismissed.

defendants' offer.  Mr. Cullin stated, "This was *a settlement offer* – it was ***not*** a statement of the total amount of the City's claims against you. I apologize for any confusion."[71] (emphasis in original).

318.    The May 26, 2021 email was directly contrary to the May 17, 2021 email exchange.  Contrary to Mr. Cullin's claim, there was no "confusion" - the PUFTA defendants had *not* initiated settlement talks, *not* asked the City for a settlement demand, and had *not* asked the City what amount it would accept to *settle* the claims - the PUFTA defendants simply had asked what the City "claim[ed]" was due and owing in the tax/PUFTA matters.  As plaintiff stated to Mr. Cullin:

> With respect to the City's request for a release, defendants are not settling the cases; we are paying what the City claims is due and owing.

---

[71]   Mr. Cullin further stated:

> If we do some math here, it is abundantly clear that $345,000 would not be full payment of the amounts owed to the City. On November 10, 2020, City obtained a $340,581.35 judgment against ELS Realco, LLC. Over the intervening 6 months, substantial post-judgment interest has accrued on that judgment. As of May 17, 2021, the date of my email, including the post-judgment interest and the $250.00 monetary sanction you owe the City, City was owed $351,050.73 to satisfy the judgments. Post-judgment interest continues to accrue at $55.99/day.

> To state the obvious – if you were able to make a lump sum payment of $351,554.64 tomorrow, the City would have to accept that payment, and we would satisfy the Tax Judgment and the Fraudulent Transfer Judgment, and you could preserve the ability to pursue your claims. However, to state the obvious again, if you'd like to pay less than $351,554.64 or you would like to have the privilege to pay that amount via a payment plan, then the City is fully within its rights to seek a full release from you in exchange for that lesser payment and/or a payment plan.

Accordingly, not only did the City twist itself into a knot in an effort to explain why the plain language of the May 17, 2021 email supposedly was not plain, the May 26, 2021 email itself constituted retaliation for engaging in protected activity.

319.     In the May 26, 2021 email, the City now took the position that the full amount then-due and owing actually was $351,554.64, which was $5,000 or .017% more than the amount set forth in the May 17, 2021 email, and which the City now claimed was the basis for rejecting the PUFTA defendants' offer.

320.     Notwithstanding that the difference between the two amounts is legally *de minimis*, that a "discount" (purportedly for settlement purposes) of .017% is absurd, and that there was no "settlement" process/offer in the first place, the May 26, 2021 email actually confirms there was no true dispute - no reasonable, rational municipality would respond that an offer that was 99.9% of the full amount due and owing was insufficient.[72]

**The July 30, 2021 Agreement**

321.     On or about July 30, 2021, the tax/PUFTA defendants again agreed to pay the full amount the City claimed was due and owing, and to satisfy the judgments.

322.     In response, the City first demanded payment by September 1, 2021, and then subsequently demanded that the tax/PUFTA defendants sign a "Settlement Agreement" (and do so by August 6, 2021) which again required a release of claims.

323.     Accordingly, in order to pay the amount the City claimed was due and owing, the City once again demanded the tax/PUFTA defendants relinquish their Constitutional, statutory,

---

[72] In effect, in the May 26, 2021 email, the City is claiming that even though defendants had requested the amount the City claimed was due and owing, and unbeknownst to defendants, the City actually provided defendants a discount.  Notwithstanding that is not what occurred, the suggestion that $5,000, or .017%, constituted a "discount" for purposes of settlement, while plainly absurd, is also a reflection of the City's recognition that the meaning and import of the May 17, 2021 email exchange was not truly in dispute.

and other rights/remedies.  Further, the City once again required a "settlement" agreement even though there was no settlement process of any kind, and no agreement of any kind was legally necessary or required - the PUFTA defendants merely were paying taxes the City claimed were due and owing.

324.    The tax/PUFTA defendants determined to not make payment because the City continued to impose wrongful/unlawful conditions, and otherwise had made clear that such payment alone would not resolve the City's claims/judgments.

**The Proxy War - Part 4 (The PUFTA Claim)**
**The City's Petition for Contempt**

**The Hearing of July 7, 2021**

325.    On July 7, 2021, a hearing was conducted via Zoom videoconference on certain pending Motions, including the City's Motion for Contempt (based upon plaintiff's purported failure to respond to certain discovery requests in aid of execution) and the PUFTA defendants' Motion to Set Aside Execution.  At the hearing, Mr. Cullin stated, in pertinent part:

> Plaintiff's petition for contempt should be granted and Defendant Silverberg should be imprisoned until such time as he complies with this Court's multiple court orders concerning plaintiff's discovery in aid of execution. To date, Your Honor, what we've seen is really outrageous behavior from Defendant Silverberg, brazen, purposeful, continued violation of multiple court orders concerning discovery in aid of execution, four total court orders to date that he has not complied with. … To date, Defendant Silverberg has accrued $35,650 in monetary sanctions. And this Court has been very patient in using intermediate monetary sanctions to incentivize and persuade Defendant Silverberg to do the thing that, as an officer of the court, I hope he wouldn't need to be persuaded to do, which is comply with court orders. And $35,000 in monetary sanctions has not worked in persuading him

to comply with court orders, and that is why it is appropriate and it
is proper that this petition for contempt be granted and Defendant
Silverberg be imprisoned until such time as he respects the
authority of the Court and complies with court orders.

326.   At the time of the of July 7, 2021 hearing, the City already had failed/refused

(beginning in October 2019) to levy the Vanguard account and had rejected (in May 2021) the

PUFTA defendants' offer to pay the full amount the City claimed was due and owing,

notwithstanding there was no legitimate basis to file/pursue the PUFTA claim in the first

instance.  Yet, the City's Motion sought to have plaintiff "imprisoned" purportedly for failure to

provide responses to discovery in aid of execution - an execution the City repeatedly had

failed/refused to carry out.

327.   At the hearing of July 7, 2021, the following exchange took place:

THE COURT: So you had the Vanguard account levied, and as
Mr. Silverberg has argued here, dissolution of that levy, after
several rounds of preliminary objections, is the basis for estoppel
in some fashion. What's your response?

MR. CULLIN: [T]he City dissolved the attachment because we
have alternate avenues in which to collect this money. And it was a
strategic decision to pursue a sheriff sale that is quicker, easier.
Again, a strategic decision made by the City. Mr. Silverberg
doesn't get to choose how the City collects its money. That's the
plaintiff's decision to make, not Mr. Silverberg's.

328.   This exchange further confirmed the City was not participating in

execution/enforcement proceedings in good faith and/or for a proper purpose, and that Judge

Roberts had no interest in the facts and/or enforcing the prevailing legal standards.  In effect, the

City admitted that it had engaged in an abuse of process when, after filing the Vanguard Writ,

the City failed/refused to levy the Vanguard account and to satisfy its claims/judgments.

329.     While the PUFTA defendants' Motion to Set Aside Execution should have been granted, Judge Roberts denied the Motion and permitted the City to continue with execution/enforcement proceedings that the City effectively had admitted were not for purposes of recovering on its claims/judgments.

### Judge Roberts' Treatment of the Vanguard Writ, the PUFTA defendants' Agreement to Pay the Full Amount Due and Owing, and the City's Judgments

330.     At the July 7, 2021 hearing, plaintiff argued the City was not engaging in execution/enforcement for a proper purpose, and that the City's Motion for Contempt (as with the PUFTA case more generally) was itself an abuse of process.

331.     At the July 7, 2021 hearing, the following exchange took place:[73]

> MR. SILVERBERG: In May of 2021, we asked the City what is it that the City claims is due and owing. The City responded with a figure. We agreed to pay that figure and satisfy the judgments in both the tax and fraudulent transfer case outright. … At the moment that we agreed to satisfy the judgment, the City had no basis to continue with its execution. … [T]he entire execution proceeding has not been about recovery of taxes.
>
> ……………
>
> [T]he complaints are about recovery of taxes. If they wanted the taxes paid, they would have levied the Vanguard account. … they would have accepted our offer of full payment on May 17th; they didn't.
>
> THE COURT: Hang on, Mr. Silverberg. I have two things. The judgment is the judgment. I just want to make clear that we're all talking about the same thing. The judgment is the judgment. My sanction -- the $35,650 Mr. Cullin noted, that hasn't been reduced to judgment. That's currently a sanction. So for purposes of the

---

[73] For economy of space, the following is an edited version of the proceedings.

judgment, are you ready, willing and able, if you had to, within 30 days, to write a check to the City to satisfy the judgment?

MR. SILVERBERG: You can't separate these two issues. They are connected. If they are engaging in an abuse of process in the execution phase of the proceeding -- so, in other words, if they're not using the execution phase of the proceedings for purposes of recovering taxes, but to coerce us into waiving our claims against them or for purposes of retaliating against us for filing the racketeering case against them, this execution should be set aside. … They're not using the execution for a proper purpose. And why did they dissolve the attachment without ever levying the account, Judge, respectfully?

THE COURT: I'm going to disagree. I don't think that their withdrawal or their dissolution of a levy can be -- you can't ascribe a motive to it and --

MR. SILVERBERG: They didn't dissolve --

THE COURT: Hang on. I let you speak. You've got to let me speak. Just because they dissolve a levy, you can't ascribe a motive to why they did or didn't do something. And on top of that, the judgment is the judgment. They have a judgment against you. However they choose to collect it, as long as they do it within the 20 years that they have, and they can always keep that judgment alive by renewing it, as long as they choose to do what they do, they have a judgment against you. … I have two things I want to ask you again. So if I said today, Mr. Silverberg, you have to repay the judgment within 30 days, do you have the ability to do so?

MR. SILVERBERG: Respectfully, that is not the legal standard. I gave you the legal standard, both in our original motion and in our reply. That is not -- respectfully, that is not the standard. And in terms of paying the judgment, they forfeited that when they used the execution proceedings to coerce and to retaliate in violation of the United States Constitution.

THE COURT: So what if I disagreed with you and said I think their practices have been in accordance with the law? If I disagreed with you, do you have the ability to repay the judgment, let's say, within 30 days of an order?

MR. SILVERBERG:  You can't ignore what they've done with that writ in the Vanguard case. You can't just say that they can file a writ and then restrict an account for 19 months and then say, well, you know, that didn't work so we're going to let that writ go now. They have --

THE COURT: Hang on. Hang on a second. They didn't restrict the account. You filed preliminary objections and they were overruled.

MR. SILVERBERG: You know what? You should have a serious issue with that because that's an imposition on the Court. We filed POs three separate times. They contested that three separate times. And then they never levied the account. So what was the point of all of that? Each one of those was an abuse of process. We, in good faith, filed POs. They contested the POs on a writ. And then never levied the account. So what was the point of all of that if, in good faith, they never went and got the funds to satisfy their judgment?

332.    At the end of the July 7, 2021 proceedings, Judge Roberts stated, in pertinent part:

THE COURT: All right. So here's what I'm going to do: The sanction is going to be $2,500 a day. I'm going to up it to $2,500 a day. I'm going to have you back in on July 23rd. Mr. Silverberg, if they don't have responses on July 23rd, you're going to be prepared to have an in-person proceeding for contempt and I'm going to have the sheriff come get you. I do not want to do that. I do not want to have to send the Philadelphia Sheriff out to have you come in and have a proceeding in person --

……………

The sanctions are going to be $2,500 a day. We're going to have a proceeding. It's going to be July 23rd at 11:00 a.m. If it's not -- if the responses are not received by the City by -- to the City by that time, we're going to agree to a date and we're going to have an in-person contempt hearing. And, Mr. Silverberg, as I said, I do not want to have the sheriffs have to come get you and bring you to City Hall. I know that we've had our differences and you have your differences with the City, but it doesn't mean you're above the law and can disobey orders. It's the last thing I want to do, is send [] -- It's the last thing I want to do, to have the sheriff go out and get you, but I will do it if I have to.

……………

MR. SILVERBERG: What is the basis for denial of the motion to [set aside] the execution?

THE COURT: Mr. Silverberg, I don't need to -- I will explain the basis, should I need to, down the road. But in summary -- in other words, I will explain in more detail, should I be required to do so. But in summary, I haven't a heard a good faith basis for why you haven't responded to discovery, and I have not heard a basis for why the execution should be set aside. Under the legal standard

that's applicable here, I haven't heard any reason that the execution should be set aside. The only basis that you stated is that they dissolved the Vanguard writ, and I -- that is not a basis for estopping them from seeking -- from executing on their valid judgment.

MR. SILVERBERG: Well, what about the failure to accept our offer to satisfy the judgment?

THE COURT: Mr. Silverberg -- and I was going to note this earlier. You're blurring the line between what's a settlement offer and -- I see --

MR. SILVERBERG: There wasn't a settlement offer.

THE COURT: I stated several times, if you want to pay the judgment, you can pay the judgment at any time. But what I've heard is an offer and I've heard conditions. So if there was a settlement offer, then

MR. SILVERBERG: [T]here's nothing to suggest that it was a settlement offer, nothing, anywhere in the record. … The only person in this entire proceeding who's ever used the word "settlement" is Mr. Cullin, and he didn't use it until May 26th. There's nothing in this record anywhere that suggested that there was a settlement process of any kind at any time.

333.     As a preliminary matter, the entire process/proceedings (the City's Petition for Contempt, the July 7, 2021 hearing, and subsequent Orders) were a complete sham - the City was seeking discovery in aid of execution (and related sanctions) when the City already had failed/refused to execute on its claims/judgments, notwithstanding there was no legitimate basis to file/pursue the time-barred PUFTA claim in the first instance.  Further, as set forth in the PUFTA defendants' submissions, not only was the City proceeding in bad faith, the City failed to show that any actions/omissions on the part of the PUFTA defendants met the standard for contempt under Pennsylvania law.

334.     With respect to Judge Roberts' statement that the "judgment is the judgment," there is no support for the proposition that judgments somehow immunize parties against the

consequences of their wrongful/unlawful conduct, and in particular, are not a defense to legal violations committed in either obtaining and/or enforcing those same judgments.

335.    The July 7, 2021 hearing demonstrated not only that the tax/PUFTA matters were not being decided on the merits, but the lengths to which the City and Judge Roberts went to avoid the actual facts/prevailing legal standards, and to decide disputes consistent with the objectives/goals of the proxy war.  In particular, Judge Roberts' statement, "I haven't a heard a good faith basis for why you haven't responded to discovery, and I have not heard a basis for why the execution should be set aside[]" was directly contrary to the procedural history and the actual facts of record.

## The Order of July 8, 2021

336.    On or about July 8, 2021, as a result of the July 7, 2021 hearing, Judge Roberts issued an Order granting the City's Petition for Contempt (Control No. 21051831) and which provided, *inter alia*, that the then-existing sanctions against plaintiff would be increased to $2500/day until such time as he complied with the City's written discovery requests, scheduling a status hearing for July 23, 2021, and that in-person contempt hearing would be scheduled if plaintiff failed to comply by the date of the status hearing.

**The Order of July 23, 2021**
**The Bench Warrant of August 3, 2021**
**The Order of August 10, 2021**

337.    On or about July 23, 2021, Judge Roberts issued an "Order for Attachment of the Person (Civil Bench Warrant)" directing the Office of Judicial Records to issue a bench warrant,

and scheduled an in-person hearing on the City's Petition for Contempt.  The Order stated, in

pertinent part:

> **AND NOW**, this **23RD day of July, 2021**, despite due notice, Defendant Richard J. Silverberg failed to appear before this Court on July 23, 2021 to respond to a *Rule issued by this Court* and to participate in a status hearing.

(emphasis supplied and bold in original).

338.     It would be highly unusual for a Rule to be issued concerning a status hearing.  In

fact, contrary to the July 23, 2021 Order, no Rule was issued in connection with the July 23,

2021 hearing, and therefore no violation had occurred.

339.     Accordingly, Judge Roberts manufactured both a condition, and a purported

violation, the purpose of which was to justify the issuance of a bench warrant for plaintiff.  In so

doing, the actions of Judge Roberts in connection with the July 23, 2021 proceedings and Order

violated, *inter alia*, 18 Pa. C.S. § 4911(a)(Tampering with public records or information).

340.     On or about August 3, 2021, the Office of Judicial Records issued a bench

warrant addressed to the Philadelphia Sheriff for purposes of taking plaintiff into custody in

connection with a hearing scheduled for August 6, 2021.

341.     Since the July 23, 2021 Order was illegitimate and/or for the illegitimate purpose

of issuing a bench warrant, the August 3, 2021 Bench Warrant itself was illegitimate, and also

constituted a violation of § 4911(a).

342.     On or about August 6, 2021, two Sheriff's deputies were dispatched to the Market

Street property to execute the bench warrant, but plaintiff was not there.

343.    On or about August 10, 2021, Judge Roberts issued an Order finding plaintiff in contempt "for his failure to appear" and cancelled all future proceedings related to the contempt. The Order stated, in pertinent part:

> 3.    The Court finds Mr. Silverberg in **CONTEMPT** for his failure to appear.
>
> 4.    In light of the City of Philadelphia's writ of execution filing of August 9, 2021, all future proceedings relating to the contempt, including the previously scheduled August 30, 2021 hearing announced on the record, are **CANCELLED**.

(emphasis in original).

344.    While the basis for the City's Petition for Contempt was purported discovery-related violations, and while the basis for the bench warrant was the purported violation of a Rule, Judge Roberts found undersigned in contempt based upon the failure to appear.[74]

345.    Both as a general matter, and under the circumstances presented, a failure to appear does not meet the standard for contempt under Pennsylvania law.  Further, the stated reason for cancelling future proceedings related to the contempt (i.e., the reissuing of a writ of execution by the City) was entirely irrelevant to the contempt proceedings.[75]

346.    Accordingly, the actions of the City and Judge Roberts in connection with the Petition for Contempt were not legitimate and/or for a legitimate purpose, but rather were for the same or substantially the same reason(s) the City filed/pursued the PUFTA matter in the first

---

[74] This is consistent with Judge Roberts' pattern of conduct during the course of the proceedings - the record is replete with instances of inconsistent, conflicting, unsupported, and often completely nonsensical actions/explanations.

[75] The challenged Orders/hearings all violated and/or were superseded by the July 2, 2021 Administrative Order No. 24 of 2021 ("In re: Expansion of Court Operations") which prohibited all such hearings due to the pandemic.

instance - to harass, intimidate, oppress, threaten, coerce, and/or retaliate against the PUFTA defendants as part of the proxy war.

**The Proxy War - Part 5 (The PUFTA Claim)**
**The Disciplinary Complaints**[76]

347.    In or around March 2022, plaintiff was notified that Complaints had been filed against him with the Disciplinary Board of the Supreme Court of Pennsylvania in connection with the PUFTA matter.  Plaintiff was notified that the Complaints were filed by defendants Cullin and Anders.

348.    While the letter from the Disciplinary Board did not identify which complainant made which allegations, plaintiff only had minimal interaction with defendant Anders, a Philadelphia Court of Common Pleas judge, during the litigation.  Upon information and belief, the Enterprise Defendants and/or others engaged defendant Anders to participate in the proxy war, and to file a disciplinary complaint, so there would be more than one Complaint, a Complaint from someone other than Mr. Cullin, and so the disciplinary matter would not appear retaliatory or part of the proxy war - it was both.

349.    The Complaints were not filed based upon a legitimate belief that plaintiff had violated the Rules of Professional Conduct (RPC), but rather as part of the proxy war.  Further, although there was no legitimate basis to file/purse the PUFTA matter, and although Mr. Cullin and others violated multiple provisions of the RPC in connection with the filing/pursuit of the

_____

[76] While plaintiff denies engaging in any violations of the RPC, the purpose of this section is to identify the Enterprise Defendants/City's improper, tactical use of the disciplinary process, and not to address the specific charges.

tax/PUFTA matters, disciplinary Complaints were filed against plaintiff based upon his effort to defend himself against the wrongful/unlawful actions of Mr. Cullin, Judge Roberts, and others.

350.    There is no better evidence of the Enterprise Defendants' strategy to utilize legal/administrative process/proceedings for a wrongful/unlawful purpose than the filing of knowingly illegitimate disciplinary complaints.  In effect, the Enterprise Defendants/City utilized legitimate process/proceedings for illegitimate purposes, then accused plaintiff of violations when he sought to hold them accountable for their improper, abusive actions.

351.    For those who participated in the proxy war it was a double violation of the Rules - they committed multiple violations of the RPC in connection with the proxy war, which including utilizing the disciplinary process for wrongful purposes.

352.    The Complaints remain pending.

**The Proxy War - Part 6 (The PUFTA Claim)**
**The Petition for Appointment of Sequestrator**

353.    On or about July 30, 2021, the same day the PUFTA defendants had agreed (for the second time) to pay the full amount the City claimed was due and owing, the City filed a Petition for Appointment of Sequestrator.[77]

---

[77] Pennsylvania Rule of Civil Procedure 3114 states:

> Upon execution against any interest in real property, or a mortgage or lien thereon the court on petition of the plaintiff, may order the sheriff, or a sequestrator appointed by the court, to collect any rent, interest, principal or other sum *becoming due to the defendant*, to exercise any powers *possessed by the defendant as landlord*, mortgagee, life tenant, judgment creditor, lien holder, vendor or

354.     Pursuant to the plain language of Rule 3114, the Rule provides certain limited remedies to judgment creditors in certain limited circumstances, and specifically where a defendant possesses certain "powers" to collect rent and/or other funds "becoming due to the defendant."  In effect, although the City had failed/refused to levy the Vanguard account and twice rejected the PUFTA defendants offers to pay the full amount the City claimed was due and owing (i.e., approximately $350,000), the City now was seeking to forcibly remove plaintiff from the Market Street property and then have a Sequestrator market the property for purposes of obtaining market-rate rental payments of approximately $3,000/month - purportedly for purposes of satisfying the same claims/judgments.

355.     The Petition contained no facts supporting the application of Rule 3114 - the City came forward with no evidence (and did not even allege) that ELS held any of the positions/roles or possessed any of the powers identified in Rule 3114, and instead merely alleged, "The Market Street Property has the potential to generate rents, issues, or profits."  Further, other than a reference to Rule 3114 itself, the Petition contained no legal authority of any kind.

356.     Nevertheless, on October 29, 2021, Judge Roberts not only granted the factually/legally unsupported Petition and appointed a Sequestrator, but also permitted the Sequestrator to "take control" of the Market Street property, a remedy which is not available under Rule 3114 or any relevant Pennsylvania law.

---

otherwise, and to account to the court. The court may require a sequestrator's bond in such amount and upon such terms as it deems proper.

*Pa.R.C.P. 3114* (emphasis supplied).

357.    At bottom, as with the filing/pursuit of the PUFTA claim more generally, the

Petition was a raw display of official oppression, as well as a violation of 18 U.S.C. § 242.[78]/[79]

---

[78] In Pennsylvania, the offense of official oppression is defined as:

> A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:
> > (1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or
> > (2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.

18 Pa.C.S.A. § 5301.

[79] Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. *See 18 U.S.C. § 242*; *see also 18 U.S.C. § 241* (proscribing conspiracy to violate the Constitution or laws of the United States).  The United States Department of Justice has stated:

> For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, *as well as judges*, care providers in public health facilities, and others who are acting as public officials. It is not necessary that the crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin of the victim.

> The offense is punishable by a range of imprisonment up to a life term, or the death penalty, depending upon the circumstances of the crime, and the resulting injury, if any.

*Deprivation of Rights Under Color of Law, U.S. Dept. of Justice, Div. of Civil Rights* (https://www.justice.gov/crt/deprivation-rights-under-color-law)(emphasis supplied).

**The PUFTA defendants' Motion to Strike the**
**Petition was Unopposed and Should Have Been Granted**

358.    On or about September 7, 2021, the PUFTA defendants filed a Motion to Strike the City's Petition to Appoint Sequestrator alleging, *inter alia*, there was no factual and/or legal basis for the Petition, which contained no relevant facts supporting relief under Rule 3114 and no legal authority (other than a reference to the Rule itself), and therefore was filed in bad faith and/or for an improper purpose.

359.    The Response to the Motion to Strike was due on or before September 28, 2021 but the City did not submit the documents required by Local Rule 208.3(b)(2)(D), which is mandatory.  Accordingly, the PUFTA defendants' Motion to Strike was unopposed.

360.    Pursuant to the plain meaning of Local Rule 208.3(b)(2)(D), in failing/refusing to oppose defendants' Motion to Strike the City took the position and/or conceded the City's Petition should have been be stricken.  Nevertheless, Judge Roberts still permitted the City to oppose the Motion on the merits, scheduled a hearing where the City was permitted to argue the Petition and to offer testimony.

361.    Apparently emboldened by Judge Roberts' decisions to both consider the Petition and schedule a hearing, the City subsequently submitted a proposed Amended Order which provided that the Sequestrator immediately could "take control" of the Market Street property - a remedy which is unsupported by Rule 3114 or any legal authority, and which is directly contrary to both the purpose and spirit of Rule 3114.

362.    On or about October 29, 2021, Judge Roberts granted (the abandoned) Petition and denied the unopposed Motion to strike it.

363.    These events permitted Judge Roberts to do something he otherwise did not have the authority to do as a judge, and which the City *initially* was unwilling to do on its own but *ultimately* agreed to do and/or was complicit with the Court in doing - utilize a legally frivolous Petition predicated upon an inapplicable Pennsylvania Rule to hire a law firm that "acts under the direction and supervision of the court" to forcibly remove plaintiff from his home, or to attempt to do so.

**The Wrongful/Unlawful Actions of Gary F. Seitz, Esquire
and the Law Firm of Gellert Scali Busenkell & Brown LLC**

364.    On or about October 26, 2021, at a hearing concerning the City's Petition, the City proposed that Gary F. Seitz, Esquire of the law firm Gellert Scali Busenkell & Brown LLC be appointed Sequestrator.[80]  At the hearing, the following exchange took place:

> MR. CULLIN:  To the extent that you reviewed the docket and other, you know, relevant materials on the docket, do you have any general plan or approach that you would take in *managing* the Market Street property in this matter?[81]
>
> MR. SEITZ:  As a sequestrator, *which essentially just means rent receiver base* [sic] -- as a very basic core, I would treat this like I would any case.  First I would investigate the nature of the entity that owns the interest, request the operating report, take a look at their tax history -- the filings with tax history to determine the basis for the real estate and the transactions that are involved.
>
>        Once I get an understanding of the ownership of the property and any leases that are in place and review those, do an analysis to determine whether the lease is at market value or whether it needs to be adjusted in any way and then proceed on that basis to determine whether the current tenant is willing to, you

---

[80] With respect to the October 26, 2021 hearing, the PUFTA defendants had no prior notice that the City would be proposing Mr. Seitz (or anyone else) to serve as Sequestrator, or would be permitted to do so.
[81] There is nothing in Rule 3114 that pertains to and/or supports "managing" a property.

> know, pay market price for the property and if not, you know, seek
> to evict that tenant and replace it with a tenant so that the
> sequestrator can capture the legitimate cash flow that's due from
> the real estate.

> MR. CULLIN:  Thank you, Mr. Seitz.  I have no further questions.

365.    Mr. Seitz's statements that he would "first" investigate the nature of the entity and

request the "operating report," among others, were knowingly false - there was no such

investigation, request, and/or determination.[82]

366.    Had Mr. Seitz conducted such an investigation he would have determined there

was no factual/legal basis for the application of Rule 3114 to ELS and/or the Market Street

property.  Alternatively, Mr. Seitz knew/should have known there was no factual/legal basis for

the application of Rule 3114 but still proceeded anyway, suggesting he was not seeking the

appointment for legitimate purposes but rather as part of the proxy war.

367.    On or about November 2, 2021, the same day the October 29, 2021 Order was

docketed and before the compliance period for ELS (as set forth in the Order) had expired, Mr.

Seitz emailed the Property Manager for the Market Steet property, informed her that he had been

---

[82] At the hearing of October 26, 2021, Mr. Seitz also testified, in pertinent part:

> Once I get an understanding of the ownership of the property and any leases that
> are in place and review those, do an analysis to determine whether the lease is at
> market value or whether it needs to be adjusted in any way and then proceed on
> that basis to determine whether the current tenant is willing to, you know, pay
> market price for the property and if not, you know, seek to evict that tenant and
> replace it with a tenant so that the sequestrator can capture the legitimate cash
> flow that's due from the real estate.

In fact, those also were knowingly false statements, and/or made in reckless disregard for
whether they were true or false.  Since neither the City nor Mr. Seitz possessed any evidence
concerning the formation and/or structure of ELS, it was impossible for Mr. Seitz to know
whether Rule 3114 applied to ELS/the Market Street property.

appointed by the Court and had full authority to "take control" of the Market Street property, and attached a copy of the Order.  Mr. Seitz also had a telephone conversation with the Property Manger during which he demanded the keys to the apartment and threatened to have the locks changed if he was unable to obtain them.[83]

368.    The knowingly false statements by Mr. Seitz at the hearing of October 26, 2021, which were relied upon by the trial court, were a substantial/determinative factor in the granting of the City's Petition, as well as in Mr. Seitz being appointed Sequestrator.

369.    Upon information and belief, the City knew both the general nature and specific testimony Mr. Seitz intended to offer at the October 26, 2021 hearing.  Further, because the City knew its Petition was unsupported by the facts/prevailing legal standards, the City also knew that it was not possible for Mr. Seitz to offer legitimate, credible testimony in support of being appointed Sequestrator, yet proceeded anyway.

370.    Regardless, the entire process/proceedings were a sham – since the City already had failed/refused to recover on its claims/judgments, and since there was no factual/legal basis for the City's Petition, the actions of the City, Mr. Seitz, and Judge Roberts only could have been

---

[83] On or about November 11, 2021, plaintiff emailed Mr. Seitz stating, in pertinent part:
> [P]ursuant to the plain language of the October 29 Order, while the Sequestrator is authorized to exercise "any powers possessed by ELS as landlord," the Order does not authorize the Sequestrator to *establish ELS* as a leasehold and/or otherwise to transform the legal status of ELS, nor could it."  …  Further, while the Order authorizes the Sequestrator to "collect any rent … becoming due to ELS," this assumes there are funds "becoming due to ELS" in the first instance, which never has been established.

(quotes in original, emphasis supplied).

for a wrongful/unlawful purpose(s).  Further, the objective of the Petition (to forcibly remove plaintiff from his home, or to attempt to do so) was consistent with the objectives of the proxy war, to wit: a) harass, intimidate, oppress, coerce, threaten, instill fear, and punish plaintiff in connection with his anticipated book and related activities; and b) retaliate against plaintiff for engaging in protected activity.

### The Order of October 29, 2021 and the Actions of Gary F. Seitz

371.    The October 29, 2021 Order states, in pertinent part:

> 5.      Gary Seitz, Esq. of Gellert, Scali, Busenkell & Brown LLC, is appointed Sequestrator with full authority as permitted by law to operate and control all aspects of ELS in connection with ELS's ownership of the Property.

> 6.      The Sequestrator is authorized to collect any rent, interest, principal, or other sum becoming due to ELS.

> 7.      The Sequestrator is authorized to exercise any powers possessed by ELS as landlord, mortgagee, life tenant, judgment creditor, lien holder, vendor, or otherwise.

> 8.      The Sequestrator shall immediately take control of ELS for the purpose of controlling the property, as set forth in Paragraphs 6 and 7 of this Order.

372.    With respect to Paragraph No. 5, the October 29, 2021 Order, by its terms, was an "enabling" Order and not the actual authority for the "take control" provision.  Accordingly, the Sequestrator had the authority to operate and control ELS *only* "as permitted by law."

373.    Since Rule 3114 does not authorize a Sequestrator to take control of a subject property, nor is there any legal support/authority in Pennsylvania permitting a Sequestrator to do so, the "take control" provision of the October 29, 2021 Order was of no legal force or effect.

374.     Further, pursuant to the plain language of the Order, the Sequestrator was authorized to "take control" of the Market Street only if the requirements of Paragraph Nos. 6 and 7 of the Order were met - they were not.

375.     With respect to Paragraph No. 6, there was no evidence that defendant ELS "collect[ed] any rent, interest, principal, or other sum" and/or of "sum[s] becoming due to ELS." With respect to Paragraph No. 7, there was no evidence that defendant ELS was a "landlord, mortgagee, life tenant, judgment creditor, lien holder, [and/or] vendor," and/or otherwise possessed any "powers" within the meaning of Paragraph No. 7.

376.     On or about November 10, 2021, plaintiff sent Mr. Seitz an email describing, *inter alia*, the procedural history, that post-2017 the City had no legitimate basis to file/pursue the tax/PUFTA matters, the City's actions in connection with the Vanguard account and the PUFTA defendants May and July 2021 agreements, and that he knew/should have known there was no basis to proceed under Rule 3114 - even the (illegitimate) October 29, 2021 Order did not authorize the actions Mr. Seitz threatened.  A Sequestrator cannot proceed in good faith where the plaintiff/creditor has acted in bad faith and repeatedly failed/refused to satisfy the claims/judgments.

377.     In response, Mr. Seitz emailed plaintiff that same day and claimed that the circumstances surrounding the City's filing/pursuit of the time-barred, bad faith PUFTA claim essentially were irrelevant to his appointment as Sequestrator.  Mr. Seitz stated, "I am a fiduciary that owes allegiance only to the court that appointed me.  A sequestrator is an officer and arm of the court and acts under the direction and supervision of the court.  As such, the sequestrator only has the powers set forth by the court in the order and reports only to the court."

378.     Mr. Seitz's statements, and November 10, 2021 email more generally, cannot be reconciled with the actual facts/prevailing legal standards.  In particular, Mr. Seitz's own actions, including the making of knowingly false statements for purposes of being appointed and/or the actions he planned to take as Sequestrator, undercut any subsequent statements by Mr. Seitz concerning the appointment.  More generally, Mr. Seitz cannot be a participant in a fraud/fraud upon the court and then use that same fraud as a basis to support his actions.

379.     Mr. Seitz proceeded with the sequestration process even though the PUFTA defendants brought to his attention the actual facts/prevailing legal standards, and he otherwise knew/should have known there was no legitimate basis to do so, to wit:  a) the City lacked probable cause to file PUFTA claim, which was time-barred, and which was supported by knowingly false statements; b) the City's own actions demonstrated the Petition had not been filed/pursued in good faith and/or for a proper purpose since the City failed/refused to levy the Vanguard account and twice rejected the PUFTA defendants' agreements (in May and July 2021) to pay the full amount the City claimed was due and owing and the City's improper/ wrongful rejection of those offers; c) the Order of October 29, 2021 itself was illegitimate since, despite the mandatory requirements of Local Rule 208.3(b), the PUFTA defendants' Motion to Strike the Petition was unopposed yet Judge Roberts still granted the Petition; and d) there is nothing in Rule 3114, or Pennsylvania law, that authorizes a Sequestrator to "take control" of a property.

380.     Accordingly, the demand by Mr. Seitz that plaintiff pay $3000/month or be locked out of the Market Street property was not for purposes of carrying out the terms and conditions of the October 29, 2021 Order, his appointment as Sequestrator, and/or for a legitimate purpose of any kind, but rather was for the same or substantially the same reason(s)

the City filed/pursued the Petition in the first instance - to harass, intimidate, oppress, threaten,

instill fear, coerce, and/or retaliate against the PUFTA defendants consistent with the proxy war.

**The Hearing of December 7, 2021**

381.    On or about December 7, 2021, Judge Roberts conducted a status hearing in

connection with the Sequestrator's activities where the following exchange occurred:

> THE COURT: Mr. Silverberg, you had a question?
>
> MR. SILVERBERG: Yeah. Under what authority under Rule 3114 is there for a sequestrator to take control [of] the property?
>
> THE COURT: Mr. Silverberg, this was a briefed motion, and I entered an order. And the order was entered on October 29, 2021, so that is the authority whereby a sequestrator was appointed.
>
> MR. SILVERBERG: No. That's not the question. The question is under what authority -- meaning pursuant to Rule 3114, under 3114, how does a sequestrator take control of the property? There is nothing in Rule 3114 that provides for that. There's no case law that provides for it. So, my question to the Court is, under what authority is that order entered, because I'm unable to locate any anywhere?
>
> THE COURT: So, prior to the entry of my order, I had briefing, and then I held argument and a hearing, Mr. Silverberg, where you excused yourself from. But there was a full briefing and there was an opportunity to raise all of these arguments. As a result of the proceeding, I entered the order. So, that is the authority pursuant to which I entered that order.
>
> MR. SILVERBERG: So, there isn't any authority. Is that what you're saying? … Right now, the only authority I have been able to locate is the order of October 29, where it seems to me that you completely made up the ability of someone in Mr. Seitz's position to take control of a property. There is nothing in [the] Commonwealth of Pennsylvania anywhere that says that a sequestrator may take control of a property pursuant to Rule 3114. … Also, ELS is not a leasehold; it never was a leasehold. … It does not possess any of the powers identified in Rule 3114, any of them. … Mr. Seitz has no evidence. The City has no evidence that

ELS possesses any of the powers identified in Rule 3114 or in your order, for that matter. There is no basis for an appointment of a sequestrator. None. Nor did the City come forward with any. So, again, I'm asking you to please explain how Mr. Seitz can serve as a sequestrator when there [isn't] any authority or any evidence. None that a sequestrator is appropriate here. … You can't just make this stuff up. You're a judge.

MR. SEITZ: Your Honor --

THE COURT: Mr. Seitz, I will turn to you in a moment.

MR. SEITZ: Okay.

THE COURT: Mr. Seitz, so, what would you need to take control of the property that you have not been granted thus far?[84]

………………

THE COURT: Mr. Silverberg, I gave you a long opportunity to say whatever you wanted to say --

MR. SILVERBERG: You didn't provide an answer, though.

382.    This critical exchange was central not only to the October 29, 2021 Order granting the City's Petition for Appointment of Sequestrator, but also to the litigation more generally.  In particular, while Judge Roberts granted the City's Petition and also granted sweeping powers to the Sequestrator, he was unable to identify any legal basis for providing Mr. Seitz with the authority to "take control" of the Market Street property.

383.    While Judge Roberts claimed the authority for the October 29, 2021 Order was the briefing and October 26, 2021 hearing, the City failed/refused to cite any legal authority (other than Rule 3114 itself) in either its submissions or at the hearing.

---

[84] The appointment of a Sequestrator, and any powers secondary thereto, are governed by Rule 3114.  Once appointed, a Sequestrator is not empowered to establish his own powers, or to seek authority beyond that provided for by Rule 3114.  Therefore, Judge Roberts' inquiry was highly improper and suggested that the October 29, 2021 Order was not pursuant to Rule 3114.

384.     In effect, Judge Roberts conceded he had fabricated the powers/remedies that were provided to the Sequestrator in the October 29, 2021 Order, that the power(s) provided to the Sequestrator were not legitimate and/or for a legitimate purpose, and that the appointment/powers were for the same or substantially the same reason(s) the City filed/pursued the Petition in the first instance - to harass, intimidate, oppress, threaten, instill fear, coerce, and/or retaliate against the PUFTA defendants for purposes of the proxy war.

**The Order of January 11, 2022 - Part 1**

385.     On or about January 4, 2022, a Status Hearing was held in connection with the Sequestrator's activities.

386.     On or about January 11, 2022, and as a result of the Status Conference, Judge Roberts signed an Order which required that plaintiff immediately vacate the Market Street property, and which stated "[U]pon consideration of the Sequestrator's status report … [plaintiff] shall immediately remove himself and his personal belongings from [the Market Street property]. … The Sequestrator is authorized to take control of the Premises with the assistance of a private security guard and locksmith."

387.     The January 11, 2022 Order is inconsistent with and/or contrary to the October 29, 2021 Order.  In particular, but not by way of limitation, the January 11 Order was not an "enabling" Order whereby the Sequestrator only was permitted to "take control" of the property "as permitted by law."  Rather, the January 11 Order itself now was the authority.

388.     While a primary distinction(s) between the October 29, 2021 and January 11, 2022 Orders was that the later Order was signed pursuant to a Status Report submitted by the

Sequestrator, there still was no legal support/authority for a Sequestrator to "take control" of a property under either Rule 3114 or Pennsylvania law more generally.

**The Order of January 11, 2022 - Part 2**

389.    On or about January 5, 2022, based upon a draft of the January 11 Order that had been provided to plaintiff, and in fear that plaintiff would be forcibly removed and/or locked out from the Market Street property, plaintiff emailed Mr. Cullin and Mr. Seitz stating, "Assuming the proposed form of order submitted yesterday (or similar order) is signed, please advise what you are seeking so that I may determine whether an agreement may be reached."

390.    On or about January 5, 2022, Mr. Seitz sent an email to plaintiff which stated, in pertinent part:

> As you know, my mandate is to take control of the condo unit and monetize it in satisfaction of the City's judgment.  In order to do so, I must also comply with the rules of the Condo Association.  The Property Manager and Condo Association require that I change the locks of the unit in the presence of law enforcement.  Since I was unable to arrange a mutually convenient time with the police department or Sheriff's office, I plan to utilize a security guard to remove you or anyone else present, exclude you from the building and change the locks. I plan to take control of the unit, storage space and parking - clear out any contents left behind and market the unit for rental.

391.    To avoid plaintiff's forcible removal from the Market Street property, Mr. Seitz proposed, *inter alia*, a month-to-month lease whereby plaintiff would "pay into the receivership estate the monthly sum of $3,000 pending further orders of the court," and also demanded funds totaling $7,109.20 payable to his law firm.

392.     On or about January 5, 2022, Mr. Cullin also sent an email to plaintiff which

stated, in pertinent part:

> All,
>
> Mr. Seitz, thank you for providing the information. You've outlined a solid, common sense way to approach the negotiation and settlement of these matters.
>
> Mr. Silverberg – City requires that the $7,109.20, plus the $3,000 monthly amount, **for a total of $10,109.20**, be paid to Mr. Seitz by 5 PM on 1/10/22 via certified check. Additionally, City requires your compliance with the 5 points Mr. Seitz identified in his email below. If you do not comply with those 5 conditions and the payment conditions, City will continue to move forward with the sequestration process and the actions outlined in the proposed order.
>
> To provide you with the number that is due and owing and which will achieve satisfaction of the judgments in the City Tax Case and Fraudulent Transfer Case, as of today, the number is $364,346.40. Please note that if you pay the $3,000 monthly amount referenced in the paragraph above to Mr.  Seitz, you can deduct $3,000 from this number. Please also note that $55.99/day in post-judgment interest accrues each day, so the number I just provided assumes you'd be paying the City that amount today. As such, if it happens that you will pay a week or two from now, for instance, please be sure to deliver a check with the appropriate additional post-judgment interest tacked on to it. City requires that any such payment be made by certified check (money orders will not be accepted).
>
> Please confirm that you will be delivering the check for $10,109.20 to Mr. Seitz by 5 PM on 1/10/22 and that you agree to abide by the 5 points laid out in Mr. Seitz's prior email. If I don't receive that written confirmation **by 1/6/22 at 5 PM,** then I will assume you are not interested in this effort to resolve, and we will move forward with the activities outlined in the proposed order.
>
> Best,
>
> Brian Cullin

393.     With respect to Mr. Seitz's email of January 5, 2022, notwithstanding there was

no legitimate basis for Mr. Seitz's appointment, for the City's Petition, and/or for the PUFTA

claim more generally, there was no legitimate factual/legal basis for any of the threatened actions. Further, based upon the circumstances described herein, Mr. Seitz's threats/demands that plaintiff either pay Mr. Seitz $3,000/month or be forcibly removed from the building by private security, was itself a criminal extortion - plain and simple.[85]

394.    With respect to Mr. Cullin's email of January 5, 2022, which effectively incorporated Mr. Seitz's email of that same day, and notwithstanding there was no legitimate basis for the City's Petition or the PUFTA case more generally, the email again confirmed there simply was no legitimate basis for the ongoing litigation - the City repeatedly had failed/refused to engaged in execution/enforcement activities for a proper purpose, which included repeatedly failing/refusing to actually obtain the funds the City claimed were due and owing.

395.    On or about January 13, 2022, as a direct and proximate result of Mr. Seitz's January 5, 2022 email (as well as certain, subsequent related emails) and the January 11, 2022 Order, the terms/conditions and/or threats contained therein, and the threat/fear that plaintiff would be forcibly removed/locked out from the Market Street property and/or lose his personal property, plaintiff agreed to the terms/conditions demanded by Mr. Seitz in the January 5, 2022 email.

396.    On or about January 19, 2022, plaintiff sent Mr. Seitz a letter enclosing money orders totaling $3,000 payable to "Gary Seitz, as Sequestrator" in payment of the January 2022 "rent."

---

[85] Mr. Seitz's statement that he was "unable to arrange a mutually convenient time with the police department or Sherriff's office," despite the Order of October 29, 2021, suggested that both the Police Department and Sherriff's Office did not believe the terms/conditions of the Order were proper/lawful, and/or otherwise were unwilling to enforce such an Order.

**The Dissolution of ELS Realco LLC**

397.     On or about December 13, 2021, plaintiff wrote a letter to the Hon. Max Baer,

then-Chief Justice of the Supreme Court of Pennsylvania, and the Hon. Idee Fox, President

Judge of the Philadelphia Court of Common Pleas, stating, "[T]he members of ELS have

determined to dissolve ELS, in part, because those in positions of responsibility and trust have

abused those positions and rogue actors with a malign motive are intent upon misusing and

abusing their authority for the specific purpose of doing harm to ELS and its members."[86]  A

copy of the letter was emailed to the relevant parties, including Ms. Cortes, Mr. Cullin, and Mr.

Seitz.

398.     On or about January 24, 2022, plaintiff emailed the relevant parties, including Ms.

Cortes, Mr. Cullin, and Mr. Seitz, and attached a letter notifying them that a Certificate of

Cancellation for ELS had been filed with the State of Delaware, and that "the City/Mr. Seitz

have no further authority in this matter as against ELS."

399.     On or about January 28, 2022, Mr. Seitz sent plaintiff an email claiming the

January 6, 2022 agreement had been breached stating, "To be clear, if certified funds totaling

$7,109.20 payable to 'GSBB Law' are not received by my office [] by close of business on

February 1, 2022, our agreement is terminated and I will take steps to effectuate the court's most

recent order."

---

[86] Plaintiff previously had written to Justice Baer and Judge Fox in connection with the
tax/PUFTA matters on July 19 and August 8, 2021.

400.    On or about February 2, 2022, Mr. Seitz sent plaintiff an email which stated, "I did not receive your funds yesterday. You have materially breached our agreement which is no longer in effect. I will now take steps to effectuate the court's most recent order. Please vacate the premises by Friday to avoid any confrontation with the security service."

401.    On or about February 2, 2022, in a separate email to plaintiff, Mr. Seitz stated, in pertinent part:

> Even if you have a certificate of cancellation, it is void. … The LLC clearly has not dealt with the City's judgment pending against it and therefore the certificate is void. Since the certificate is void, it has no effect on the orders entered by the Court of Common Pleas. Please be advised that I have been in communication with the local police since my appointment. I have already notified Captain Colleen Billups of the Ninth Police District of the situation and I have provided the police with copies of the Court of Common Plea's two orders. They already have the facts in their files. If you wish to provide me with a copy of the certificate of cancellation. I will pass that along as well.

402.    On or about February 4, 2022, Mr. Cullin sent plaintiff an email which stated, in pertinent part, "Once again, you've refused to provide a copy of the dissolution paperwork you filed, despite multiple requests for it, so I am firmly of the opinion that you are blustering. If you'd like to prove me wrong, you can do so in 2 minutes by emailing me a copy of the filed dissolution paperwork."

403.    Mr. Seitz insisted the Certificate of Cancellation was "void" - it was not - when the City's Petition, his appointment, and the PUFTA case more generally, all were fraudulent. Regardless, as Mr. Seitz knew/should have known, the legal status of a company/corporation is not determined by a lawyer/party opponent but rather by a Department of State and/or court of law. To that end, the City/Mr. Seitz were required to bring any challenge to the dissolution in Delaware court, which they declined to do.

404.    At the precise moment that ELS was dissolved, the basis for the City's Petition no longer existed, the October 29, 2021 Order effectively became a nullity, and there was no legitimate basis to take any further action - plain and simple.  Even the pretense that the City/Mr. Seitz's actions were authorized no longer could be sustained.[87]

405.    On or about February 7, 2022, plaintiff sent Mr. Cullin an email which stated, in pertinent part:

> Your recent emails state that based upon my failure to produce the Certificate of Cancellation, it is the City's position (and your "firm opinion") that I am just "blustering" concerning dissolution and that the City will "push on" with sequestration.  As I previously stated, I no longer represent ELS and am not authorized to take any further action on behalf of the former company.  In any event, since the dissolution of ELS is a matter of public record, the City is charged with notice regardless of my response(s) to your emails.  As such, it is impossible that my failure to produce the Certificate is the true reason the City is continuing to pursue the Petition.  In turn, it also is impossible that the City's continuing pursuit of its made-up Petition (or the PUFTA case more generally) is about past due taxes and/or a supposed fraudulent transfer - the City cannot proceed under the CCP Orders and/or recover from a company that no longer exists.
>
> Therefore, the City's insistence that I produce the Certificate, and determination to proceed based upon my failure to do so, are a pretext/pretense for the true reasons for the City's actions - to harass, intimidate, coerce, and retaliate against opposing counsel and a party opponent.  Not only would any further action represent a gross violation(s) of the First and Fourteenth Amendments, there now is a clearly identifiable pattern which includes the City repeatedly engaging in pretextual conduct for purposes of committing Constitutional violations.

---

[87] For purposes of Section 242, acts under "color of law" include acts done not only by federal, state, or local officials within their lawful authority, but also "acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties."  This clearly would include the actions of Mr. Cullin and Mr. Seitz following the dissolution of ELS since the Order authorizing their actions no longer was effective.

> Since there is no basis for the Petition or the case itself, it remains apparent the City's only "strategy" is to maintain a fraudulent claim and behave as though it is legitimate - to engage in a ruse where literally nothing that is occurring has a proper basis in fact or law, or is a violation of it.

This was the last communication as between the parties in connection with the dissolution of ELS, the Petition for Appointment of Sequestrator, or the PUFTA matter more generally.

406.    On or about June 16, 2022, Mr. Cullin filed a Withdrawal of Appearance in both the tax and PUFTA matters, and in or around that same time, his employment with the City of Philadelphia ended.

407.    While there has been no execution/enforcement activity in either the tax or PUFTA matters since in or around February 2022, both cases still remain active on the docket, which itself constitutes a continuing abuse of process.

**The Proxy War - Part 7 (The PUFTA Claim)**
**The Implications of The Proxy War**

408.    In the section titled "The Implications of the Original Case Against Rohm and Haas Company," plaintiff alleges, in pertinent part:

> [I]n an effort to protect the Company in connection with its botched and otherwise wrongful/unlawful internal investigation, the Company manufactured a rape allegation by one employee against another employee, falsely claiming that McCrory had accused Jackson of committing a heinous crime.

> The determination to make knowingly false allegations that Jackson had attacked McCrory, and to offer altered and manufactured documentary evidence and perjured testimony to support its position [] reflected a policy/practice, operating strategy, and approach to corporate governance which was to take whatever action(s) were necessary to achieve the desired outcome

and/or the Company's objectives more generally, regardless of the actual facts and/or prevailing legal standards.

The policies, practices, strategies, and tactics utilized by R&H in the original state case are part of a years-long pattern and practice of wrongful/unlawful conduct by defendants and/or others whereby litigation-related decisions/activities, and business-related decisions/activities more generally, are not based upon the facts and relevant legal/regulatory/administrative standards, but rather upon whatever is required for the company, organization, entity, and/or individual to achieve the desired outcome and/or their objectives more generally.

409.    As the Jackson cases progressed through the federal courts, the defendants in those cases maintained these same policies/practices, strategies/tactics, approach to corporate governance and corporate citizenship, and views with respect to outcomes and objectives.

410.    What has emerged is a clearly-identifiable pattern of conduct whereby, when faced with an allegation or claim, a core group of defendants responds precisely the same way the Enterprise Defendants responded here - by taking whatever steps are necessary to achieve the desired outcome or their overall objectives more generally, regardless of the actual facts/legal standards, even if it means manufacturing facts and/or violating legal/regulatory/administrative standards - even if it means committing crimes.  They are willing to break rules, violate standards, and test the boundaries of enforcement, both in the name of protecting their financial and reputational interests and to satisfy their primal need "to win."  As part of that effort, both a tactic and overall strategy simply is to inflict as much damage, injury and harm as possible to those who oppose/threaten them and/or their interests - just to be vindictive.

411.    What also has been revealed is an antipathy - a lack of respect for democratic institutions, values and norms.  While it is a failure of leadership, character, and judgment, it also is something more basic - a lack of simple human decency.

412.     Pursuant to the Order of July 7, 2021, court-imposed sanctions of $2,500/day continue to accrue and now are approaching $2 million.

413.     Although there has been no litigation activity since February 2022, both the tax and PUFTA cases remain active on the docket.  Accordingly, despite the City's various activities during the past six years, the case(s) are in the exact same position as they were when judgment was first entered in the tax case in June 2008, nearly 15 years ago.

**The Role of Avantor, Inc.**

414.     In 1904, John Townsend Baker founded the chemical company J.T. Baker.  The company was acquired by Procter & Gamble in 1985, and subsequently was sold to Mallinckrodt in 1995.

415.     In 2010, investment firm New Mountain Capital purchased Mallinckrodt Baker Inc., which then changed its name to Avantor, Inc.  In or around that same time, Raj Gupta was named Chairman, a position he held until his retirement from the Company in May 2022.

416.     In May 2019, the Company went public with a $3.8 billion initial public offering (IPO), and which resulted in a market capitalization of $7.62 billion.

417.     Upon information and belief, at all times relevant and material hereto, Gupta authorized, ratified, participated in, and/or otherwise engaged in activities in connection with the proxy war by and through Avantor.  In particular, under Gupta's tenue, while Avantor engaged in numerous financial transactions purportedly for general or other corporate-related purposes

(including the May 2019 IPO), the true purpose of certain transactions was to fund and/or otherwise to facilitate the proxy war.

**The Role of Ballard Spahr LLP**

418.    Upon information and belief, Ballard Spahr represented R&H prior to its acquisition by Dow, regularly represents the City, and also represents certain other defendants, some in multiple matters.  Accordingly, the firm has had longstanding professional relationships with certain Enterprise Defendants, including during the relevant time period, which the firm viewed as critical to its business/financial interests.

419.    From August 2010-July 2016, Marcel Pratt was employed as an Associate at Ballard Spahr LLP.

420.    Upon information and belief, pursuant to an agreement by and between the Enterprise Defendants, the City/City/officials, Ballard Spahr, and/or Marcel Pratt, Marcel Pratt left Ballard Spahr and was hired by the City.

421.    In or around August 2016, Pratt was hired as Chair of Litigation, and in March 2018, was appointed City Solicitor.  In both positions, Pratt had oversight responsibility for, and authorized/ratified the Law Department's various actions in, the tax/PUFTA matters.

422.    Accordingly, Pratt played a central role in the execution of the proxy war by authorizing/ratifying the wrongful/unlawful actions of the Law Department in filing/pursuing the tax/PUFTA matters.

423.     In or around January 2021, Pratt returned to Ballard Spahr as Managing Partner of the firm's Philadelphia Office.

424.     Upon information and belief, Pratt would not have returned to Ballard Spahr and/or been named Managing Partner but for the agreement as between the Enterprise Defendants, City/City/officials, Ballard Spahr, and Pratt, and/or Pratt's role in the proxy war.

425.     Upon information and belief, Ballard Spahr agreed to participate, and participated, in the proxy war in connection with defendant Pratt's employment/positions because of the importance of maintaining its business relationships with the Enterprise Defendants and/or other defendants, and in furtherance of those same interests.


**The Role of the Courts**[88]/[89]

426.     Upon information and belief, at the time the Enterprise Defendants conceptualized the proxy war, they understood the participation and cooperation of the court(s) in the plan/scheme was essential to achieving their objectives.  In particular, because the proxy war was carried out by and through the filing/pursuit of the illegitimate tax/PUFTA matters and implemented by use of legal process/proceedings for a wrongful/unlawful purpose(s), the proxy

---

[88] The allegations pertaining to the role of the courts are intended to be representative and not exhaustive.

[89] For purposes of the instant Civil Action, plaintiff is not challenging whether decisions by the state court(s) were correctly decided.  However, because certain actions by Judge Roberts (and/or others) are the subject of the instant Civil Action, it may appear that plaintiff is asking the district court to review and reverse certain state court decisions as wrongly decided - plaintiff is not making such an allegation/challenge nor seeking such relief.

war only was possible because the courts repeatedly permitted/enabled the City's illegitimate activities.

427. As alleged herein, Judge Roberts intentionally and repeatedly ignored the facts, manufactured facts, ignored prevailing legal standards, fabricated standards, tampered with official court records, and/or took actions favorable to the City and harmful to the tax/PUFTA defendants regardless of the facts/legal standards, all as part of the Enterprise Defendants' proxy war as executed by the City/City officials/Law Department and/or others.

428. Where a judge knowingly and repeatedly disregards the facts/legal standards, going so far as to manufacture evidence and to tamper with official court records, and does so to intentionally benefit one party and/or to harm another, it is not discretion, mistake, inadvertence, or even political/social leanings, it is corruption - plain and simple.

429. Upon information and belief, and because there simply is no legitimate explanation for Judge Roberts' repeated failure to apply the facts/prevailing legal standards, to manufacture facts, tamper with official information/records, and/or otherwise repeatedly to decide matters in favor of the City and against the tax/PUFTA defendants regardless of the facts/prevailing legal standards, Judge Roberts was engaged for the proxy war in the same way and/or a substantially similar way (and for the same reasons and/or substantially the same reasons) as the City/City officials/Law Department.

**The Assignment of Judge Roberts to the Tax/PUFTA Matters**

430. On or about July 27, 2020, plaintiff placed defendants William Penn and Haas on notice of his intention to name them as defendants in SII.

431.    On or about August 13, 2020, 17 days later, Judge Roberts was introduced to the PUFTA case and scheduled the August 25, 2020 hearing.

432.    On or about November 10, 2020, just 77 days later, Judge Roberts awarded severe sanctions and entered default judgments against the PUFTA defendants.

433.    On or about January 11, 2021, without explanation, certain critical Motions in the tax case were re-assigned from Judge Wright to Judge Roberts.  The Motions were re-assigned even though, *inter alia*:  a) certain matters had been pending for more than a year; b) Judge Wright repeatedly had scheduled/rescheduled matters during the past 12+ months; c) Judge Wright recently had rescheduled all pending matters for a hearing via Zoom video conference for February 4, 2021; and d) counsel for all parties recently had been in contact with Judge Wright's Clerk for purposes of resolving certain disputed matters.

434.    On numerous occasions throughout the tax/PUFTA cases, matters originally assigned to other judges were re-assigned to Judge Roberts, even when Judge Roberts was not assigned/responsible for the subject of particular motions.

435.    Upon information and belief, Judge Roberts and or/others took improper action(s) to ensure that Judge Roberts was assigned to the various tax/PUFTA matters for purposes of effectuating the proxy war.

**Judge Roberts Engaged in Multiple Instances of Tampering**

436.     In Pennsylvania, tampering with public records or information is a misdemeanor of the second degree unless the intent of the actor is to defraud or injure, in which case the offense is a felony of the third degree.[90]

437.     In the tax/PUFTA matters, Judge Roberts engaged in multiple instances of tampering with public records or information including, *inter alia*:  a) the August 25, 2020 discovery-related Orders where the Orders were intentionally misidentified by the incorrect Control Number; b) the Order of September 9, 2020 denying the PUFTA defendants' Renewed Motion for Protective Order and/or to Stay Discovery (Control No. 80-2009D180) where, in Note 1 of the Order, Judge Roberts supported the decision by referring to a previous Order which, in fact, he did not issue and did not exist; c) although the PUFTA defendants Motion for Protective Order and to Stay Proceedings (Control No. 31-20092231) in connection with their Renewed Motion for Summary Judgment was denied by Order dated October 6, 2020, Judge Roberts *sua sponte* marked Control No. 31-20092231 moot; d) while the Docket Report for Control No. 31-20092231 states "MOTION/PETITION MARKED MOOT" and the specific entry states "31-20092231 SEE ORDER," no Order is identified and no corresponding link to the Order is included; and e) the Order of July 23, 2021, which authorized the issuance of the Bench Warrant based upon the purported violation of a Rule when no Rule had been issued, and when the City's Petition for Contempt was based upon purported discovery violations.

---

[90] *See note 27, supra.*

438.     In each instance, Judge Roberts' actions were for the specific purpose of advancing and protecting the interests of the City/City officials and others in connection with the proxy war, and harming those of plaintiff.

## The City and Judge Roberts Have Engaged in Official Oppression

439.     Under Pennsylvania law, official oppression is defined as:

> A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:
>
> (1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or
>
> (2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.

18 Pa.C.S.A. § 5301.

440.     The official oppression statute, like all criminal statutes, is intended to protect the public in general from certain behavior which society finds abhorrent and to punish those who engage in that behavior.  This includes protecting the public from an abuse of power by public officials and punishing those officials for such abuse.

441.     Since at least October 1, 2019, and as early as June 2017, the City and/or Judge Roberts (upon his introduction to the tax/PUFTA matters) knowingly have engaged in a pattern of unlawful conduct.  For example, but not by way of limitation, the Writ of Execution of October 2, 2019 which encumbered the Vanguard IRA violated Section 5301 since, *inter alia*:  a) the Writ was filed in connection with an action to recover past due taxes that purportedly were

due and owing; b) the City utilized the Writ to encumber the Vanguard account for 19 months; and c) the City dissolved the attachment without ever levying any funds, even though the account contained sufficient funds to satisfy the City's claims/judgments.

442.     Accordingly, the Writ constituted a "lien or other infringement of personal or property rights" within the meaning of Section 5301.  Further, because the funds were encumbered for nearly 2 years, the City's actions were intended to deny/impede and did deny/impede plaintiff "in the exercise or enjoyment of [his] right[s]."

443.     At the hearing of July 7, 2021, Judge Roberts stated:

> I don't think that their withdrawal or their dissolution of a levy can be -- you can't ascribe a motive to it[.].  Just because they dissolve a levy, you can't ascribe a motive to why they did or didn't do something. And on top of that, the judgment is the judgment. They have a judgment against you. However they choose to collect it, as long as they do it within the 20 years[.]

444.     To the contrary, intent may be inferred from acts/conduct or from the attendant circumstances, and proven by direct or circumstantial evidence.  Further, pursuant to the plain language of the Writ, the Writ had only one purpose - to forcibly obtain the funds necessary to satisfy the plaintiff's judgment.

445.     At the hearing of July 7, 2021, the following exchange took place:

> THE COURT: So you had the Vanguard account levied, and as Mr. Silverberg has argued here, dissolution of that levy, after several rounds of preliminary objections, is the basis for estoppel in some fashion. What's your response?
>
> MR. CULLIN: [T]he City dissolved the attachment because we have alternate avenues in which to collect this money. And it was a strategic decision to pursue a sheriff sale that is quicker, easier. Again, a strategic decision made by the City. Mr. Silverberg doesn't get to choose how the City collects its money. That's the

132

plaintiff's decision to make, not Mr. Silverberg's.

446.     The determination to pursue a Sheriff's Sale rather than execute on the Vanguard account and/or accept defendants' offer/payment of the full amount the City claimed was due and owing (which, *inter alia*, violated defendants' right to due process) violated Section 5301. Rather than obtain the taxes/funds and satisfy the judgments, the City made the "strategic decision" to continue execution/enforcement - in essence, to maintain a litigation where the objective was to pursue but not to actually obtain a remedy.

447.     Accordingly, encumbering plaintiff's IRA for 19 months served no legitimate purpose whatsoever.  Dissolving the attachment without ever levying any funds merely confirmed that the City had not filed the Writ for purposes of recovering taxes that supposedly were due and owing, or any other proper/legitimate purpose, but rather to harass, intimidate, threaten, instill fear, oppress, and coerce plaintiff in connection with the proxy war.

448.     Judge Roberts' attempt to explain or excuse the City's conduct only amplified his own scienter.  The Court's obligation is to confront an abuse of process - not to facilitate it.

**The Letters to Justice Baer and Judge Fox**

449.     On July 19, August 8, and December 13, 2021, plaintiff sent letters to the Hon. Max Baer, former Chief Justice of the Pennsylvania Supreme Court, and the Hon. Idee Fox, President Judge of the Philadelphia Court of Common Pleas, in connection with Judge Roberts' conduct in the tax/PUFTA matters.

450.    As Chief Justice, Justice Baer also was head of the Administrative Office of

Pennsylvania Courts, which provides operational and policy oversight in connection with local

court management.  As President Judge, Judge Fox sits on the First Judicial District's

Administrative Governing Board "which functions much like a Board of Directors for the

District," according to the First Judicial District's website.

451.    The letter of December 13, 2021 stated, in pertinent part:

> To respond to a legitimate claim or dispute by manufacturing an
> illegitimate claim/dispute sends one overarching message - there is
> no legitimate explanation and/or defense to the conduct being
> challenged. … There can be no dispute that a severe, pervasive
> corruption as infected the courts, infused by an equally insidious,
> pervasive corruption of City government.  The failure by AOPC
> and/or the President Judge to take immediate remedial action,
> including against Judge Roberts, only can be viewed as an
> abdication by them of their oversight responsibility.  As for those
> copied on here and their principals, I would say shame on you but
> it is apparent you have none.

452.    Although plaintiff's letters provided a detailed account of Judge Roberts'

activities and violations, and requested immediate remedial/corrective action including an

investigation, plaintiff was not informed of any action taken in response to his letters/requests,

and Judge Roberts continued to preside over the tax/PUFTA matters.

**The Role of the Lawyers**

453.    Upon information and belief, at the time the Enterprise Defendants

conceptualized the proxy war, they also understood that lawyers would need to play a central

role.  In particular, because the proxy war was carried out by and through the filing/pursuit of the

illegitimate tax/PUFTA matters, and because the tax/PUFTA matters were filed/pursued by use

of legal process/proceedings for a wrongful/unlawful purpose(s), the proxy war only was able to occur because lawyers were willing to engage in wrongful, unlawful, and/or unethical conduct.

454.    Lawyers swear an oath to uphold the Constitution and laws of the United States and the Commonwealth of Pennsylvania.  They also are bound by the Pennsylvania Rules of Professional Conduct (RPC), and can be subject to discipline up to and including disbarment.

455.    Since 2017, there has been no legitimate basis to pursue the tax matter, and there never was a legitimate basis to file/pursue the PUFTA claim.  Therefore, every action taken in the tax/PUFTA matters by Mr. Cullin and Mr. Seitz has been in bad faith and/or for an improper purpose, an abuse of process, violated multiple Rules of Professional Conduct, and otherwise has been wrongful/unlawful.  Where a claim/case is illegitimate, every action by counsel in further of the claim/case necessarily is illegitimate as well.

456.    In both the tax and PUFTA matters, every submission included a Verification, typically signed by Mr. Cullin, stating that "[T]he foregoing pleading is true and correct to the best of my knowledge, information and belief.  I understand that any false statements made herein are subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities."  However, numerous submissions contained knowingly false statements, or statements made in reckless disregard for whether they were true or false, beginning with the PUFTA Complaint itself.[91]

457.    The RPC states, in pertinent part:

> Although a lawyer is personally answerable to the entire criminal
> law, a lawyer should be professionally answerable only for

---

[91] For example, the PUFTA Complaint alleged that ELS was a single-member LLC and that plaintiff was the sole member, allegations which were knowingly false or made in reckless disregard for whether they were true or false.

> offenses that indicate lack of those characteristics relevant to law
> practice.  Offenses involving violence, dishonesty, breach of trust,
> or serious interference with the administration of justice are in that
> category. A pattern of repeated offenses, even ones of minor
> significance when considered separately, can indicate indifference
> to legal obligation.

*R.P.C. 8.4, Comment 2.*

458.    In the instant case, Mr. Cullin's various actions in connection with the tax/PUFTA

matters, and Mr. Seitz's actions in connection with the City's Petition, violated multiple

provisions of the Rules of Professional Conduct.  *See e.g. Rule 3.1 (Meritorious Claims and

Defenses)*("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue

therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a

good faith argument for an extension, modification or reversal of existing law."); *Rule

3.3(a)(1)(Candor Towards the Tribunal)*("A lawyer shall not make a false statement of material

fact or law to a tribunal or fail to correct a false statement of material fact or law previously

made to the tribunal by the lawyer[.]"); *Rule 3.3, Comment 2* ("This Rule sets forth the special

duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the

adjudicative process. … [T]he lawyer must not allow the tribunal to be misled by false

statements of law or fact or evidence that the lawyer knows to be false."); *Rule 4.4(a)(Respect

for Rights of Third Persons)*("[A] lawyer shall not use means that have no substantial purpose

other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence

that violate the legal rights of such a person."); *Rule 8.4 (Misconduct)*("It is professional

misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or

misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice[.]");

*Preamble at 5* ("A lawyer should use the law's procedures only for legitimate purposes and not

136

to harass or intimidate others. … While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.").

459.    It does not matter that the Courts permitted various actions/submissions since the RPC specifically notes that "It is not a justification that similar conduct is often tolerated by the bench and bar."

460.    Attorneys Cortes, Pratt, and/or possibly others in the Law Department also violated the Rules based upon their respective roles as supervisors/managers.[92]

461.    Since there is no legitimate basis to pursue an illegitimate claim, or to engage in illegitimate activities, counsels' filing/pursuit of the tax/PUFTA matters and related activities, including the City's Petition, only could have been for wrongful/unlawful purposes.

462.    Yet, it is plaintiff who is facing disciplinary Complaints, at least for now.

---

[92] The Rules of Professional Conduct state, in pertinent part:

> (b)  A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.
> (c)  A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:
> > (1)  the lawyer orders or, with knowledge of the specific conduct ratifies the conduct involved; or
> > (2)  the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

*Pa.R.P.C. 5.1(b)-(c)*; *see also Pa.R.P.C. 5.1(c), Comment 1* (noting that Part (c) specifically applies to government agencies).

**Defendants Have Engaged in a Pattern and Practice of Harassment,**
**Intimidation, Oppression, Threats, Instilling Fear, Coercion, and Retaliation**

463.     The proxy war was not the first time that harassment, threats, fear, and

intimidation were used as tactics in connection with the Jackson litigation, including threats/fear

for personal safety/property, in an effort to intimidate Jackson and his counsel.

464.     As set forth in Paragraph Nos. 139-165 of the Consolidated Amended Complaint,

after the district court determined that Jackson had stated claims for violation of RICO and

ERISA against R&H and R&H officials, and consistent with the Jackson III defendants efforts to

defeat Jackson's claims, there were multiple incidents where Jackson discovered that memorial-

like flowers had been placed on his car (which was parked in his driveway) and down his

driveway, an incident where there was loud banging on his front door at 3:00 am, and a "strange

van" parked across the street from his home, which were reported to the police.

465.     The CAC alleged, in pertinent part:

> **The Black SUV**
>
> 164.  On March 7, 2007, at approximately 9:30 p.m., while
> plaintiff was crossing the street from picking up his mail, a black
> SUV nearly struck him. The driver of the SUV stopped, rolled
> down his window, and then stated to plaintiff:
>
>> I'm sorry, I almost hit you. You need to be more
>> careful, especially in other situations when you're
>> fucking with the wrong people.
>
> The car then pulled away. It is apparent that the car already was on
> plaintiff's block, and that the driver had been waiting for precisely
> such an opportunity. Plaintiff perceived the incident to be a threat
> to his person, safety, and/or property intended to harass, intimidate,
> oppress, retaliate and dissuade him from continuing the litigation
> against the R&H/Liberty Life defendants and/or others. Further,
> plaintiff believed the incident was connected to the litigation since,
> inter alia: a) the incident occurred within days of plaintiff
> providing a detailed account to the district court of R&H's
> improper interference with, and termination of, his health

138

insurance benefits and R&H's proffered explanation for its
conduct, all of which directly implicated, among other things,
defendants' various duties pursuant to ERISA; b) there had been a
number of previous incidents at plaintiff's home, all consistent in
time with events in the litigation, and all intended to harass,
intimidate, oppress, retaliate and dissuade plaintiff from continuing
with the litigations against the R&H/Liberty Life defendants and/or
others; and c) the incident represented an escalation since the prior
conduct had failed to intimidate plaintiff out of his claims against
defendants.

466.    The CAC noted that that the incident with the Black SUV "represented an

escalation since the prior conduct had failed to intimidate plaintiff out of his claims against

defendants."

467.    In the instant matter, the Enterprise Defendants, by and through the City, Judge

Roberts, and Mr. Seitz, also engaged in threats and intimidation - they simply did so through the

filing/pursuit of the illegitimate tax/PUFTA matters and by utilizing legal process/proceedings as

a club for purposes of the proxy war.

468.    Further, in the same way the incident with the Black SUV represented an

escalation from the prior incidents, the Petition for Appointment of Sequestrator also was an

escalation - the City/Mr. Seitz (by/through Judge Roberts) now were seeking to have plaintiff

forcibly removed from his home, and doing so based upon a Petition that contained literally no

relevant facts/legal authority (other than a reference to Rule 3114 itself).

469.    Both matters involved Fortune 500 companies engaging in a muti-year, multi-

faceted pattern of criminal conduct, predicated upon case-fixing, where fraud, abuse of process,

school-yard bulling, and base thuggery were used both as tactics and a strategy to obtain a

desired outcome and to achieve the companies' overall objectives.

470.    As plaintiff argued at the R&H trial, it's all been just one big lie - it still is.

**COUNT I**
**PLAINTIFF V. CITY OF PHILADELPHIA, JAMES KENNEY, MARCEL S. PRATT,**
**ESQUIRE, DIANA P. CORTES, ESQUIRE, MARISSA O'CONNELL, ESQUIRE,**
**BRIAN R. CULLIN, ESQUIRE, JOSHUA ROBERTS, DANIEL ANDERS, GELLERT**
**SCALI BUSENKELL & BROWN LLC, GARY F. SEITZ, ESQUIRE**
**42 U.S.C. § 1983 - VIOLATION OF CONSTITUTIONAL RIGHTS**

471.     Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Four hundred seventy (470) as though fully set forth herein.

472.     The conduct of defendants, individually and/or through the City's and/or First Judicial District's employees, representatives, and/or associates, acting at all times within the course and scope of their employment and in furtherance of the City/First Judicial District's business and interests, constitutes conduct under color of state law within the meaning of Section 1983 and which has, *inter alia*:  a) violated plaintiff's right to free speech/petition as secured by the First Amendment; b) violated plaintiff's right to procedural due process as secured by the Fourteenth Amendment; and c) violated plaintiff's right to substantive due process, namely the rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment to the Constitution and laws of the United States, all to plaintiff's great detriment and loss.

473.     The conduct of defendants in connection with the filing, pursuit, and disposition of the various disputed matters in the tax and PUFTA matters constituted a violation of procedural due process as secured by the Fourteenth Amendment.  Procedural due process is violated when disputes are not decided fairly and impartially, based upon the actual facts and prevailing legal standards, which is what occurred here.  In particular, but not by way of limitation, the various discovery-related matters (including the various Motions for Protective

Order and to Stay Proceedings), Motions to Set Aside Judgment, Motion to Foreclose Upon

Lien, Motion to Compel Entry, Petition for Contempt, and Petition for Appointment of

Sequestrator, among others, and the related process/proceedings, were not decided fairly,

impartially, and/or otherwise on the merits.  To the contrary, Judge Roberts intentionally and

repeatedly ignored the facts, manufactured facts, ignored prevailing legal standards, fabricated

standards, tampered with official court records, and/or otherwise took actions favorable to the

City and harmful to the tax/PUFTA defendants regardless of the actual facts/legal standards, all

as part of the Enterprise Defendants' proxy war as executed by the City/City officials/Law

Department, Mr. Cullin, Mr. Seitz, Judge Roberts, and/or others.

474.    The conduct of defendants in connection with the filing, pursuit, and disposition

of the various disputed matters in the tax and PUFTA matters also constituted a violation of

substantive due process - a loss or deprivation of plaintiff's rights, privileges, and immunities

and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment.

As a general matter, the City is not permitted to file/pursue baseless legal claims/lawsuits, to

file/pursue claims for a wrongful/unlawful purpose, to engage in legal/rights violations in the

filing/pursuit of claims, and/or otherwise to utilize legal process/proceedings for a wrongful/

unlawful purpose(s) and/or to obtain remedies to which they are not entitled, which is what

occurred here.  In particular, but not by way of limitation, the City/City officials/Law

Department and/or others did not file/pursue the tax/PUFTA matters for purposes of recovering

past due taxes that supposedly were due and owing, and Judge Roberts did not preside over the

tax/PUFTA matters for purposes of properly resolving disputed matters.  Rather, all activities by

all participants were part of the proxy war - a corrupt plan/scheme by the Enterprise Defendants

and/or others on behalf of all defendants whereby the tax/PUFTA matters were utilized to, *inter*

*alia*: a) harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff in connection with his anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities; and b) retaliate against plaintiff for engaging in protected activity.

475.    The allegations and claims set forth in the original and Amended Silverberg I and Silverberg II Complaints are an exercise of, and protected by, the freedom of speech and right to petition clauses of the First Amendment to the United States Constitution.  Further, a cause of action, and money, are forms of property.  The repeated interference with plaintiff's exercise of his federal rights, and relatedly, repeated and resulting interference with and against plaintiff's affairs, property, accounts and funds, constituted a loss or deprivation of plaintiff's rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment.

476.    The City's actions in connection with the filing/pursuit of the tax/PUFTA matters, when (since 2017) the tax matter was not being pursued for purposes of recovering past due taxes that purportedly were due and owing, and the City lacked probable cause to file the PUFTA matter, which was time-barred by more than four years and based upon knowingly false statements concerning the formation/status of ELS and that a fraudulent transfer had occurred, violated plaintiff's rights as secured by the First and Fourteenth Amendments.  Further, the tax/PUFTA matters together were not filed/pursued for tax-related purposes but rather for purposes of the proxy war, and therefore constituted the use legal process/proceedings for wrongful/unlawful purposes.

477.    The May 17, 2021 email exchange whereby the City rejected the PUFTA defendants' offer to pay the full amount the City claimed was due and owing because the

PUFTA defendants would not release their Constitutional and other claims against the City and others violated plaintiff's rights under the First and Fourteenth Amendments.  In particular, but not by way of limitation:  a) there are no pre-conditions to a taxpayer's legal obligation to pay taxes, nor can the government impose any such conditions; otherwise, the government would be able utilize its taxing authority for wrongful/unlawful purposes unrelated to the payment of taxes; b) a lawsuit and the claims contained therein are a form of property; c) the City specifically connected the tax/PUFTA matters and plaintiff's claims in SI/SII;[93] and d) the City specifically demanded that the PUFTA defendants release claims in connection with the City's "tax collection activities" - the same actions that were the subject of the district court's January 8, 2020 decision finding that claims had been stated for Constitutional violations.

478.    The City's actions in connection with its baseless Petition for Contempt, and Judge Roberts' actions in connection with granting the Petition, violated the First and Fourteenth Amendments.  As a preliminary matter, since the tax/PUFTA claims were illegitimate and/or filed/pursued for an illegitimate purpose(s), every action in furtherance of the claims/cases necessarily was illegitimate as well.  In particular, but not by way of limitation:  a) the City's Petition was based upon the PUFTA defendants' purported failure to respond to discovery in aid of execution; b) Judge Roberts granted the Petition based upon the purported violation of a Rule; and c) the Petition was granted even though no Rule ever was issued and therefore no violation of Rule had occurred, and the City already had failed/refused to execute on its claims/judgments. Even though the City was proceeding in bad faith, and failed to show that any actions/omissions on the part of the PUFTA defendants met the standard for contempt under Pennsylvania law,

---

[93] *See ELS Realco LLC, et al. v. City of Philadelphia, et. al*., United States District Court for the Eastern District of Pennsylvania, No. 5034 (filed Oct. 12, 2020)("Silverberg II" or "SII").  On February 23, 2021, SII was voluntarily dismissed.

Judge Roberts issued Orders finding plaintiff in contempt, resulting in a Bench Warrant for plaintiff to be taken into custody, and two Sheriff's deputies being dispatched to plaintiff's home to execute the warrant.  Because there were no relevant facts supporting the illegitimate Petition, and because the Petition did not meet the standard for contempt, the true purpose of both the Petition and decision was to create a scenario whereby plaintiff could be taken into custody, and/or the City/Judge Roberts could attempt to do so, all as part of the proxy war, all in violation of the First and Fourteenth Amendments.

479.    The actions of the City, defendant Seitz, and Judge Roberts in connection with the baseless Petition for Appointment of Sequestrator violated the First and Fourteenth Amendments.  In particular, but not by way of limitation: a) the PUFTA defendants' Motion to Strike the Petition should have been granted, and Judge Roberts' failure to do so violated the Local Rules; b) the Petition contained no facts/legal authority (other than a reference to Rule 3114 itself) supporting the application of Rule 3114; c) defendant Seitz provided knowingly false testimony for purposes of securing the appointment as Sequestrator, which Mr. Cullin knew/should have known was false, but still advanced for purposes of securing defendant Seitz's appointment; d) Judge Roberts granted the Petition and appointed defendant Seitz as Sequestrator even though there were no facts supporting the application of Rule 3114 to the instant matter in the first instance; e) in the October 29, 2021 Order, Judge Roberts authorized the Sequestrator to "take control" of the Market Street property, a power which is not available under Rule 3114 or any relevant Pennsylvania law; f) c) on or about November 2, 2021, Mr. Seitz improperly emailed the Property Manager at the Market Street location, indicated that he had been appointed by the Court, had full authority to "take control" of the Market Street property, and ultimately demanded the keys to the apartment and threatened to have the locks

changed if he was unable to obtain them; and d) defendant Seitz did not carry out the legitimate functions of a Sequestrator and/or attempt to do so.  Rather, the true purpose of the Petition, and of the actions of Mr. Cullin, Mr. Seitz, and Judge Roberts in connection with the Petition, was to, *inter alia*:  a) to harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff in connection with his anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities; and b) to retaliate against plaintiff for engaging in protected activity.  Further, the objective(s) was to coerce plaintiff into paying funds to the City/Seitz that plaintiff was not required to pay, to forcibly remove plaintiff his home and/or attempt to do so, and/or otherwise to harass, threaten, intimidate, and coerce plaintiff in connection with the proxy war, all in violation of plaintiff's rights as secured by the First and Fourteenth Amendments.  As a direct and proximate result of defendants' wrongful/unlawful actions in connection with the illegitimate Petition, plaintiff was wrongfully/unlawfully coerced into an agreement and forced to pay (and did pay) the sum of $3,000 to Gellert Scali, Mr. Seitz's law firm, to avoid being forcibly removed and/or locked out from his home.

480.    The City/City officials, Judge Roberts, and others engage in a policy, practice, and/or custom of utilizing legal process/procedures for wrongful/unlawful purposes, utilizing the courts for political, personal and/or other wrongful/unlawful purposes, and/or of a failure to supervise.  In particular, but not by way of limitation, although the City/City officials have legal/fiduciary duties to advance and protect the interests of taxpayers, lawyers swear an oath to abide by the Constitution and laws of the United States and the Commonwealth of Pennsylvania and are required to abide by the Rules of Professional Conduct, as do/are judges who also are subject to the Pennsylvania Code of Judicial Conduct, all violated those same standards in

service of Mayor Kenney's political and personal interests and agenda, those of the Kenney Administration, their own political/personal agendas, and for purposes of the proxy war.  In so doing, the City/City officials, lawyers in the Law Department, and defendant judges regularly authorized/ratified actions that are both wrongful/unlawful and a breach of fiduciary duty in order to achieve specific outcomes, and the objectives of the Kenney Administration more generally.

481.    At all times relevant and material hereto, all actions by defendant Cullin have been at the specific direction and/or with the approval of Marissa O'Connell, Divisional Deputy City Solicitor, Marcel S. Pratt, former City Solicitor, and/or Diana Cortes, City Solicitor, City of Philadelphia.  Further, at the hearing of October 26, 2021, Mr. Cullin proposed Mr. Seitz as Sequestrator, and following his appointment, worked with Mr. Seitz in connection with the City's Petition for purposes of obtaining the remedies described herein.  Therefore, all such actions constitute and/or were in furtherance of a policy, practice, and/or custom of the City of Philadelphia of utilizing legal process/procedures for wrongful/unlawful purposes.

482.    As relief, plaintiff demands all legal and equitable remedies for all injuries, harms, damages, and losses suffered as the result of defendants' violations of plaintiff's rights as described herein.  In particular, but not by way of limitation, plaintiff demands, as appropriate, to be made whole, including but not limited to, an award of monetary damages/funds, interest on said money/funds, and any associated fines, penalties, attorney's fees, and costs.  As further relief for defendants' violations of plaintiff's rights, plaintiff demands:  a) an award of compensatory damages for his severe personal injuries as described herein, including but not limited to, damage to and/or loss of personal and professional reputation, severe emotional distress and/or mental anguish with associated physical symptoms, humiliation, anxiety, and

stress; b) an award of punitive damages in that defendants' conduct was motivated by an evil

motive or intent, and/or was in callous or reckless disregard to the rights of plaintiff and/or

others, and/or was intentional and/or reckless, wanton, extreme, and outrageous, and otherwise

satisfied the standard of outrageousness necessary to support an award of punitive damages; c)

an order enjoining defendants from ongoing violations and from engaging in similar or like

conduct in the future; and d) all fines, penalties, attorney's fees, costs, and all other legal and

equitable relief that may be available and that the Court deems just and appropriate.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants,

City of Philadelphia, James Kenney, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa

O'Connell, Esquire, Brian R. Cullin, Esquire, Joshua Roberts, Daniel Anders, Gellert Scali

Busenkell & Brown LLC, and Gary F. Seitz, Esquire, jointly and/or severally, in an amount in

excess of $150,000, exclusive of interest and costs.

## COUNT II
## PLAINTIFF V. ALL DEFENDANTS
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## <u>OBSTRUCTION OF JUSTICE - 18 U.S.C. §1951</u>

483.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Four

hundred eighty-two (482) as though fully set forth herein.

484.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C.

§§ 1962(c), 1951.

485.    The conduct of the municipal, corporate, and nonprofit defendants, each acting through their employees, associates, and/or representatives, constitutes conduct of an enterprise through a pattern of racketeering activity.  In particular, but not by way of limitation:  a) the Enterprise Defendants, Dupont, Dow, Corteva, IFF, Avantor, Liberty Mutual, Vanguard, the City, William Penn, Ballard Spahr, Gellert Scali, and the First Judicial District each constitute an association-in-fact or enterprise within the meaning of RICO engaged in, or the activities of which affect, interstate or foreign commerce; b) in addition, the Enterprise Defendants, Dupont, Dow, Corteva, IFF, Avantor, Liberty Mutual, Vanguard, the City, William Penn, Ballard Spahr, Gellert Scali, and the First Judicial District formed a joint association-in-fact or enterprise within the meaning of RICO; c) the activities of each enterprise and the joint enterprise were operated, managed, and/or otherwise conducted by persons who were either employed by or associated with said enterprise/joint enterprise within the meaning of RICO; d) in addition, the Enterprise Defendants, Dupont, Dow, Corteva, IFF, Avantor, Liberty Mutual, Vanguard, the City, William Penn, Ballard Spahr, Gellert Scali, and the First Judicial District each conducted their respective enterprises through the other, and therefore, were "persons" within the meaning of RICO for purposes of doing so; and e) said persons conducted or participated, directly or indirectly, in said enterprise's/joint enterprise's affairs through a pattern of racketeering activity.  Defendants Breen, Liveris, Gupta, Fibig, Long, Buckley, Haas, Roberts, Anders, Kenney, Pratt, Cortes, O'Connell, Cullin, and/or Seitz created, authorized (and continue to authorize), operate, manage, and/or administer the respective enterprises and/or the joint enterprise, endorse and/or condone the corrupt plan or scheme to utilize the tax/PUFTA matters as part of the illegitimate proxy war, and to do so by utilizing legal process/proceedings for a wrongful/unlawful purpose(s).  Each enterprise and the joint enterprise comprise an ongoing organization with a framework for

making and carrying out decisions, with members that function as a continuing unit with established duties, and which is separate, distinct, and apart from the pattern of racketeering activity in which it engages.

486.   Defendants obstructed, delayed, and/or affected commerce or the movement of an article or commodity in commerce by extortion, or attempted and/or conspired to do so. Defendants have endeavored and/or conspired to obtain property from another, with his consent, induced by wrongful use of actual or threatened force, fear, and/or under color of official right, in violation of 18 U.S.C. §§ 1951(a), (b).  In particular, but not by way of limitation, the actions of defendants in connection with the discovery-related matters, Motion to Foreclose Upon Lien, Motion to Compel Entry, Petition for Appointment of Sequestrator, disciplinary Complaints, and the tax/PUFTA matters more generally, including the illegitimate actions of Judge Roberts in granting illegitimate motions/petitions and awarding remedies that were not supported by the facts and/or prevailing legal standards, were not for purposes of (or related to) recovering past due taxes that supposedly were due and owing.  Rather, the true purpose and objective was to obtain from plaintiff, by the wrongful use of force, threat, and/or fear, certain funds and/or real/personal property within the meaning of §1951, or to threaten/attempt to do so, property to which defendants have no lawful claim or entitlement.  Accordingly, defendants' actions as described herein, including those actions from June 2017-present in connection with the filing/pursuit of the tax/PUFTA matters, all constituted obstruction and/or an endeavor to obstruct, and/or a conspiracy to obstruct justice, within the meaning of 18 U.S.C. §§ 1951(a), (b).

487.   The repeated obstructive acts of defendants, as hereinbefore set forth, were not isolated or sporadic events but rather were all related in that they had the same or similar purposes, participants, victims, results and/or methods of commission, and/or otherwise were

related by distinguishing characteristics.  Additionally, the actions have continued over a substantial period of time and amount to, pose a threat of continuing racketeering activity, and/or are part of defendants' regular way of doing business, all of which has and will continue indefinitely into the future to have an adverse effect upon interstate commerce.

488.    As a direct and proximate result of defendants' pattern of racketeering activity as described herein, plaintiff has suffered an injury to business or property, and otherwise was legally injured within the meaning of RICO.  In particular, but not by way of limitation, plaintiff has suffered the following damages and losses:  a) the sum of $3,000, which was paid to Gellert Scali, to avoid being forcibly removed from the Market Street property; b) $2500/day for the period July 8, 2021-present, pursuant to the Order of July 8, 2021; c) loss of access to and/or use of retirement and/or other funds; d) damage to and/or loss of personal and professional reputation; e) the loss and/or threatened loss of possessions, property, and funds, including but not limited to, the awards, damages, sanctions, and/or other remedies awarded in various Court Orders, both monetary and non-monetary; f) fear of damage, loss, and harm as the result of defendants' wrongful/unlawful actions; g) actual/threatened loss and/or impairment to business interests and concerns, including licensure and/or certification/registration; and h) attorney's fees and costs and/or a substantial increase in attorney's fees and costs, which were required and expended as a direct and/or proximate result of defendants' racketeering activities.

489.    As relief for defendants' violations of plaintiff's rights as secured by RICO, plaintiff demands all legal, equitable, and/or other remedies available pursuant to RICO for all damages, harms, injuries, and losses suffered, including all losses to business and/or property, for the pattern of racketeering activity.  In particular, but not by way of limitation, plaintiff demands: a) an award of all economic and/or compensatory damages for the losses as hereinbefore set

forth; b) punitive, liquidated, and/or treble damages pursuant to 18 U.S.C. § 1964(c); c) an injunction against further violations of plaintiff's rights as secured by the Act; and d) fines, penalties, attorney's fees, interest, costs, and all other legal and equitable relief that may be available and that the Court deems just and appropriate.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT III
### PLAINTIFF V. ALL DEFENDANTS
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### OBSTRUCTION OF JUSTICE - 18 U.S.C. §1512

490.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Four hundred eighty-nine (489) as though fully set forth herein.

491.    The conduct of defendants, both individually and collectively, constitutes a violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C. §§ 1962(c), 1512(b)-(d).

492.     Defendants knowingly used intimidation, threats, or corruptly persuaded another person, or attempted to do so, or engaged in misleading conduct toward another person, with intent to:  a)  influence, delay, or prevent the testimony of a person in an official proceeding; b) cause or induce a person to withhold testimony, or withhold a record, document, or other object from an official proceeding; c) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense; d) corruptly obstructed, influenced, or impeded an official proceeding, or attempted to do so; and/or e) intentionally harassed another person and thereby hindered, delayed, prevented, or dissuaded a person from attending or testifying in an official proceeding and/or reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT IV
## PLAINTIFF V. ALL DEFENDANTS
## OBSTRUCTION OF JUSTICE - 18 U.S.C. §1503

493.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Four

hundred ninety-two (492) as though fully set forth herein.

494.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C.

§§ 1962(c), 1503.

495.    Defendants corruptly, or by threats or force, or by threatening letter or

communication, influenced, obstructed, or impeded, or endeavored to influence, obstruct, or

impede, the due administration of justice.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants,

Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc.,

Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia,

William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward

Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet

Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana

Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire,

jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

**COUNT V**
**PLAINTIFF V. ALL DEFENDANTS**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**MAIL/WIRE FRAUD**

496.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Four

hundred ninety-five (495) as though fully set forth herein.

497.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et. seq., and in particular but not by way of limitation, 18

U.S.C. §§ 1341 and 1343 relating to mail and wire fraud.

498.    The fraudulent scheme or plan described herein was predicated upon, advanced,

carried out, furthered and/or concealed by defendants' use of the mails and wires in violation of

18 U.S.C. § 1341 (mail fraud) § 1343 (wire fraud), including "innocent" mail/wire

communications, in that there were numerous communications concerning and/or secondary to

defendants' racketeering activity.  In particular, from in or around June 2017-February 2022,

defendants and/or their representatives sent plaintiff numerous communications via electronic

and/or regular mail, and electronically submitted and served upon plaintiff numerous court

filings, concerning and/or in furtherance of the tax/PUFTA matters and their illegitimate effort to

interfere with and/or to obtain plaintiff's property.  All communications from and to defendants

and their attorneys described herein or contemplated by the instant Civil Action, including all

court filings, were transmitted via regular mail, email, and or electronically via the relevant

electronic court filing system.

499.    The mails and wires were used, and were necessary, to further the scheme to

defraud, were detrimentally relied upon as part of the scheme, and resulted in damage and loss.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT VI
### PLAINTIFF V. ALL DEFENDANTS
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### CONSPIRACY - 18 U.S.C. § 1962(d)

500.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Four hundred ninety-nine (499) as though fully set forth herein.

501.    The conduct of defendants, both individually and collectively, constitutes a violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C. § 1962(d).

502.    The conduct of defendants constitutes an agreement or conspiracy to violate RICO within the meaning of 18 U.S.C. § 1962(d).  In particular, but not by way of limitation, defendants' various actions as described herein were in furtherance of a RICO conspiracy.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc.,

Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia,

William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward

Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet

Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana

Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire,

jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT VII
### PLAINTIFF V. CITY OF PHILADELPHIA, JAMES KENNEY, MARCEL S. PRATT, ESQUIRE, DIANA P. CORTES, ESQUIRE, MARISSA O'CONNELL, ESQUIRE, BRIAN R. CULLIN, ESQUIRE, JOSHUA ROBERTS, DANIEL ANDERS, GELLERT SCALI BUSENKELL & BROWN LLC, GARY F. SEITZ, ESQUIRE
### 42 U.S.C. § 1983 - RETALIATION

503.     Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five

hundred two (502) as though fully set forth herein.

504.     The conduct of defendants, individually and/or through the City's and/or First

Judicial District's employees, representatives, and/or associates, acting at all times within the

course and scope of their employment and in furtherance of the City/First Judicial District's

business and interests, constitutes conduct under color of state law within the meaning of Section

1983 and which has, *inter alia*:  a) violated plaintiff's right to free speech/petition as secured by

the First Amendment; b) violated plaintiff's right to procedural due process as secured by the

Fourteenth Amendment; and c) violated plaintiff's right to substantive due process, namely the

rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured

by the Fourteenth Amendment to the Constitution and laws of the United States, all to plaintiff's

great detriment and loss.

505.    Plaintiff engaged in a protected activity within the meaning of Section 1983 and the United States Constitution, defendants took a series of adverse actions against plaintiff, and there is casual link between the protected activity and the adverse actions.  In particular, but not by way of limitation:  a) every action taken by defendants against plaintiff subsequent to filing of SI/SII has been in retaliation for the filing of SI/SII; b) the filing/pursuit of the tax/PUFTA matters generally, and the various illegitimate litigation activities related thereto, including the disciplinary Complaints, were not for purposes of recovering past due taxes that purportedly were due and owing, but were in retaliation for engaging in protected activity; and c) in the May 17, 2021 email exchange, the City admitted that it was maintaining the tax/PUFTA matters against plaintiff because plaintiff had asserted claims against the City in SI/SII and would not relinquish his claims.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, City of Philadelphia, James Kenney, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, Joshua Roberts, Daniel Anders, Gellert Scali Busenkell & Brown LLC, and Gary F. Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT VIII
## PLAINTIFF V. ALL DEFENDANTS
## ABUSE OF PROCESS

506.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five hundred five (505) as though fully set forth herein.

507.    The conduct of defendants constituted an abuse or a perversion of legal process. The conduct of defendants in connection with the improper filing/pursuit of the tax/PUFTA

matters and the disciplinary Complaints constituted the use of legal/administrative process and proceedings primarily to accomplish a purpose for which the process/proceedings were not designed, a wrongful/unlawful purpose designed to obtain an illegitimate and unlawful result, all of which caused harm to plaintiff.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.


### COUNT IX
### PLAINTIFF V. ALL DEFENDANTS
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

508.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five hundred seven (507) as though fully set forth herein.

509.    Defendants tortiously interfered with contractual relations, to wit:  a) a contractual or prospective contractual relationship(s) existed between plaintiff and a third party, namely as between plaintiff and ELS, as between plaintiff and the owners of the Market Street Property, and as between plaintiff and/or others associated with the Market Street property; 2) defendants took purposeful action, intended to harm those relationships; 3) no privilege or justification applied to the harmful action; and 4) damages resulted from defendants' conduct.

510.     Defendants, intentionally and/or knowingly, and/or in reckless disregard for the truth, made a series of false and/or fraudulent misrepresentations and/or omissions, which were material to the transaction at hand, with the intent to mislead another to rely on them, which were justifiably relied upon by plaintiff, and which resulted in damage or harm to plaintiff proximately caused by the reliance.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.


## COUNT X
## PLAINTIFF V. ALL DEFENDANTS
## FRAUD

511.     Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five hundred ten (510) as though fully set forth herein.

512.     Defendants, intentionally and/or knowingly, and/or in reckless disregard for the truth, made a series of false and/or fraudulent misrepresentations and/or omissions, which were material to the transaction at hand, with the intent to mislead another to rely on them, which were justifiably relied upon by plaintiff, and which resulted in damage or harm to plaintiff proximately caused by the reliance.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT XI
## PLAINTIFF V. ALL DEFENDANTS
## NEGLIGENT MISREPRESENTATION

513.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five hundred twelve (512) as though fully set forth herein.

514.    Defendants, intending to induce plaintiff to act, misrepresented material facts, either knowing of the misrepresentations or without knowledge as to their truth or falsity, upon which plaintiff justifiably relied, and which resulted in injury to plaintiff.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana

Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

**COUNT XII**
**PLAINTIFF V. ALL DEFENDANTS**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

515.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five hundred fourteen (514) as though fully set forth herein.

516.    The conduct of defendants was extreme and outrageous, intentional and/or reckless, and caused plaintiff to suffer severe emotional distress with associated physical symptoms.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

**COUNT XIII**
**PLAINTIFF V. ALL DEFENDANTS**
**CIVIL CONSPIRACY**

517.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Five hundred sixteen (516) as though fully set forth herein.

518.    Defendants acted with a common purpose to do an unlawful act, or to do a lawful act by unlawful means or for an unlawful purpose, and committed an overt act in furtherance of the common purpose, all with an intent to injure plaintiff and/or with malice, and which did injure plaintiff.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont De Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors And Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., Joshua Roberts, Daniel Anders, James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial concerning all claims which may be tried to a jury.

**RICHARD J. SILVERBERG**

BY: <u>s/Richard J. Silverberg</u>
      **RICHARD J. SILVERBERG**
      I.D. No. 48329
      P.O. Box 30433
      Philadelphia, PA 19103
      215-563-6369
      rjs@rjsilverberg.com
      Attorney for Plaintiff