**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RICHARD J. SILVERBERG                              :
                                                  :
            Plaintiff                   :        CIVIL ACTION
                                                  :
         v.                               :
                                                  :
DUPONT DE NEMOURS, INC.                            :        NO.  23-1868
       -and-                             :
DOW, INC.                                         :
       -and-                             :
CORTEVA, INC.                                      :
       -and-                             :
INTERNATIONAL FLAVORS AND                          :
  FRAGRANCES, INC.                                :
       -and-                             :
AVANTOR, INC.                                      :
       -and-                             :
LIBERTY MUTUAL GROUP, INC.                         :
       -and-                             :
THE VANGUARD GROUP, INC.                           :
       -and-                             :
WILLIAM PENN FOUNDATION                            :
       -and-                             :
CITY OF PHILADELPHIA                               :
       -and-                             :
BALLARD SPAHR LLP                                  :
       -and-                             :
GELLERT SCALI BUSENKELL                            :
  & BROWN LLC                                     :
       -and-                             :
EDWARD BREEN                                       :
       -and-                             :
ANDREW LIVERIS                                     :
       -and-                             :
RAJIV GUPTA                                        :
       -and-                             :
ANDREAS FIBIG                                      :
       -and-                             :
DAVID H. LONG                                      :
       -and-                             :

TIMOTHY BUCKLEY                          :
            -and-                        :
JANET HAAS, M.D.                         :
            -and-                        :
JAMES KENNEY                             :
            -and-                        :
MARCEL S. PRATT, ESQUIRE                 :
            -and-                        :
DIANA CORTES, ESQUIRE                    :
            -and-                        :
MARISSA O'CONNELL, ESQUIRE               :
            -and-                        :
BRIAN R. CULLIN, ESQUIRE                 :
            -and-                        :
GARY F. SEITZ, ESQUIRE                   :
            -and-                        :
JOHN DOE NOS. 1-15                       :
                                         :
            Defendants                   :

## AMENDED CIVIL ACTION

### Preliminary Statement

"Eventually, you reap what you sow."

Jack McCoy

### PARTIES

1.      Plaintiff, Richard J. Silverberg, is an individual with a principal address in Philadelphia, Pennsylvania.

2.      Defendant, DuPont de Nemours, Inc. (DuPont), is a Delaware corporation with a principal place of business in Wilmington, DE.

3.      Defendant, Dow, Inc. (Dow), is a Delaware corporation with a principal place of business in Midland, MI.

4.      Defendant, Corteva, Inc. (Corteva), is a Delaware corporation with a principal place of business in Indianapolis, IN.

5.      Defendant, International Flavors & Fragrances, Inc. (IFF), is a New York corporation with a principal place of business in New York, NY.

6.      Defendant, Avantor, Inc. (Avantor), is a Delaware corporation with a principal place of business in Radnor, PA.

7.      Defendant, Liberty Mutual Group, Inc. (Liberty Mutual), is a manufacturer and provider of insurance products and services and/or owns/holds companies that provide such products/services, including Liberty Life Assurance Company of Boston (Liberty Life) prior to its sale to Lincoln Financial Group, with a principal place of business in Boston, MA.[12]

8.      Defendant, The Vanguard Group, Inc. (Vanguard), is a manufacturer and provider of financial products and services with a principal place of business in Malvern, PA.

9.      Defendant, William Penn Foundation (William Penn), is a private nonprofit charitable organization with a principal place of business in Philadelphia, PA.

---

[1] On August 15, 2023, Liberty Mutual Group, Inc. filed a Corporate Disclosure Statement (CDS) pursuant to Federal Rule of Civil Procedure 7.1(a)(1).  Pursuant to the CDS, Liberty Mutual Holding Company, Inc. owns 100% of the stock of LMHC Massachusetts Holdings, Inc., and LMHC Massachusetts Holdings, Inc. owns 100% of the stock of Liberty Mutual Group, Inc.

[2] For purposes of the instant Civil Action, all references to Liberty Life should be treated as references to Liberty Mutual.

10.    Defendant, City of Philadelphia (City), is a municipal corporation with a principal place of business in Philadelphia, PA.

11.    Defendant, Ballard Spahr LLP, is a duly organized law firm with a principal place of business in Philadelphia, PA.

12.    Defendant, Gellert Scali Busenkell & Brown LLC (Gellert Scali), is a duly organized law firm with a principal place of business in Philadelphia, PA.

13.    Defendant, Edward Breen, is an individual with a principal address in Wilmington, DE.

14.    Defendant, Andrew Liveris, is an individual with a principal address in Newark, CA.

15.    Defendant, Rajiv Gupta, is an individual with a principal address in Radnor, PA.

16.    Defendant, Andreas Fibig, is an individual with a principal address in New York, NY.

17.    Defendant, David H. Long, is an individual with a principal address in Boston, MA.

18.    Defendant, Timothy Buckley, is an individual with a principal address in Malvern, PA.

19.    Defendant, Janet Haas, M.D., is an individual with a principal address in Philadelphia, PA.

20.    Defendant, James Kenney, is an individual with a principal address in Philadelphia, PA.

21.     Defendant, Marcel S. Pratt, Esquire, is an individual with a principal address in Philadelphia, PA.

22.     Defendant, Diana Cortes, Esquire, is an individual with a principal address in Philadelphia, PA.

23.     Defendant, Marissa O'Connell, Esquire, is an individual with a principal address in Philadelphia, PA.

24.     Defendant, Brian R. Cullin, Esquire, is an individual with a principal address in Philadelphia, PA.[3]

25.     Defendant, Gary F. Seitz, Esquire, is an individual with a principal address in Philadelphia, PA.

26.     Defendants, John Doe Nos. 1-15, are officers, directors, executives, managers, administrators, attorneys, employees, and/or other representatives of the corporate defendants, the City, William Penn, and/or defendant law firms.

27.     At all times relevant and material hereto, plaintiff was a licensed attorney, the former sole principal at Richard J. Silverberg & Associates, P.C., a law firm, and a former member of ELS Realco LLC (ELS), a former Delaware multi-member limited liability company.

28.     At all times relevant and material hereto, defendant Breen was Chairman and Chief Executive Officer and/or Executive Chairman of DuPont, and Chief Executive Officer of

---

[3] For purposes of the instant Amended Civil Action, unless otherwise stated, references to the "City" or "City Defendants" are to defendants City, Kenney, Pratt, Cortes, O'Connell, and Cullin.

DowDuPont. Defendant Breen is the former Chairman and Chief Executive Officer of Tyco International Ltd. and currently is a member of the Board of Directors of Comcast Corporation.

29.    At all times relevant and material hereto, defendant Liveris was Chairman and Chief Executive Officer of Dow, and Executive Chairman of DowDuPont. Defendant Liveris currently is Chairman of the BlackRock Long Term Private Capital Fund, a member of the Board of Directors of IBM, NOVONIX, Worley, Lucid Motors Group, and Saudi Aramco, a Special Advisor to the Saudi Sovereign Wealth Fund (PIF) and the Crown Prince of Saudi Arabia, and President of the Organizing Committee for the Brisbane 2032 Olympic and Paralympic Games.

30.    At all times relevant and material hereto, defendant Gupta was Chairman, President, and Chief Executive Officer of Rohm and Haas Company, Chairman of Avantor, and a member of the DuPont and Vanguard Board of Directors. Defendant Gupta currently is a Senior Advisor to New Mountain Capital.

31.    At all times relevant and material hereto, defendant Fibig was Chairman and Chief Executive Officer of IFF.

32.    At all times relevant and material hereto, defendant Long was Chairman, President, and Chief Executive Officer of Liberty Mutual.

33.    At all times relevant and material hereto, defendant Buckley was Chairman and Chief Executive Officer of Vanguard.

34.    At all times relevant and material hereto, defendant Haas was Board Chair of William Penn.

35.    At all times relevant and material hereto, defendant Kenney was Mayor of the City of Philadelphia.

36.    At all times relevant and material hereto, defendant Pratt was Chair, Litigation Group (August 2016-March-2018) and City Solicitor (March 2018-December 2020) for the City of Philadelphia.  As City Solicitor, Pratt was the highest-ranking policymaking official in the Law Department and had ultimate supervisory/decision-making authority for all City of Philadelphia legal matters, including the tax/PUFTA matters.

37.    At all times relevant and material hereto, defendant Cortes was Chair, Litigation Group and City Solicitor (December 2020-present) for the City of Philadelphia.  As City Solicitor, Cortes was the highest-ranking policymaking official in the Law Department and had ultimate supervisory/decision-making authority for all City of Philadelphia legal matters, including the tax/PUFTA matters.

38.    At all times relevant and material hereto, defendant O'Connell was Divisional Deputy City Solicitor, Tax and Revenue Unit, for the City's Law Department and had direct oversight and supervisory responsibility in connection with the tax/PUFTA matters and defendant Cullin.

39.    At all times relevant and material hereto, defendant Cullin was a Deputy City Solicitor, Tax and Revenue Unit, for the City's Law Department and had direct responsibility in connection with the tax/PUFTA matters.

40.    At all times relevant and material hereto, defendant Seitz was an attorney and a Partner at defendant Gellert Scali.[4]

41.    At all times relevant and material hereto, as Chairman, Executive Chairman, Chief Executive Officer, President, and/or Mayor respectively, defendants Breen, Liveris, Gupta, Fibig, Long, Buckley, Haas and Kenney were the highest-ranking policymaking officials and had ultimate/final decision-making authority for their respective companies/organizations.[5]

42.    At all times relevant and material hereto, unless otherwise stated herein, the individual defendants acted within the course and scope of their employment and in furtherance of their respective employers' business and interests.  Alternatively, the individual defendants acted solely in their individual capacities.  To the extent that an agency relationship existed or may have existed between any of the entities or persons identified herein, or it is determined that an agency relationship existed, the entities/persons acted outside the scope of and/or exceeded said agency.

## JURISDICTION AND VENUE

43.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that plaintiff has brought the instant Amended Civil Action pursuant to, *inter alia*, 42 U.S.C. § 1983 and the

---

[4] For purposes of the instant Amended Civil Action, unless otherwise stated, all references to defendants Seitz and/or Gellert Scali are treated as references to defendants Gellert Scali and Seitz collectively.
[5] The positions/position titles of certain defendants changed during the relevant time period, and may not be stated with complete precision.

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.  Supplemental

jurisdiction over plaintiff's state law claims is pursuant to 28 U.S.C. § 1367.

44.    Venue properly lies in the United States District Court for the Eastern District of

Pennsylvania since the alleged violations of plaintiff's federal and state law rights occurred

within the geographical boundaries of the Eastern District of Pennsylvania.

## FACTUAL ALLEGATIONS

### The Proxy War - A Brief Introduction

45.    On or about April 22, 2016, plaintiff sent an email to counsel for certain

defendants in connection with a prior litigation in which they and/or their affiliates were parties

including, among others, defendants Dow, DuPont, Corteva, and Liberty Mutual, which stated in

pertinent part:

> It seems like a good time to let you and others know that I will
> soon be completing my book concerning the Jackson odyssey.[6] As
> I expected, this project has generated great interest since the cases
> are a window into a complex and disturbing aspect of corporate
> America, the conduct of corporate officials and corporate counsel,
> and our broken justice system. While the book examines the
> underlying conduct it also explores the business judgment, legal
> and strategic decisions, individual actions, and judicial proceedings
> that cumulatively led to and killed-off multiple causes of action.

---

[6] The "Jackson odyssey" referred to a series of fraud and racketeering cases that Mark Jackson, a
former Rohm and Haas Company (R&H) employee, had brought against R&H, Liberty Mutual,
and others, in both Pennsylvania state and federal courts.  *See gen'lly Mark A. Jackson v. Rohm
& Haas Company et al.*, Philadelphia Court of Common Pleas, June Term 1999, No. 1906; *Mark
A. Jackson v. June McCrory*, Philadelphia Court of Common Pleas, June Term 1999, No. 3824.
*See also Mark Jackson v. Rohm and Haas Company*, United States District Court for the Eastern
District of Pennsylvania, Nos. 03-5299, 05-4988, and 06-3682.

46.     Since that time, the City has filed and/or actively pursued two tax-related matters: a) a business tax claim against plaintiff's former law firm (which closed in 2008) and plaintiff as principal;[7] and b) a fraudulent transfer claim against plaintiff and a limited liability company (LLC) with which plaintiff formerly was associated.[8]  According to the City, the purpose of filing/pursuing the tax/PUFTA claims was to recover past-due taxes that supposedly were due and owing.

47.     In fact, since at least 2017-present, the City's various actions have revealed the City has not filed/pursued the tax/PUFTA matters for purposes of actually recovering past due taxes that supposedly are due and owing, but rather as part of a "proxy war" on behalf (and for the benefit) of certain third parties including defendants Dow, DuPont, Corteva, and Liberty Mutual, their predecessors/successors, affiliates, certain individuals, and/or others, the purpose of which has been to, *inter alia*, delay, deter, dissuade, and/or prevent the publication of plaintiff's anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities; and b) to retaliate against plaintiff for engaging in protected activity.

48.     The proxy war also has included a malicious smear campaign, predicated upon knowing and/or manufactured falsehoods, intended to damage/destroy plaintiff's professional and personal reputation, and which has included the filing of baseless Complaints with the Disciplinary Board of the Supreme Court of Pennsylvania.

---

[7] *See City of Philadelphia v. Richard J. Silverberg & Assoc., et al*., Philadelphia Court of Common Pleas, March Term 2008, No. 1510 (the "tax" case).
[8] *See City of Philadelphia v. ELS Realco LLC, et al*., Philadelphia Court of Common Pleas, September Term 2019, No. 3805 (the "PUFTA" case).

49.     A primary purpose of the proxy war simply has been to entangle plaintiff in baseless litigation, a not uncommon tactic by certain abusers, which causes resources to be squandered and is itself wrongful/unlawful.

50.     To understand the reasons for the proxy war, there first must be an understanding of the wrongful/unlawful actions that are the subject of plaintiff's anticipated book, the potential consequences of those actions, defendants' apparent beliefs/perceptions concerning the related risks/exposures, and the relationship(s) between those who conceived the proxy war and those who actually carried it out.

### The Reasons for the Proxy War[9]

**Reason #1:**
**The Original Case Against Rohm and Haas Company**

51.     On or about June 26, 1998, Mark Jackson, a former accountant at Rohm and Haas Company (R&H), and June McCrory, another former R&H employee, went on a date. At the end of the evening, the two returned to Jackson's apartment where they engaged in consensual sex.

52.     Approximately two weeks later, Nigel Spence, another former R&H employee and friend of McCrory, after hearing McCrory relate some account of her evening with Jackson,

---

[9] For organizational purposes, the reasons for the proxy war generally are set forth in chronological order. Accordingly, the order of presentation is not intended to suggest or convey the significance or importance of particular events.

took it upon himself to contact David Gartenberg, a former R&H Human Resources Representative.

53.     Spence asked Gartenberg what an R&H employee should do if "something bad" happened involving another R&H employee, Gartenberg responded "the person (meaning McCrory) should be encouraged to come forward," and thereafter Spence returned to Gartenberg's office with McCrory and possibly one other R&H employee.[10]

54.     McCrory was interviewed by Gartenberg, Royce Warrick (former in-house employment counsel for R&H), and Celia Joseph (former Assistant General Counsel, Corporate EEO/Diversity Manager, and Employment Law Manager for R&H), who arrived while the interview was in progress.  According to the Company, during the interview McCrory reported that Jackson had raped her.

55.     Jackson subsequently was interviewed by Michael McLaughlin (former in-house counsel for R&H) and Wayne Davis (former Director of Corporate Security for R&H).[11] Although company officials claimed they were conducting an investigation into a claim of sexual harassment, McLaughlin and Davis only questioned Jackson about the events occurring in Jackson's apartment, which included extensive and detailed questioning about the intimate, physical details of the sexual encounter between Jackson and McCrory.

56.     On or about June 17, 1999, Jackson filed suit against R&H and certain individuals (hereinafter the "R&H defendants") claiming that his privacy was invaded when company

---

[10] McCrory herself had made no prior complaint or report to the Company concerning Jackson or their evening together.

[11] Prior to his position at R&H, Wayne Davis was Special Agent-in-Charge (SAC) of the Philadelphia Office of the Federal Bureau of Investigation.  Based upon his review and analysis of the facts, Davis testified that he did not believe that McCrory had been sexually assaulted.

officials interrogated him, under the implicit threat of termination, about the intimate, physical details of the June 1998 consensual sexual encounter between Jackson and McCrory occurring at Jackson's apartment.[12]

57.     At trial, McCrory testified that she never informed anyone at R&H that Jackson had raped her, that no R&H official ever asked her whether Jackson had sexually assaulted her, and that she was not even thinking about the events in those terms.

58.     On October 19, 2001, following a three-week trial, the jury found that R&H had invaded Jackson's privacy and awarded damages in the amount of $150,000.

59.     On April 10, 2002, the Philadelphia Court of Common Pleas (Collins, J.) granted judgment notwithstanding the verdict (JNOV) on the ground that Jackson's state law tort claims against R&H were barred by the exclusivity provision of the Pennsylvania Worker's Compensation Act ("WCA"), 77 P.S. § 1, even though this same argument previously had been rejected both at preliminary objections and summary judgment.[13/14/15]

---

[12] At all times relevant and material hereto, plaintiff represented Jackson in the state and federal cases described herein.

[13] The decision was shocking.  Not only was it contrary to the law of the case, Judge Collins presided over a trial concerning a claim that she ultimately determined was legally precluded.

[14] At trial, Wayne Davis testified the matter was work-related because Jackson and McCrory had left the workplace together.

[15] The decision subsequently was affirmed by a 3-judge panel of the Pennsylvania Superior Court in an unpublished decision, and thereafter, review by the Pennsylvania Supreme Court was denied.

**Reason #2:**
**The Implications of the Original Case Against Rohm and Haas Company**

60.    R&H's defense in the original state case was predicated upon the knowing falsehood that June McCrory had reported to R&H that Mark Jackson had raped her.

61.    Even after McCrory testified that she did not report to R&H (or anyone else) that Jackson had sexually assaulted her, and that R&H investigators had not even asked her whether she had been assaulted, R&H maintained the litigation position that McCrory had reported a rape and that the Company was investigating a claim of sexual harassment.[16]

62.    Accordingly, in an effort to protect the Company in connection with its botched and otherwise wrongful/unlawful internal investigation, the Company manufactured a rape allegation by one employee against another employee, falsely claiming that McCrory had accused Jackson of committing a heinous crime.

63.    The determination to make knowingly false allegations that Jackson had attacked McCrory, and (as described more fully herein) to offer altered and manufactured documentary evidence and perjured testimony to support its position, reflected a policy/practice, operating strategy, and approach to corporate governance which was to take whatever actions were necessary to achieve the desired outcome and/or the Company's objectives more generally, regardless of the actual facts and/or prevailing legal standards.

64.    As described herein, the policies, practices, strategies, and tactics utilized by R&H in the original state case are part of a years-long pattern and practice of wrongful/unlawful

---

[16] Even if McCrory had reported a sexual assault, such a claim would not have been the proper subject of a sexual harassment investigation, but rather would have been a police matter.

conduct by defendants and/or others whereby litigation-related decisions/activities, and business-related decisions/activities more generally, are not based upon the actual facts and relevant legal/regulatory/administrative standards, but rather upon whatever is required for the company, organization, entity, and/or individual to achieve the desired outcome and/or their objectives more generally.


**Reason #3:**
**The Rohm and Haas Company Long-Term Disability Plan**
**<u>was Funded from the General Assets of the Corporation</u>**

65.    The Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., requires that employee welfare benefit plans meet certain requirements, which include a proper funding source.  A disability benefits plan that is funded from the "general assets" of the corporation, and which is not insured, is not a welfare plan within the meaning of ERISA and is not governed by the statute, regardless of how the plan is characterized by the employer.

66.    During the litigation, Jackson became disabled and was placed on disability.  The 2003 R&H Summary Plan Description (SPD) revealed that while R&H characterized its long-term disability benefits plan as a welfare plan within the meaning of ERISA, it also represented that "Benefits under the Program are self-funded from the general assets of Rohm and Haas and are not guaranteed through an insurance contract."

67.    Based upon the plain language of the 2003 R&H SPD, the rights and remedies prescribed by ERISA, which ordinarily are exclusive in nature, were not applicable and/or were not the exclusive rights and remedies available to Jackson and/or others who were eligible for disability benefits.  As a provider of insurance products and services, both R&H (as Plan

Administrator) and Liberty Life[17] (as Claims Administrator) knew/should have known the R&H plan was not a disability plan within the meaning of ERISA, and therefore that their actions violated the relevant legal and/or administrative standards governing such plans.

68.     On April 25, June 28, and August 1, 2002, and March 10, 2006, R&H and/or Liberty Life sent letters to Jackson with respect to his disability benefits in which the companies misrepresented the long-term disability plan as an ERISA-governed plan - representations the companies knew were false and/or were in reckless disregard for whether they were true or false.

69.     From at least 2002-2008, both R&H and/or Liberty Life intentionally and repeatedly misrepresented to numerous employees, plan participants and/or others that R&H's disability plan was a welfare plan within the meaning of ERISA when they knew/should have known that the plan was not an ERISA-governed plan.  In so doing, R&H and/or Liberty Life intentionally and/or recklessly misled those same persons into believing that ERISA was their exclusive remedy for the harm suffered, that they had no tort remedies, and/or otherwise for purposes of improperly limiting R&H's liability and conserving R&H's resources.

70.     Both R&H and Liberty Life intentionally and repeatedly misrepresented the disability plan as an ERISA-governed plan to numerous state and Federal courts for purposes of limiting liability and conserving resources, a position which repeatedly was relied upon and accepted by those same courts.

---

[17] Liberty Life Assurance Company of Boston provided R&H certain insurance-related products and services, including in connection with R&H's long-term disability plan, and was a defendant in Jackson II and III.  On January 19, 2018, Lincoln Financial Group announced that it had entered into a definitive agreement to acquire Liberty Life from Liberty Mutual Insurance Company.  The transaction closed on May 1, 2018.

71.     Jackson relied upon the misrepresentations of R&H and Liberty Life, as did the Courts which dismissed Jackson's various tort claims on the ground of ERISA exclusivity.  The dismissal of Jackson's tort claims based upon ERISA exclusivity/pre-emption, when those claims were not pre-empted, directly caused Jackson the loss of the claims.

**Reason #4:**
**The Implications of The Rohm and Haas Company Long-Term**
**Disability Plan Being Funded from the General Assets of the Corporation**

72.     While R&H had certain legal obligations to R&H employees as their employer, the Company (which was self-insured) had separate obligations as an insurer, including a fiduciary duty to act in the best interests of the insured.  For its part, Liberty Life had both a business relationship with R&H and a fiduciary duty to R&H employees to whom Liberty Life provided insurance-related products/services.

73.     Whether wittingly or not, not only did Liberty Life not administer an ERISA-governed plan, the Company misrepresented to R&H employees the legal basis for their disability benefits, the effect of which was to protect R&H against tort claims and to harm R&H employees to whom Liberty Life owed a fiduciary duty.  In effect, Liberty Life not only placed its business interests above its fiduciary duty to plan participants, the Company conspired with R&H to deprive R&H employees of their rights/remedies.

**Reason #5:**
**The First Federal Case Against the Rohm and Haas Defendants (Jackson I)**

74.    On or about September 19, 2003, Jackson filed a Complaint against R&H,

Morgan Lewis & Bockius LLP (MLB),[18] Conrad O'Brien Gellman and Rohn P.C. (COGR),[19]

certain individual MLB and COGR lawyers, and certain other individuals involved in the

representation of R&H in the state court case, in the United States District Court for the Eastern

District of Pennsylvania alleging, *inter alia*, violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.[20]

75.    The *Jackson I* case was based upon the conduct of the *Jackson I* defendants

during the original state court case.  In particular, but not by way of limitation:  a) David

Gartenberg, Celia Joseph, and Royce Warrick all took handwritten notes during the interview of

June McCrory, but Gartenberg and Joseph subsequently claimed their notes were either lost or

shredded, leaving Warrick's notes as the only documentary evidence of the McCrory interview;

b) pursuant to a discovery request that Warrick's original notes be produced for inspection and

copying, a photocopy of Warrick's notes was produced at Warrick's November 2000 deposition;

c) upon inspection, the notes contained numerous irregularities including, *inter alia*, substantial

additions and redactions (which, in some instances, were inconsistent with the flow of the

interview), numerous and unusual cross-outs and write-overs, and at least two different types of

---

[18] MLB represented R&H in the original state case.
[19] COGR represented June McCroy in the state case, although COGR's fees were paid by R&H.
[20] *See Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 03-5299 (as amended February 18, 2004)(Jackson I).  Named as defendants were Rohm and Haas Company, Morgan Lewis & Bockius LLP, Conrad O'Brien Gellman & Rohn, P.C., Robert Vogel, Esquire, Celia Joseph, Esquire, Royce Warrick, Esquire, Michael McLaughlin, Esquire, Wayne Davis, David Gartenberg, Ellen Friedell, Esquire, Jane Greenetz, James D. Pagliaro, Esquire, Paul J. Greco, Esquire, P. Daffodil Tyminski, Esquire, Aretha Delight Davis, Esquire, Nancy Gellman, Esquire, William O'Brien, Esquire, Kelly G. Huller, Esquire, and June McCrory.

handwriting suggesting the handwriting of more than one person, all of which suggested that the notes had been altered from their original form; d) despite repeated requests, R&H failed/refused to produce the original interview notes for inspection and copying, forcing Jackson to obtain a Court Order, dated January 31, 2001, requiring R&H to do so; and e) shortly thereafter, R&H produced an affidavit from Warrick, dated February 9, 2001, claiming for the first time that the original notes purportedly could not be located but that Warrick had "reviewed a copy of [her] notes (a copy of which [was] attached as an Exhibit) and [] determined they are identical to [her] original notes," which was the same version produced at Warrick's November 2000 deposition.

76.     As the trial approached, Jackson's counsel notified R&H's counsel that Jackson would be seeking an adverse inference instruction at trial based upon spoliation due to R&H's failure to produce Warrick's original notes.

77.     Sixteen days later, but more than four months after the expiration of fact and expert discovery, the MLB attorneys notified Jackson that the alleged original notes had been located and now were available for inspection and copying at MLB's offices.

78.     On or about May 23, 2001, the alleged original notes were produced to Jackson for inspection and copying at MLB's offices.  However, the document that was produced, which consisted of handwritten notes on white notebook paper written in red felt-tip pen, did not appear to be the true original of Warrick's interview notes, or at least not the true original of the copy of the notes produced at Warrick's November 2000 deposition, but instead appeared to be a fraud. In particular, but not by way of limitation: a) the writing on the red felt-tip pen version was smoother and bolder (consistent with something written with a felt-tip pen) while the writing on the photocopy produced at the deposition was thinner and more jagged (consistent with something written with a ball point pen); b) the horizontal lines on the two documents did not

match; and c) a character-by-character comparison revealed numerous differences and/or discrepancies between the individual letters in the words, and the way in which the letters/words were written.

79.    The purported "original" notes that were produced for inspection and copying at MLB's offices were not the true original, but rather were a complete fraud.[21]  In fact, it was apparent that white notebook paper simply had been laid over the version of the notes produced at Warrick's November 2000 deposition and then "traced" with a red felt-tip pen, with the felt-tip pen accounting for the "edges" of a ball point pen.

80.    At trial, although R&H and MLB knew the Warrick notes were not legitimate and Warrick's testimony that the documents were authentic was untruthful, they still claimed the documents/testimony were authentic/truthful and advanced/relied upon them throughout the litigation, including in post-trial motions and on appeal.[22]/[23]

81.    On June 30, 2005, the district court dismissed the *Jackson I* Amended Complaint on the ground that Jackson lacked RICO standing, and declined to exercise supplemental jurisdiction over the pendent state law claims.

---

[21] It was Jackson's position the true original was not be produced because it would have been apparent the notes had been altered.

[22] At trial, the R&H defendants presented the results of a photocopying "experiment" which actually demonstrated it was impossible that the version of the notes introduced at Warrick's deposition was a photocopy of the alleged original.

[23] Jackson hired Robert J. Phillips, a forensic document examiner, to prepare a report to support Jackson's petition to re-open discovery following notice that the "original" notes had been located.  On June 4, 2001, Phillips issued a preliminary report stating that, contrary to Warrick's deposition testimony and affidavit, the two versions of the interview notes were not identical, and that "strong differences in the appearance of the writing suggest multiple authorship."  The Report was unrefuted.

**Reason #6:**
**The Implications of The First Federal Case**
**Against the Rohm and Haas Defendants (Jackson I)**

82.     R&H's defense in the original state case was predicated upon the knowing falsehood that Mark Jackson had sexually assaulted June McCrory.

83.     Even after McCrory testified that she did not report to R&H (or anyone else) that Jackson had assaulted her, and that R&H investigators had not even asked her whether she had been assaulted, R&H still maintained the litigation position that McCrory had reported a rape and that the Company was investigating a claim of sexual harassment, notwithstanding the incongruity(s) of such a position.

84.     It was Jackson's position that the reason the photocopy of Royce Warrick's notes of her interview of June McCrory (produced at her November 2000 deposition) had been altered, and the "original" (produced in May 2001 at MLB's offices) was a manufactured document, was because the true original did not support R&H's litigation position that McCrory reported to R&H that Jackson had sexually assaulted her.

85.     Accordingly, R&H manufactured a claim of sexual assault by one employee against another employee, and then manufactured documentary evidence (and offered related perjured testimony) to support the manufactured claim, all in an effort to protect a botched internal investigation, and the Company's financial, reputational, and other interests more generally.

86.     Significantly, the R&H Defendants determination to conduct the "experiment" was an acknowledgment (if not an admission) by R&H that the versions of the notes did not appear identical, regardless of the actual outcome of the exercise.

87.    This represented the second case in which the R&H defendants presented altered/manufactured documentary evidence and related perjured testimony, again violating numerous legal and ethical standards, all in an effort to defeat a liability claim.  This is consistent with an overarching policy/practice, operating strategy, and approach to corporate citizenship and corporate governance, which was to take whatever action(s) were necessary to achieve the desired outcome and the objectives of the Company more generally, regardless of the actual facts and/or prevailing legal standards and/or despite them - precisely the same policies, practices, strategies, tactics, and activities that various defendants have employed throughout the various disputes and proceedings.

**Reason #7:**
**The Second Jackson Federal Case (Jackson II)**

88.    On or about September 19, 2005, Jackson filed a separate Complaint against the Jackson I defendants, their counsel in Jackson I, and Liberty Life alleging, *inter alia*, violations of RICO and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.[24]

---

[24] *See Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 05-4988 ("Jackson II").  Named as defendants were Rohm and Haas Company, Morgan Lewis & Bockius LLP, Conrad O'Brien Gellman & Rohn, P.C., Harkins Cunningham LLP, Liberty Life Assurance Company of Boston, Robert Vogel, Esquire, Celia Joseph, Esquire, Royce Warrick, Esquire, Michael McLaughlin, Esquire, Wayne Davis, David Gartenberg, Ellen Friedell, Esquire, Jane Greenetz, James D. Pagliaro, Esquire, Paul J. Greco, Esquire, P. Daffodil Tyminski, Esquire, Aretha Delight Davis, Esquire, Nancy Gellman, Esquire, William O'Brien, Esquire, Kelly G. Huller, Esquire, June McCrory, John G. Harkins, Jr, Esquire, Eleanor Morris Illoway, Esquire, Steven A. Reed, Esquire, and Colleen Healy Simpson, Esquire.

89.    In short, the Amended Complaint challenged the litigation conduct of the Jackson I defendants, as well as the conduct of R&H and Liberty Life during the litigation with respect to plaintiff's disability insurance benefits, specifically:  a) the R&H defendants' improper use of the altered/manufactured Warrick notes and related testimony in defending themselves; b) that R&H and Liberty Life improperly interfered with Jackson's disability insurance benefits, and breached their fiduciary duties, in an effort to harm Jackson and to gain an advantage in the litigation; and c) that the Jackson I defendants conspired to violate the various statutes, all in violation of various provisions of RICO and ERISA.

90.    On September 13, 2007, the district court granted in part and denied in part the Jackson II defendants' respective Motions to Dismiss the Amended Complaint, permitting Jackson's claims pursuant to RICO (predicated upon mail/wire fraud), RICO (conspiracy), ERISA (breach of fiduciary duty), ERISA (breach of co-fiduciary duty), and ERISA (denial of benefits) to proceed.

**Reason #8:**
**The Third Jackson Federal Case (Jackson III)**

91.    On or about August 18, 2006, Jackson filed a separate Federal Complaint against R&H, Liberty Life, Rajiv Gupta, and others alleging, *inter alia*, violations of RICO, ERISA, and the Americans with Disabilities Act, 29 U.S.C. § 1001 et seq.[25]  The Jackson III proposed Third Amended Complaint alleged that the conduct of the Jackson III defendants with respect to Jackson's employment and the litigation, including the termination of Jackson's employment,

---

[25] *See Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 06-3682 ("Jackson III").  Named as defendants were Rohm and Haas Company, Liberty Life Assurance Company of Boston, Raj L. Gupta, Robert A. Lonergan, Esquire, Ellen Friedell, Esquire, Marilyn Orr, and Lori Hamlin.

constituted violations of RICO (predicated upon obstruction of justice and mail/wire fraud),

RICO conspiracy, 18 U.S.C. 1513(e)(retaliation in violation of the Sarbanes-Oxley Act of 2002,

ERISA (retaliation), ERISA (breach of fiduciary duty), ERISA (breach of co-fiduciary duty), the

Americans with Disabilities Act, the Pennsylvania Human Relations Act, and Pennsylvania state

tort law, including fraud and abuse of process.

92.    On or about September 5, 2007, the district court granted in part and denied in

part defendants' various motions to dismiss, permitting claims pursuant to ERISA (Section 510),

fraud, and negligent misrepresentation to proceed, and dismissed the RICO claims based on the

pattern element.

93.    On May 21, 2008, the district court consolidated Jackson II and Jackson III,

directed Jackson to file a Consolidated Amended Complaint on or before June 11, 2008, and

further directed defendants to file any response by July 2, 2008.

94.    On June 11, 2008, Jackson filed a Consolidated Amended Complaint ("CAC").


**Reason #9:**
**The Disappearance of the "Original" Warrick Notes and the R&H "Experiment"**

95.    On or about March 1, 2006, plaintiff wrote counsel for R&H stating that Jackson

intended to inventory the file from the original state court case (which was located at City Hall)

on March 6, 2006, have the file transported to Records Management Corporation for

safekeeping, and have the red felt-tip pen notes delivered to Jackson's expert for evaluation.

96.     On or about March 3, 2006, counsel for the R&H defendants sent a letter to Charles Sofia, Supervisor, Old Records Department, City of Philadelphia, formally requesting that no one be permitted to take any records from the state court file "off site."

97.     On or about March 3, 2006, counsel for R&H wrote plaintiff's counsel stating that plaintiff has "not cited anything that has happened to the record since the end of the state court litigation that would raise any legitimate concern about the record remaining in the state court . . . and see no reason to remove the record . . .," and that "Any effort by [Jackson] to remove the record unilaterally will be tampering . . ."

98.     On or about March 6, 2006, plaintiff appeared at Room 975 City Hall, Philadelphia, PA to inventory the original state court file, where he discovered that the red felt-tip pen version of the notes and original "experiment" were missing from the case file.

99.     Plaintiff contacted counsel for R&H who claimed to have no knowledge or information that the documents were missing from the file, who may have removed them, and/or where they were located.

**Reason #10:**
**The Answers to the JI, JII, and JIII Complaints: Those Persons**
**With Direct Knowledge of Royce Warrick's Handwriting Denied**
**That the Documents Produced to Jackson and Advanced in the State**
**Court Proceedings Were Warrick's True Interview Notes or a Copy Thereof**

100.     In the various Jackson I, II, and III Complaints, Jackson alleged, *inter alia*, that the photocopy of Royce Warrick's interview notes (produced at her November 2000 deposition) had been altered and the "original" (produced in May 2001 at MLB's offices) was a manufactured document.

101.    On September 20 (Jackson III), 26 (Jackson I), and 27 (Jackson II), 2007, the various Jackson Defendants filed Answers to the Jackson I-III Complaints.

102.    David Gartenberg, Celia Joseph, Wayne Davis, and Michael McLaughlin all were participants in R&H's internal investigation of the McCrory matter and had direct knowledge of Warrick's original notes.  In particular, but not by way of limitation:  a) Gartenberg was in the room while McCrory was being interviewed by Warrick; b) Joseph also was in the room during the interview, sat across the table from Warrick and had an unobstructed view of Warrick's notepad (which Warrick had placed on the table in front of her) as Warrick took the notes; c) Davis reviewed Warrick's notes in preparation for his deposition in the original state case; and d) Warrick testified that she gave her notes to Michael McLaughlin prior to McLaughlin and Davis interviewing Jackson.

103.    Although Gartenberg, Joseph, Davis, and McLaughlin all had direct knowledge concerning the authenticity of Warrick's true original notes, all filed Answers to the Complaints in Jackson I, Jackson II, and Jackson III stating that they were "without knowledge or information sufficient to form a belief" as to whether the versions of Warrick's notes produced to Jackson during discovery were authentic, and denied the allegations on that basis.

104.    On the other hand, in each of the Answers filed by R&H (and certain of the other R&H defendants, including Warrick herself), the Company expressly represented Royce Warrick's interview notes as legitimate (and her testimony concerning their authenticity as truthful), offered them for their truth, and asked plaintiff and the Court to rely upon them for their truth.  For instance, in the Answer to the Jackson II Corrected Second Amended Complaint, R&H stated:

> Rohm and Haas admits . . . that the original notes that were
> produced on May 23, 2001 are the same as the copy of the notes
> that was produced at Warrick's November 22, 2000 deposition,
> except that the copy produced on November 22, 2000 contained a
> few minor additions made by Warrick after the interview, as she
> testified, and that the notes produced on May 23, 2001 and marked
> as Rohm and Haas Exhibit 64 are not a fraud and are in fact the
> original notes taken by Warrick at the McCrory interview, and that
> Warrick's testimony at trial was truthful and not perjured[.]

105.    Accordingly, the Company's Answers to the Jackson Complaints (swearing that

the versions of Warrick's interview notes produced to Jackson were authentic) cannot be

reconciled with the Answers of its own in-house lawyers and Director of Corporate Security -

persons who had first-hand knowledge and who denied those same documents were Warrick's

true interview notes.

106.    At bottom, the investigators' Answers effectively rejected the Company's position

and implicitly conceded the Company had perpetrated a fraud/fraud upon the court.


**Reason #11:**
**The Implications of the Second and Third Jackson Federal Cases,**
**The Circumstances Surrounding the Haas Family Trusts' Decision**
**to Divest Their Holdings in Rohm and Haas Company, and the Related**
**Sale of Rohm and Haas Company to the Dow Chemical Company**

107.    According to published reports and regulatory filings, in November 2007,

representatives of the Haas Family Trusts informed Rajiv Gupta (Chairman and CEO of Rohm

and Haas Company) of the Trusts' decision to divest their holdings in R&H, which constituted

approximately 33% of all outstanding shares of R&H, and to do so within 12-18 months.[26]

---

[26] The time-period of 12-18 months was consistent with the then-anticipated discovery period
and trial date in Jackson II.

108.     The Trusts contacted Gupta approximately sixty days after the district court's decisions in Jackson II and III permitting Jackson's RICO and ERISA claims to proceed.  While R&H had fought the state and federal cases for many years, it was the first time that a federal district court had determined that Jackson had stated claims against R&H and/or R&H company officials for violations of RICO and ERISA.

109.     Upon information and belief, the Haas Family Trusts determined that Jackson's RICO and/or ERISA claims were both significant and presented an unacceptable risk/exposure to R&H and/or the Trusts' financial interests.

110.     Gupta and R&H's advisors initially considered several options, including the sale or purchase of at least some of the Trusts' holdings, as well as the outright sale of the Company.

111.     In or around early June 2008, Gupta had discussions with three chemical companies concerning the possible sale/purchase of R&H.  In particular, Gupta reached out to Andrew Liveris, Chairman and CEO of Dow, at or around the same time as the June 11, 2008 filing of the Consolidated Amended Complaint.

112.     On or about June 16, 2008, just five days after the filing of the CAC, Dow offered to purchase R&H for $74/share in cash.

113.     The decision of the Haas Family Trusts to divest the entirety of their holdings in R&H (shortly after the dismissal decisions in Jackson II and III permitting Jackson's RICO, ERISA and other claims to proceed) constituted unlawful insider trading by the Trusts and/or those individuals/entities on whose behalf the Trusts acted.  In particular, the Trusts were trading upon information pertaining to the Jackson claims/cases, material information of which they were aware and which was not (but should have been) disclosed in R&H's regulatory filings.

114.    Because Raj Gupta knew and/or should have known that the Jackson claims/cases were material and should have been disclosed, and therefore knew/should have known that the Haas Family Trusts were unlawfully trading on inside information, Gupta should not have participated in and/or facilitated any such unlawful transaction(s).

115.    R&H/Gupta engaged in securities violations in connection with the sale of R&H to Dow, including the Sarbanes-Oxley Act of 2002 (SOX), 15 U.S.C. § 7201 et. seq.[27]  In particular, but not by way of limitation, R&H never disclosed the Jackson claims/cases in any SEC Form 8-K, Form 10-Q, Form 10-K, relevant proxy materials, and/or other regulatory filing(s), even though the claims/cases were material and such disclosures otherwise were required pursuant to prevailing legal/regulatory standards.

116.    To the contrary, prior to the sale of R&H to Dow, Gupta/R&H filed knowingly false Certifications concerning the status and condition of R&H.  For example, but not by way of limitation, Gupta/R&H filed the following Certifications:

a.    The Form 10-K filed on February 21, 2008 which included, pursuant to 18 U.S.C. § 1350 as adopted pursuant to § 906 of the Sarbanes-Oxley act of 2002, the following Certification, signed by Raj. L. Gupta (Chairman,

_____

[27] The Sarbanes-Oxley Act of 2002 (SOX), 15 U.S.C. § 7201 et. seq., was passed in 2002 with bi-partisan Congressional support.  A primary objective was to prevent company management from interfering with an independent financial audit.  Further, Section 302 requires public companies to adopt internal procedures for ensuring the accuracy of financial statements and makes the Chief Executive Officer (CEO) and Chief Financial Officer (CFO) directly responsible for the accuracy, documentation, and submission of the financial reports and internal control structure.  *See* 15 U.S.C. § 7241.  Importantly, in response to the Enron matter, Congress sought to regulate certain types of public disclosures.  *See e.g.,* Section 401 (Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. §78m)(re: required disclosures)(specifically addressing deceptive accounting/disclosure practices in connection with losses and whistleblower protections).

President and Chief Executive Officer) and Jacques M. Croisetiere (Executive

Vice-President and Chief Financial Officer):

> In connection with the quarterly report of Rohm and Haas
> Company ("Rohm and Haas") on Form 10-K for the period ended
> December 31, 2007, as filed with the Securities and
> Exchange Commission on the date hereof (the "Report"), the
> undersigned Chief Executive Officer and Chief Financial Officer
> of Rohm and Haas hereby certify, pursuant to 18 U.S.C. Section
> 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley
> Act of 2002 that, based on their knowledge: (1) the Report fully
> complies with the requirements of Section 13(a) or 15(d) of the
> Securities Exchange Act of 1934, and (2) the information
> contained in the Report fairly represents, in all material respects,
> the financial condition and results of operations of Rohm and Haas
> as of and for the periods covered by the Report.

> ……..

    c.    The Form 10-K filed on February 21, 2008 included Exhibit Nos.

31.01 and 31.02 in which the Chairman and Chief Operating Officer certified:

> Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this report[.]

> d. In Item 9(a) of the Form 10-K, it states:

> In 2007, our CEO also certified, without qualification, to the New
> York Stock Exchange (NYSE) that he was not aware of any
> violation by the Company of NYSE corporate governance
> standards.

Such Certifications and/or non-disclosure more generally was directly contrary to the Jackson I-

III cases.[28]  "Materiality" was not a defense since, as the Company's Conduct Standards stated,

---

[28] The Certifications in the Form 10-K filed on February 21, 2008 are consistent with those filed
in previous Forms 10-K, 10-Q, and 8-K during the relevant time period.

"The Securities and Exchange Commission and the New York Stock Exchange require prompt public disclosure of material information about the Company; that is, information that could affect the market price or investor decisions about our securities."

117.    Accordingly, Gupta/R&H not only violated SOX based upon, *inter alia*, R&H's conduct in connection with the sale/purchase of R&H to Dow as well as R&H's role in facilitating the Haas Family Trusts' sale of their interest in R&H, Gupta/R&H filed knowingly false Certifications which affirmatively misled shareholders, regulators, and others concerning the true status/condition of R&H.

118.    On or about April 1, 2009, the sale of Rohm and Haas Company to the Dow Chemical Company closed.

**Reason #12:**
**The Implications of the Sale of Rohm and Haas**
**Company to the Dow Chemical Company**

119.    The 2008 agreement to sell R&H to Dow began a chain of events that continues through to the present day.

120.    The initial determination by the Haas Family Trusts, unlawfully trading upon inside information, to divest their holdings in R&H and the related sale of R&H to Dow whereby R&H, Dow, and R&H/Dow together, failed to make full and proper disclosures, individually and/or collectively, resulted in a sale/purchase of securities that violated multiple legal, regulatory, and fiduciary standards.

121.    Because of the wrongful/unlawful actions of R&H and Dow, shareholders of both companies did not receive information to which they were entitled, which prevented them from

making informed decisions concerning their investments, including whether to vote for or against the proposed transaction. Further, the failure to make full and proper disclosures prevented shareholders and/or others from fully and properly exercising their rights in connection with the transaction, including possible legal or other action(s) to protect their interests and/or those of the companies.

122.    The failure/refusal by R&H/Dow to make required disclosures also interfered with and/or prevented regulators from properly evaluating the transaction, as well as any possible adverse decision/action(s).

123.    Similarly, because R&H and Dow intentionally failed/refused to make required disclosures, banks, financial institutions, and/or other lenders/investors were prevented from obtaining information which interfered with and/or prevented them from conducting proper due diligence, properly evaluating the transaction, making informed decisions whether to provide financing, and/or the terms/conditions of any such financing.

124.    Since Dow engaged in legal/regulatory violations in purchasing R&H, the acquisition infected each subsequent transaction by Dow and/or others involving the assets/liabilities of R&H. For example, when Dow merged with DuPont to form DowDuPont, Dow's valuation was based, in substantial part, upon the valuation of R&H by Dow even though R&H had not been properly evaluated (or legitimately acquired) by Dow in the first instance. In turn, the overall Dow-DuPont transaction received shareholder and regulatory approval based, in substantial part, upon the valuation and legitimacy of the overall transaction, which included the enterprise value of R&H.

125.     To this day, it remains unknown whether a sufficient number of R&H and/or Dow shareholders, or regulators, would have approved the sale/sale price of R&H to Dow had the companies made full and proper disclosures, and/or otherwise complied with the relevant legal, regulatory, and fiduciary standards.  Alternatively, had the transaction failed, it also is unknown what impact there would have been upon the subsequent Dow-DuPont tie-up, including whether it even would have been considered or pursued.

**Reason #13:**
**Dow Chemical Company's Failure to Conduct Proper (or Any) Due**
**Diligence Concerning the Acquisition of Rohm and Haas Company**

126.     As of June 2008, R&H was nearly 100-years old, was showing no outward signs of distress, and had never expressed an interest in selling itself.  Therefore, the unexpected decision by the Haas Family Trusts to divest and subsequent overtures by R&H to potential buyers should have raised a red flag(s) for any potential suitor.

127.     Dow offered to purchase R&H within days of Raj Gupta's initial conversation with Andrew Liveris concerning a possible deal.  Publicly-available information and the precipitous sequence of events indicate that, *inter alia*:  a) Gupta exerted pressure on Liveris to act "swiftly," the intent/practical effect of which was to discourage if not prevent Liveris/Dow from engaging in proper due diligence; and b) in fact, Liveris/Dow did not conduct proper or sufficient due diligence, was not aware that R&H had failed to make full and proper disclosures, and/or otherwise had failed/refused to comply with relevant legal, regulatory, and/or fiduciary standards.

128.    On or about July 10, 2008, Dow announced that it had agreed to purchase R&H for $78/share, or $18.8 billion (including debt), a 74% premium to R&H's closing price of $44.83/share the previous day.

129.    At the time of the purchase, Liveris exuded great enthusiasm for R&H, even characterizing it as a "jewel" and "beachfront property," at the same time R&H and its principals were facing racketeering claims connected to case-fixing.  Although he noted the economy had been weakening Liveris stated, "[The purchase of R&H] didn't happen because Rohm & Haas was distressed."

130.    Once Liveris/Dow knew or came to know about the true condition of R&H, including the undisclosed liabilities, there was only one correct path concerning disclosure; Liveris/Dow simply did not choose it.  For Liveris/Dow, it is apparent that acquiring the brand was paramount even though the perception of R&H and its actual condition were very different.

131.    Once the sale of R&H to Dow was announced, and R&H's liabilities still were not fully/properly disclosed (as required by SOX) in R&H, Dow, and/or R&H/Dow's joint regulatory filings, Dow/Liveris became part of an overall effort to prevent shareholders/ stakeholders, regulators, Wall Street, and the public at large from ever having full, complete, and accurate information concerning the true condition of R&H, its value, Dow's decision to acquire R&H, the purchase price, and the overall transaction.  This was especially important since it was widely believed that Dow overpaid for R&H, and did so at a time of great economic uncertainty that even Liveris characterized as "treacherous," reportedly putting Dow's bond rating and even Dow itself at risk.

**Reason #14:**
**The Creation of DowDuPont and the "Spins"**
**Dow, DuPont, and DowDuPont Failed to Make Full and Proper Disclosures**

132.     The Dow acquisition of R&H was consummated during the Great Recession, which roughly spanned from December 2007-June 2009, and placed a tremendous financial burden on Dow, a burden that was exacerbated by the fact that Dow/Liveris had not engaged in proper or sufficient due diligence, did not fully/properly understand the true condition of R&H at the time Dow/Liveris agreed to purchase it, and had overpaid for R&H in any event.

133.     Upon information and belief, subsequent to Dow's purchase of R&H and Liveris/Dow obtaining a full and complete understanding the legal, regulatory, and financial implications of the transaction, Liveris/Dow sought to mitigate both the strategic decision and financial burden associated with the R&H acquisition.  In particular, but not by way of limitation, Dow had secured $13 billion in debt financing from Citigroup, Merrill Lynch and Morgan Stanley, as well as equity investments from Berkshire Hathaway and the Kuwait Investment Authority in the form of convertible preferred securities for $3 billion and $1 billion respectively.

134.     On or about October 5, 2015, DuPont announced that Edward Breen would become interim Chief Executive Officer (CEO), and on or about November 9, 2015, officially named him to the position.[29]

---

[29] From 2002 to 2012, Edward Breen was CEO of Tyco International and oversaw what DuPont has described as "a highly successful restructuring, including two breakups of the company resulting in the spin-offs of Covidien, Tyco Connectivity, and ADT Corp. and the merger of Tyco Flow Control with Pentair."  Breen took over Tyco after the company declared bankruptcy and former CEO L. Dennis Kozlowski was found guilty of embezzling approximately $600 million from the company.

135.    Within days of Breen's appointment, Andrew Liveris contacted Breen concerning a potential tie-up between Dow and DuPont.[30]

136.    Upon information and belief, Liveris sought to persuade Breen the then-present circumstances were a unique opportunity to merge the two companies when, in fact, a primary motivating factor(s) for Liveris/Dow was to mitigate the risks/exposures of Dow and/or others in connection with Dow's ill-advised purchase of R&H.  Alternatively, upon information and belief, Breen knew R&H and/or Dow had not made full/proper disclosures and that Dow's acquisition of R&H did not meet legal, regulatory, and/or fiduciary standards but agreed to pursue a tie-up as between Dow and DuPont anyway, determining the benefits of a proposed Dow-DuPont deal outweighed the risks/exposures associated with Dow's illegitimate acquisition of R&H.[31]

137.    On or about December 11, 2015, Dow and DuPont issued a joint Press Release announcing that their respective Boards of Directors unanimously had approved a definitive agreement under which the companies would combine in an all-stock "merger of equals" which would be named DowDuPont and have an initial combined market capitalization of $130 billion. Upon completion of the transaction, Andrew Liveris would become Executive Chairman of the Board of Directors and Edward Breen would become Chief Executive Officer.

138.    According to the Press Release, the newly-created company intended to separate into three independent, publicly-traded companies through tax-free spin-offs:  a) a global "pure-

---

[30] According to published reports, Liveris previously had approached Ellen Kullman, defendant Breen's predecessor at DuPont, concerning a potential tie-up but to no avail.
[31] As the former CEO of Tyco International, Breen was intimately involved in the aftermath of the events that led to the passage of SOX.  Accordingly, such actions would represent a raw display of both individual and corporate antipathy.

play" agriculture company; b) a global "pure-play" material science company; and c) a specialty products company.

139.    At the time the merger was first announced, Liveris stated, "This transaction is a game-changer for our industry and reflects the culmination of a vision we have had for more than a decade to bring together these two powerful innovation and material science leaders. … This transaction is a major accelerator in Dow's ongoing transformation, and through this we are creating significant value and three powerful new companies. This merger of equals significantly enhances the growth profile for both companies, while driving value for all of our shareholders and our customers."

140.    For his part, Breen stated, "This is an extraordinary opportunity to deliver long-term, sustainable shareholder value through the combination of two highly complementary global leaders and the creation of three strong, focused, industry-leading businesses. Each of these businesses will be able to allocate capital more effectively, apply its powerful innovation more productively, and extend its value-added products and solutions to more customers worldwide. For DuPont, this is a definitive leap forward on our path to higher growth and higher value. This merger of equals will create significant near-term value through substantial cost synergies and additional upside from growth synergies."[32]

---

[32] Breen also stated, "Longer term, the three-way split we intend to pursue is expected to unlock even greater value for shareholders and customers and more opportunity for employees as each business will be a leader in attractive segments where global challenges are driving demand for these businesses' distinctive offerings."

141.    On or about September 1, 2017, Dow and DuPont issued a joint Press Release announcing the successful completion of the "merger of equals" between Dow and DuPont, effective August 31, 2017.

142.    On or about June 1, 2019, DowDuPont was dissolved, resulting in the creation of three independent, publicly-traded companies:  Dow, Inc., DuPont de Nemours, and Corteva Agriscience (collectively the "spins").

**Reason #15:**
**The implications of the Creation of DowDuPont and the "Spins"**
**<u>Dow, DuPont, and DowDuPont Failed to Make Full and Proper Disclosures</u>**

143.    As alleged herein, since Dow engaged in legal/regulatory violations in purchasing R&H, the acquisition infected each subsequent transaction by Dow and/or others involving the assets/liabilities of R&H.  Accordingly, when Dow merged with DuPont to form DowDuPont, Dow's valuation was based, in substantial part, upon the valuation of R&H even though R&H had not been properly evaluated (or legitimately acquired) by Dow in the first instance.

144.    Dow and DuPont proceeded with the merger without ever taking the steps necessary to address the legal/regulatory violations in connection with Dow's illegitimate acquisition of R&H and/or its impact on the Dow-DuPont tie-up.

145.    In effect, the merger of Dow-DuPont and the subsequent spin-off of three independent, publicly-traded companies were restructurings, the purpose or effect of which was to wrongfully/unlawfully: a) transfer assets/liabilities, including from predecessor to successor companies; b) mitigate risks/exposures in connection with the companies' wrongful/unlawful conduct; and c) otherwise improperly shield the companies/company officials and/or others from

any legal, regulatory and/or other adverse consequences/action(s) concerning their wrongful/unlawful conduct.  In particular, but not by way of limitation, since April 2016 such restructurings (and/or similar ones) have been for, *inter alia*, the dual purposes of accounting for the liabilities associated with the R&H-related transactions and/or the instant matter.


**Reason #16:**
**Raj Gupta's Appointment to the Board of DuPont**

146.    On or about July 23, 2018, DowDuPont issued a Press Release announcing that Raj Gupta, the former Chairman and CEO of Rohm and Haas Company, had been named to the Advisory Committee of its Specialty Products Division (the new DuPont).

147.    In or around November 2018, Gupta was named to the DuPont Board.

148.    Under ordinary circumstances, such an appointment likely would not have been considered (and simply would make no sense) since the Company required that Board members retire by age 72 and Gupta turned age 73 the following month.  Still, Gupta was appointed despite the disruption created by appointing a Board Member who only could serve one year.

149.    Upon information and belief, whatever the true circumstances leading to Gupta's appointments may have been, Liveris, Breen and/or Gupta wanted to achieve at least two objectives:  a) create a formal relationship as between DowDuPont, its principals, and Gupta, with reciprocal legal, regulatory, and fiduciary requirements and obligations; and b) create the appearance that the three executives were unified, on good terms, and that there were no past/present disputes as between them, including with respect to the sale of R&H to Dow and/or the merger of Dow and DuPont.

150.    This was especially important in the event of a challenge to either the R&H-Dow and/or Dow-DuPont transactions - transactions that, *inter alia*, Liveris, Breen, and Gupta knew were a subject of plaintiff's anticipated book and/or possible legal/regulatory action(s).

**Reason #17:**
**The Merger of International Flavors and Fragrances, Inc.**
**with DuPont's Nutrition and Biosciences Business**

151.    Upon information and belief, following the Dow-DuPont merger and spins, defendants Breen and DuPont determined to engage in an additional, significant transaction for purposes of separating certain assets/liabilities from DuPont and further shielding DuPont from potential liability in connection with the R&H matter, including the instant matter.

152.    Because of what they were seeking to accomplish, it was important to Breen/DuPont that they not only engage in the transaction, but also that they do so with a company that would best enable them to achieve their goals/objectives.

**IFF's Acquisition of Frutarom**

153.    In May 2018, IFF announced that it had agreed to acquire Israel-based flavors and ingredients maker Frutarom for $7.1 billion in cash and stock.  According to Andreas Fibig, IFF's then-Chairman and CEO, "We see in food and cosmetics that some of these small companies have much higher growth rates than the big Unilevers of the world."  The transaction closed in October 2018.

154.    While IFF represented that revenues for Frutarom were anticipated to grow by mid-single digits, revenues actually fell by 4% in the second quarter of 2019.

155.    According to published reports and regulatory filings, including IFF's Form 10-Q for the period ending June 30, 2019, Frutarom officials were implicated in a bribery scandal involving wrongful/unlawful payments in Russia and Ukraine.  Although IFF did not identify those involved by name or position, it was widely reported that Ori Yehudai (President and CEO), Guy Gill (Vice President of Finance), and Alon Granot (Chief Financial Officer) were the Frutarom officials involved in the scandal.

156.    While IFF claimed in its regulatory filing that "improper customer payments" no longer were being made and that the estimated affected sales represented less than 1% of IFF and Frutarom's combined net sales for 2018, IFF was heavily criticized for its lack of due diligence in connection with the Frutarom acquisition.

**DuPont's Decision to Engage in a Transaction with IFF**

157.    Ordinarily, a company involved in a bribery scandal in connection with a recent acquisition would not be considered an attractive partner for purposes of a similar transaction, particularly where that same company had been loudly criticized for its lack of due diligence in connection with the acquisition.

158.    What may have made IFF unattractive to certain suitors is precisely what made the company attractive to defendants Breen and DuPont.  Because IFF was significantly damaged by the events surrounding the Frutarom acquisition, the company could ill-afford to engage in another transaction where its due diligence would be questioned, or its leadership and

judgment more generally.  Further, IFF was highly incentivized to engage in a transaction that potentially could help it recover from the Frutarom debacle.

159.    This provided defendants Breen and DuPont with a unique opportunity to engage in a transaction with a company that simply was not in a position to resist terms/conditions, or aspects of transaction, that it otherwise might oppose or even reject were the company in a stronger position.

160.    On or about December 15, 2019, shortly after IFF completed its acquisition of Frutarom, DuPont and IFF issued a joint Press Release announcing the companies had entered into a definitive agreement for the merger of IFF and DuPont's Nutrition & Biosciences (N&B) business in a Reverse Morris Trust transaction.  The deal valued the combined company at $45.4 billion on an enterprise value basis, reflecting a value of $26.2 billion for the N&B business based on IFF's share price as of December 13, 2019.

161.    Under the terms of the agreement, which was unanimously approved by both Boards of Directors, DuPont shareholders would own 55.4% and IFF shareholders would own 44.6% of the shares of the new company.  Upon completion of the transaction, DuPont would receive a one-time $7.3 billion "special" cash payment, subject to certain adjustments.  The Release stated that Andreas Fibig would become Chairman and CEO, Ed Breen would become Lead Independent Director, and that the Board would be comprised of Directors from both IFF and DuPont.

162.    Upon information and belief, a primary purpose of the merger was to "package" and transfer certain assets/liabilities from DuPont to IFF, including those in connection with R&H-related transactions and/or the instant matter.  For their part, Fibig/IFF failed/refused to

engage in proper due diligence with respect to the IFF-N&B transaction, including that DuPont was seeking to utilize the transaction to wrongfully/unlawfully shift certain liabilities from DuPont to IFF.  Alternatively, Fibig/IFF were aware that DuPont was improperly utilizing the transaction for purposes of wrongfully/unlawfully shifting liabilities from DuPont to IFF, but still agreed to the engage in the transaction and/or to indemnify DuPont against any liability in connection with the transaction.

163.    Accordingly, the merger of IFF and DuPont's N&B business was substantially similar to the Dow-DuPont merger and/or occurred for substantially similar reasons.  In effect, the merger was a restructuring, the purpose or effect of which was to wrongfully/unlawfully: a) transfer assets/liabilities, including from predecessor to successor companies; b) mitigate risks/exposures in connection with the companies' wrongful/unlawful conduct; and c) otherwise improperly shield the companies/company officials and/or others from any legal, regulatory and/or other consequences/action(s) concerning their wrongful/unlawful conduct.

164.    For the same reasons the companies did not make proper disclosures in connection with the Dow-DuPont merger and/or other transactions, the companies did not make proper disclosures in connection with the IFF-DuPont/N&B merger.

**Reason #18:**
**The Financing Transactions**

165.    All of the above-described transactions involved some form of financing.  For example, but not by way of limitation, with respect to Dow's purchase of R&H, Dow secured $13 billion debt financing from Citigroup, Merrill Lynch and Morgan Stanley, as well as equity

investments by Berkshire Hathaway and the Kuwait Investment Authority in the form of convertible preferred securities for $3 billion and $1 billion respectively.

166.    To obtain the financing required for such transactions, parties are required to prepare detailed loan applications and make detailed disclosures concerning their assets/ liabilities so that lenders can properly assess their creditworthiness.  For their part, lenders are required to engage in rigorous due diligence in connection with such financing transactions, to which such disclosures are relevant, and are subject to legal/regulatory consequences should they fail to do so.

167.    Upon information and belief, Dow, DuPont, and/or IFF did not make full and/or proper disclosures in connection with the financing related to their respective transactions in the same way they failed to do so in the regulatory filings in connection with the transactions themselves.  In turn, this interfered with and/or prevented financial institutions from taking the actions required of them in determining whether to approve, and/or the terms/conditions in connection with, any such financing.[33]

**Reason #19:**
**The Actions of The Vanguard Group, Inc.**

168.    Vanguard is a major institutional investor, including with respect to certain other defendants and/or companies with which individual defendants have been/are affiliated.  Further,

---

[33] Whether or not companies seeking financing comply with their legal/regulatory obligations, financial institutions have an independent duty to conduct proper due diligence prior to approving any such financing/terms.

Raj Gupta, the former Chairman and CEO of Rohm and Haas Company and former Board Member of DuPont, also is a former member of Vanguard's Board of Directors.

169.    On October 2, 2019, the day after the City filed the PUFTA Complaint, the City filed (in the tax case) a Writ of Execution addressed to Vanguard (the Vanguard Writ) which encumbered plaintiff's individual retirement account (IRA) despite the account being exempt from execution.

170.    By their terms, such Writs expire 90 days from the date they are filed.  Thereafter, the filing party must re-issue the Writ in order to maintain its interest but the City never did so, and therefore the Vanguard Writ expired in January 2020.

171.    Although the account was exempt from execution, and although the Vanguard Writ expired in January 2020, Vanguard continued to restrict the IRA until June 2021, or for another 17 months.  During that time, despite plaintiff's repeated notifications to the Company that there was no legitimate basis to restrict the account and requests that the account be released, Vanguard representatives repeatedly advised plaintiff that the restriction could not be removed unless plaintiff obtained a Court Order (authorizing the account to be released) or the City withdrew its claim.

172.    Plaintiff's repeated requests to speak to a Vanguard attorney also were refused even though plaintiff was/is both a Vanguard client and an attorney representing one of the parties in the dispute.

173.    On June 23, 2021, the City filed a Praecipe discontinuing the attachment.  While Vanguard removed the restriction that same day, the entire exercise was a sham; there was no

attachment to discontinue and no legal process restricting the account - the Writ had expired 17 months earlier.

174.    Vanguard knew or should have known the City's actions were wrongful/unlawful, as well as its own actions.  In particular, but not by way of limitation:  a) even a cursory review of the record would have revealed significant irregularities, shown that the City was not acting in good faith, and that the tax/PUFTA cases had not been filed/pursued for a proper/lawful purpose; b) the Writ pertained to an account which was statutorily exempt from execution; c) the Vanguard Writ expired in January 2020 and never was re-issued; d) the City never actually levied the account and/or attempted to do so; and e) the Company knew and/or should have known that, under the circumstances of this case, it never would be permissible to restrict such an account and/or to do so for this length of time.  It is not a justification that plaintiff's preliminary objections (po's) in connection with the Writ were overruled since the (po's) pertained to whether the account was exempt.[34]

175.    Once the Vanguard Writ expired, there was no legal process of any kind (legitimate or otherwise) concerning the Vanguard IRA, yet Vanguard still restricted the account, and continued to do so for an additional 17 months, wrongfully/unlawfully preventing plaintiff from accessing funds he owned and upon which he was dependent for purposes of meeting his needs, expenses, and financial obligations, and which resulted in great inconvenience, hardship, detriment and loss.

---

[34] On May 5, 2021, Michael Baughman, Esquire, counsel for Vanguard, sent plaintiff a letter stating, "As you know, Vanguard placed a restriction upon your Vanguard account due to the writ of execution served upon Vanguard in the Matter."

176.    Vanguard's actions in connection with the Vanguard account were directly contrary to the actual facts and prevailing legal standards, violated Vanguard's fiduciary duty to plaintiff, and facilitated the proxy war.  Because Vanguard's conduct represented such an extreme departure from the facts/legal standards, and the Company's policies/practices, such conduct (and Vanguard's participation in the proxy war more generally) only could have been authorized/ratified by Timothy Buckley, Chairman and Chief Executive Officer of Vanguard.

## The April 22, 2016 Email

177.    On or about April 22, 2016, plaintiff sent an email to counsel[35] for certain parties including Dow, DuPont, and Liberty Mutual, which stated, in pertinent part:

> It seems like a good time to let you and others know that I will soon be completing my book concerning the Jackson odyssey.[36] As I expected, this project has generated great interest since the cases are a window into a complex and disturbing aspect of corporate America, the conduct of corporate officials and corporate counsel, and our broken justice system. While the book examines the underlying conduct it also explores the business judgment, legal and strategic decisions, individual actions, and judicial proceedings that cumulatively led to and killed-off multiple causes of action.

---

[35] The email stated, "I am contacting each of you because although this is no longer a litigation matter, I assume you remain in a position to contact the former defendants and any other interested persons."  None of the lawyers who were contacted denied they were in such a position, and further, became part of a mailing list for purposes of subsequent communications.

[36] *See gen'lly Mark A. Jackson v. Rohm & Haas Company et al.*, Philadelphia Court of Common Pleas, June Term 1999, No. 1906; *Mark A. Jackson v. June McCrory*, Philadelphia Court of Common Pleas, June Term 1999, No. 3824.  *See also Mark Jackson v. Rohm and Haas Company*, United States District Court for the Eastern District of Pennsylvania, Nos. 03-5299, 05-4988, and 06-3682.

178.    The purpose of the April 2016 email was to offer the parties the opportunity to acquire the publishing rights/intellectual property in advance of the anticipated completion of the book, but there was no response to plaintiff's overture.

179.    On August 15, 2016, March 6, 2017, and October 23, 2017, plaintiff sent three follow-up emails but again received no (formal) response.

**The Proxy War**

180.    The response to the April 22, 2016 email (and follow-up emails) was both a culmination and coalescence of multiple events, interests, risks/exposures, and the collective effort of the individuals/entities associated with them.

181.    Upon information and belief, the April 22, 2016 email and follow-up emails led certain individual defendants and/or the companies/organizations with which they were/are affiliated, including Gupta, Breen, Liveris, Long, Haas, and/or others, either directly and/or by and through their representatives, associates, affiliates, and/or others (hereinafter the "Core Defendants") to determine that action needed to be taken and to formulate a strategy concerning precisely what that action should be.[37]/[38]  Further, because those actions required that decisions be made by and/or on behalf of certain companies, organizations and/or entities, as well as the deployment of company resources, such actions only could have been (and actually were)

---

[37] The Core Defendants were comprised of those whose actions were the subject of the emails and which generally are described under the heading "The Reasons for the Proxy War," as well as those who believed their professional/personal interests and concerns (and/or those of their affiliates) would be adversely affected by the anticipated book, any account by plaintiff of the subject matter of the book, and/or any events/claims related thereto.
[38] The original Complaint referred to "Enterprise Defendants," which has been replaced with "Core Defendants" in an effort to avoid unnecessary confusion.

authorized/ratified at the policy-making level; in other words, by the Core Defendants themselves and/or their authorized representatives.[39]

182.    In an effort to deter, dissuade, discourage, and/or prevent publication of the anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities, the Core Defendants determined to take a series of wrongful/unlawful actions against plaintiff and ELS Realco LLC (a limited liability company (LLC) with which he was affiliated), and to do so by and through the City of Philadelphia and its lawyers.  In effect, the Core Defendants determined to engage in an illegitimate "proxy war" whereby the actions of the City and/or others were at the direction, on behalf, and/or for the benefit of all defendants, and/or otherwise were either authorized and/or ratified by them.

183.    The determination to engage in a proxy war - which primarily consisted of activities in connection with the filing/pursuit of the tax/PUFTA matters - reflected the Core Defendants' recognition of and fear concerning the true extent of their wrongful/unlawful actions, the related risks/exposures, and of the consequences of the entire pattern of conduct being revealed and explained in a meaningful way to shareholders, stakeholders, regulators, lawmakers, law enforcement, market participants, both the for-profit and non-profit communities, and the public at large.

_____

[39] Further, the actions of the individual defendants/leaders were so extreme, and so contrary to the policies, practices, and interests of the companies/organizations (and their respective stakeholders) with which they were/are affiliated, they only could have occurred at the policy-making level.  For example, as described herein, after the Vanguard Writ expired, Vanguard continued to restrict plaintiff's account for an additional 17 months even though there was no legal process encumbering the account and/or legitimate basis to do so.

184.    Upon information and belief, the various actions of the Core Defendants, and how those actions reflected upon the companies/organizations with which they were/are affiliated, were a substantial motivating factor in the decision to both undertake and pursue the proxy war. Further, those same companies/organizations have participated in (either directly or indirectly) and/or have influenced the Core Defendants' actions concerning the proxy war.

185.    Upon information and belief, a combination of factors including certain pre-existing professional and/or personal relationships, as well as certain incentives, led the Core Defendants to engage the City/City officials, Gellert Scali, and/or others for purposes of executing the proxy war.[40]

186.    The determination to engage the City and Gellert Scali to execute the proxy war was central to the Core Defendants' overall strategy that any action(s) be carried out by a third party(s) with the authority/ability to carry out such actions, that the actions be "defensible" even if they actually were wrongful/unlawful, and that the Core Defendants/other defendants not be directly involved in any such actions (except those who actually executed the proxy war).

187.    Under the guise of seeking to recover past due taxes that supposedly were due and owing, the City filed/pursued two lawsuits against plaintiff for reasons having nothing to do with taxes or the City more generally, which not only was (among other things) a use of legal process/proceedings for wrongful/unlawful purposes, fraudulent, an abuse of process, and a breach of fiduciary duty, but also was directly contrary to the City's own legal and pecuniary interests and those of taxpayers.

---

[40] As described herein, the Core Defendants also engaged Vanguard for purposes of restricting plaintiff's IRA and defendants Gellert Scali/Seitz in connection with the Petition for Appointment of Sequestrator.

188.    Accordingly, in or around June 2017, nearly nine years after the City had abandoned the matter but only three months after plaintiff's March 2017 email concerning his anticipated book, the City engaged in a "renewed" collection/enforcement effort in connection with the June 2008 judgment in the original tax case.

189.    Since that time, the City has filed/pursued the PUFTA claim, engaged in various tax-related litigation activities, including numerous execution/enforcement actions, but repeatedly has failed/refused to actually recover the funds the City has claimed are due and owing despite the legal ability (and repeated opportunities) to do so.[41]

190.    The City's various actions have revealed the City has not filed/pursued the tax/PUFTA matters for purposes of actually recovering past due taxes that supposedly are due and owing, but rather for purposes of the proxy war, specifically: a) to harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff in connection with his anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities; and b) to retaliate against plaintiff for engaging in protected activity.

191.    A primary purpose of filing/pursuing the tax/PUFTA matters, and of the proxy war itself, simply has been to entangle plaintiff in baseless litigation, which has served multiple strategic/tactical purposes, all of which have constituted multiple legal, administrative, ethical and/or fiduciary violations.

---

[41] Had the City actually recovered the funds and satisfied its claims/judgments, the Core Defendants/City would not have been able (to continue) to use the tax/PUFTA matters for purposes of the proxy war.

192.    Central to the Core Defendants' strategy was to ensure that those executing the

proxy war had a "colorable" defense for their actions.  For example, but not by way of limitation:

a) the City has claimed that it merely has been seeking to recover past due taxes that were due

and owing; b) Vanguard has claimed that it merely was responding to a Writ of Execution that

had been served upon it; and c) defendants Gellert Scali and Seitz have claimed they merely

were carrying out the functions of a Sequestrator.  In fact, all defendants engaged in

Constitutional violations and/or conduct of an enterprise through a pattern of racketeering

activity, a RICO conspiracy, and either organized and/or participated in executing the proxy war.

193.    All actions taken by the Core Defendants, the City, its lawyers, Gellert Scali,

and/or others as part of the proxy war were on behalf (and for the benefit) of all defendants, and

were either authorized and/or ratified by them.

**The William Penn Foundation, The City of Philadelphia,
Marcel S. Pratt, and the $100 Million Quid Pro Quo - Part 1**

194.    The decision by the Core Defendants to engage the City/City officials and their

reciprocal agreement to participate in the proxy war was the result of a series of inter-connected

events, professional relationships, and incentives.

195.    The William Penn Foundation played a central role in the proxy war.  In

particular, but not by way of limitation:  a) the William Penn Foundation was founded in 1945 by

Phoebe and Otto Haas, co-founder of R&H, and is the philanthropic arm of the Haas Family; b)

in or around 1960, John C. Haas was named Chairman of William Penn, a position he held for

approximately 32 years;[42] c) during the relevant time period, the Haas Family Trusts owned

approximately 33% of all outstanding shares of R&H; d) in 2008, R&H was sold to Dow for

$15.3 billion; and e) in or around 2009, as a result of the sale of R&H to Dow and the proceeds

therefrom, John C. Haas donated $747 million to William Penn,[43] which represented a significant

portion of the Foundation's total assets.[44]

196.    According to its website, "The William Penn Foundation … is dedicated to

improving the quality of life in the Greater Philadelphia region[.]"  Since its inception, the

Foundation has made approximately 10,000 grants totaling more than $1.6 billion, and as of

December 2017, the Foundation's assets totaled approximately $2.5 billion.

197.    On or about November 21, 2016, approximately 90 days after plaintiff's August

15, 2016 follow-up email, William Penn announced its intention to commit up to $100 million to

Rebuild, "Mayor Kenney's bold plan to transform city parks, libraries, recreation centers and

playgrounds to enhance community life in neighborhoods across Philadelphia[.]"

198.    According to its announcement, "The Foundation's grant mark[ed] the initiative's

largest private investment to date and the largest single grant in Foundation history."  Janet Haas,

former Chair of the Foundation's Board of Directors stated, "Today's announcement underscores

---

[42] John C. Haas was the son of Otto and Phoebe Haas, and a former Chairman of R&H.

[43] As a further result of the sale, $500 million was donated to the newly-created Wyncote Foundation.  According to its website, "Wyncote Foundation, based in Philadelphia, was founded in 2009 with funds from the Otto and Phoebe Haas Charitable Trusts, at the direction of John C. Haas."  The Board of Directors is comprised of Leonard Haas, David Haas, Duncan Haas, and Frederick Haas.

[44] Accordingly, notwithstanding whatever tax and/or other benefits John C. Haas may have received from making such a donation(s), a substantial portion of William Penn's total assets were comprised of proceeds from the illegitimate sale of R&H to Dow, a sale that was illegitimate (in part) because it was predicated upon unlawful insider trading by the Haas Family Trusts, whose beneficiaries also greatly benefitted from the sale.

the William Penn Foundation's focus on generating new approaches for investing in under-resourced communities, for bringing communities together through the creative use of public space, and in providing opportunities for all of Philadelphia's citizens."

199.    William Penn's commitment was structured as a "challenge" to assist the Kenney Administration in raising the full $500 million for Rebuild,[45] to wit:  a) in July 2016, the Foundation approved an initial grant of $4.8 million for "start-up" costs; b) upon passage of a proposed $300 million City bond issue to fund Rebuild, the Foundation would release an additional $75 million; and c) the remaining $20.2 million would be structured as a 1:2 match designed to generate additional contributions from state, federal, and other philanthropic and private sources.

200.    Mayor Kenney responded, "I am extremely grateful to the Foundation not only for this overwhelming vote of confidence in Rebuild, but also for all the insights and support they supplied along the way to get us here.  This program would not be what it is without their expertise."

201.    While William Penn has made (and continues to make) significant contributions to the City, the $100 million commitment to Rebuild was larger than all previous grants by the Foundation to the City combined.

202.    Upon information and belief, a primary purpose of the grant was to create a significant "debt of good will" between the William Penn and the City, and to secure the agreement, cooperation, and assistance of the City/City Officials in carrying out the proxy war.

---

[45] In or around March 2016, Mayor Kenney announced his intention to create a $500 million public/private sector initiative known as "Rebuild" to restore and upgrade the City's civic infrastructure - its parks, playgrounds, recreation centers, and libraries.

Accordingly, the actions of William Penn in connection with the grant were on behalf (and for the benefit) of the Core Defendants/all defendants.

203.    Both the size and subject of the grant were significant.  The Core Defendants (by and through William Penn) were making an extraordinary request of the City/Kenney Administration that required extraordinary incentives, and which reflected the significant risks the Core Defendants, other defendants, and/or others believed they and their affiliates were facing in view of the anticipated publication of plaintiff's book and/or of the consequences of the entire pattern of defendants' wrongful/unlawful conduct being revealed and explained in a meaningful way to shareholders, stakeholders, regulators, lawmakers, law enforcement, market participants, both the for-profit and non-profit communities, and the public at large.

204.    Although William Penn formally announced the commitment to Rebuild in November 2016, the Foundation approved an initial grant to the City of $4.8 million in July 2016, only three months after plaintiff's April 22, 2016 email.


**The William Penn Foundation, The City of Philadelphia,
Marcel S. Pratt, and the $100 Million Quid Pro Quo - Part 2**

205.    From August 2010-July 2016, Marcel Pratt was an Associate in the litigation Department at Ballard Spahr LLP.

206.    In August 2016, approximately one month after William Penn's initial grant to the City, Pratt was hired by the City/Law Department and named Chair of the Litigation Group.  In that role, Pratt was responsible for all litigation matters in the City of Philadelphia Law Department and managed the 70-lawyer Litigation Group.  He also provided guidance to City officials and operating departments in creating legal policy and strategy.

207.    In March 2018, Mayor Kenney promoted Pratt to the position of City Solicitor.  In that role, Pratt served as Chief Legal Officer for the City of Philadelphia and led the 330-person Law Department, one of the largest municipal law practices in the country.  At age 33, he was the youngest person ever appointed to the position, which he held until December 2020.

208.    As both Chair of the Litigation Group and City Solicitor, defendant Pratt had management/supervisory responsibility for the tax/PUFTA matters and the individual lawyers assigned to the cases, including overall decision-making responsibility concerning whether to file/pursue the matters and the specific actions taken by the City in connection with the cases.

209.    In January 2021, Pratt returned to Ballard Spahr LLP where at age 35 he was named Managing Partner of the firm's Philadelphia office.

210.    In April 2021, approximately three months after his departure from the City, Pratt was named to the Board of Directors of William Penn.

211.    At all times relevant and material hereto, defendant Pratt (and defendant Cortes, his successor as City Solicitor) directed, authorized, and/or ratified the City's wrongful/unlawful activities in the tax/PUFTA matters as generally described herein.  Alternatively, defendant Pratt (and defendant Cortes) had notice of the City's wrongful/unlawful activities and failed/refused to take any remedial or corrective measures.  In so doing, Pratt (and defendant Cortes) violated his oath, fiduciary duty, and multiple Rules of Professional Conduct.

212.    Upon information and belief, defendant Pratt was incentivized at least four times in connection with his role in the proxy war, to wit:  a) in August 2016, Pratt was named Chair of the Litigation Group; b) in March 2018, he was promoted to City Solicitor; c) in January 2021, he was named Managing Partner of the Philadelphia Office of Ballard Spahr LLP; and d) in

April 2021, he was named to the Board of Directors of William Penn.[46]  While each succeeding position carried increasing responsibility, compensation, and/or prestige, there is little to suggest that Pratt's actual education, experience, and/or qualifications more generally were the true motivating factors for his rapid ascension.  Rather, despite the fact that the City was utilizing legal process/proceedings for wrongful/unlawful purposes, perpetrating a fraud/fraud upon the court, and wasting taxpayer funds purportedly to recover other taxes the City never intended to actually recover (and never actually recovered), it is apparent that Pratt was rewarded for his role in the proxy war by others who also were either organizers or participants in the proxy war.

213.    As described herein, the City could not have filed/pursued the illegitimate tax/PUFTA matters, which were filed/pursued in bad faith, fraudulent, and an abuse of process, without the authorization/ratification of defendants Pratt and/or Cortes.  Alternatively, but for Pratt/Cortes' intentional failure/refusal to properly carry out his/her duties and responsibilities as Chair of Litigation and/or City Solicitor, violation of fiduciary duty, and violation of multiple provisions of the Pennsylvania Rules of Professional Conduct, the tax/PUFTA matters could not have been used to execute the proxy war.


**The Proxy War - Part 1 (The City's Renewed Enforcement Effort)**

214.    On or about June 15, 2017, approximately three months after plaintiff's third email to counsel concerning the anticipated book, Christopher W. Dean, Esquire, of the law firm Linebarger Goggan Blair & Sampson, LLP, outside counsel for the City, sent a letter via regular

---

[46] Upon information and belief, defendant Cortes also was incentivized in connection with her role in the proxy war when, in November 2020, she was named Acting City Solicitor, and subsequently appointed to the position on a permanent basis.

mail to plaintiff advising that his law firm had been retained by the City to collect the June 3, 2008 judgment (in the tax case) and demanded immediate payment, including accrued interest and penalties (I&P).  Otherwise, according to the letter, a recommendation would be made to the City to direct the Sheriff to "levy or seize as much of your property [sic] to satisfy this obligation."

215.    The June 15, 2017 letter to plaintiff was a shocking development since the City had taken no action to enforce the judgment since October/November 2008 when, after Writs of Execution were unsuccessful, the City abandoned the matter.

216.    During Dean's active participation, the City treated the June 2008 judgment as a collection matter only, and took no action against any of plaintiff's assets/accounts.

217.    On or about April 10, 2019, Kelly Diffily, a Senior Attorney for the City's Law Department, sent an email to plaintiff advising that Drew Salaman, Esquire, of the law firm Salman/Henry was "taking the lead on collecting on the judgment."

218.    On April 17, 2019, Mr. Salaman sent plaintiff a series of emails detailing the City's claims and position and stating that although total principal wage tax liability was $41,009.17, the City presently was seeking/demanding a total of $276,400.93, inclusive of fines, interest and penalties, and further stated "kindly add 6% simple annual interest" from the date of entry of the June 2008 judgment through to the present.

219.    On or about April 23, 2019, plaintiff sent an email to attorneys Salaman and Diffily and attached a draft Complaint, stating "Attached please find a draft of a Civil Action, which seeks both legal and injunctive relief in connection with the City's tax and collection policy and practices.  I expect the final version to be ready for filing either Thursday or Friday."

220.    On or about April 29, 2019, plaintiff received an email and attached letter from

Diana P. Cortes, Chair, Litigation Group, Law Department, City of Philadelphia, stating:

> I am in receipt of your email of April 23, 2019 directed to Kelly
> Diffily of the Law Department and Drew Salaman, counsel for the
> City, enclosing a draft Civil Action which you have threatened to
> file later this week against the City and various City officials and
> others. … [P]lease be advised that we regard your draft filing as
> baseless, frivolous, and unreasonable.  Should you continue with
> your plan to file such an action, the City will vigorously contest it
> and seek sanctions from the federal court.

221.    The City did not genuinely believe the allegations/claims were "baseless,

frivolous, and unreasonable," - the draft Complaint was based upon the actual facts/prevailing

legal standards - but rather merely sought to harass, intimidate, threaten, oppress, and coerce

plaintiff in connection with the proxy war, and to retaliate against plaintiff for engaging in

protected activity.

222.    On or about May 10, 2019, also in response to the April 23, 2019 email and draft

Complaint, Brian R. Cullin, Deputy City Solicitor, began engaging in a series of escalating

execution/enforcement actions including, *inter alia*:  a) filing motions; b) serving written

discovery; c) issuing notices and subpoenas for depositions and documents; and d) making

unreasonable "settlement" demands, including a demand that was fourteen times the amount that

plaintiff had discussed with Mr. Dean.

223.    On or about June 14, 2019, defendant Cullin sent plaintiff an email in which he

increased the City's demand from $175,000 to $185,000, thereby increasing the interest and

penalties (I&P) component of the demand to nearly $100,000, stating:

> Please consider the City's updated offer to resolve the tax
> judgment against you:

Lump sum payment of $185,000.00 to be made on or before August 1, 2019. This offer is on the table until 6/21/19 at 4 PM EST. After this time, the offer is withdrawn.

City's offers will continue to escalate if you continue to ignore and refuse City's very reasonable efforts to resolve. City will also push forward in seeking out information relevant to your assets from your close associates. To be clear, the City is in this for the long haul, and we will investigate and exhaust any and all paths to executing against your assets.

Look forward to hearing from you by 6/21/19 by 4 PM.

224.    The statement that the City's "offers" only would "continue to escalate" made clear the City had no true interest in reaching an accommodation with plaintiff, but rather was using the tax case as a club for purposes of the proxy war.[47]

**The Proxy War - Part 2 (Silverberg v. City of Philadelphia (Silverberg I or SI))**

225.    On or about June 20, 2019, plaintiff filed a Complaint in the United States District Court for the Eastern District of Pennsylvania alleging, *inter alia*, violations of 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(1), et seq.[48]  On or about August 13, 2019, plaintiff also filed a Motion for Preliminary Injunction to enjoin certain actions by the City in connection with the tax case.

---

[47] Such matters typically are resolved for a fraction of the original amount or simply abandoned altogether which, in fact, originally is what occurred when the City abandoned the tax matter in October/November 2008.

[48] *See Silverberg v. City of Philadelphia, et al.,* United States District Court for the Eastern District of Pennsylvania, No. 19-2691 (as amended September 3, 2019)("Silverberg I" or "SI"). Named as defendants were the City of Philadelphia, Linebarger Goggan Blair & Sampson, LLP, James Kenney, Marcel S. Pratt, Esquire, Frank Breslin, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, Kelly Diffily, Esquire, and Christopher W. Dean, Esquire.  Within the litigation, those defendants associated with the City were referred to collectively as the "City Defendants."

226.    The SI Amended Complaint alleged, *inter alia*, the renewed execution/enforcement effort was connected to the funding shortfall for Rebuild, a Kenney Administration political initiative.[49]  In particular, while the Program was supposed to be funded (in part) with proceeds from the Beverage Tax (another Kenney Administration political initiative), less revenue was generated than originally anticipated, leading the City to improperly re-allocate wage and business privilege taxes to fund Rebuild, further leading the City to seek to recover on outstanding wage/business tax claims.

227.    On or about August 13, 2019, plaintiff served the Silverberg I defendants with both the Complaint and Motion.[50]

228.    On or about August 15, 2019, only two (2) days after service of SI Complaint and Motion and unbeknownst to plaintiff, the City filed seven Writs of Attachment concerning seven banks in connection with the original tax case.

229.    Although plaintiff was counsel of record in the tax case, he did not receive service of the Writs and only learned of the Writs based upon an independent, unrelated inspection of the docket the following day.

230.    On or about August 29, 2019, defendant Cullin wrongfully levied funds from plaintiff's bank account and froze the account.  Because of defendant Cullin's wrongful/unlawful actions, plaintiff received no prior notice, and therefore, did not have the opportunity to defend against the City's actions and/or otherwise to exercise his rights prior to the funds being levied.

---

[49] Silverberg I was filed before the circumstances surrounding the City's actions, and the proxy war, fully came into focus.

[50] All defendants were served except defendant Dean.

231.    As of August 15, 2019, the City had not filed Writs of Attachment/Execution or taken enforcement action of any kind in the tax matter since October/November 2008, shortly after the June 2008 judgment.[51]

232.    On or about January 8, 2020, the district court dismissed the SI Amended Complaint without prejudice based upon lack of subject matter jurisdiction, but determined the allegations were sufficient to state claims for violations of Section 1983, stating:

> [T]he City Defendants' tax collection activities violated Plaintiff's free speech and due process rights under the First and Fourteenth Amendments, respectively.

The district court specifically referenced Count I (Section 1983 - Violation of Constitutional Rights) and Count VII (Section 1983 - Retaliation).

233.    The City did not appeal, or otherwise challenge, the January 8, 2020 decision.

**The Proxy War - Part 3 (The PUFTA Claim)**

234.    On or about October 1, 2019, approximately three weeks after service of the Amended Complaint in Silverberg I, the City filed its Complaint in the PUFTA matter.[52]

235.    The City now alleged that certain actions in connection with the December 2011 purchase of certain real property located in Philadelphia, PA (hereinafter the "Market Street

---

[51] In June 2013 and May 2018, the City filed a pro forma Suggestion of Non-Payment.

[52] *See City of Philadelphia v. ELS Realco LLC, et al*., Philadelphia Court of Common Pleas, September Term 2019, No. 3805 (the "PUFTA" case).  The Complaint was signed by Brian R. Cullin, Deputy City Solicitor, and included a Verification (pursuant to 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities) signed by Anina Heimann, Tax Analyst I.

property") constituted a fraudulent conveyance or transfer within the meaning of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S.A. §§ 5105-5110.

236.    As relief, the City sought equitable remedies and damages, including $340,581.35 which represented the principal and interest the City claimed was due and owing in the tax matter, as well as an injunction against "further disposition" of the Market Street property.

237.    The City did not file the PUFTA claim based upon knowledge/information that a fraudulent transfer actually had occurred and/or to recover past due taxes that supposedly were due and owing, but rather as part of the proxy war.  In fact, the City lacked probable cause to file the PUFTA claim, which was time-barred by more than four years and based upon knowingly false and/or reckless allegations/claims.  For example, but not by way of limitation, the PUFTA Complaint alleged that plaintiff was the "sole member of Defendant LLC" and "transferred monies to [ELS] with actual intent to hinder, delay and/or defraud" the City, allegations that were either knowingly false or made in reckless disregard for whether they were true or false.

**The Proxy War - Part 4 (The City's Motion to Foreclose Upon Lien,**
**Motion to Compel Entry, and Petition for Contempt)**

238.    The City took a number of actions within the tax/PUFTA litigation which included, *inter alia*, filing a Motion to Foreclose Upon Lien (filed Nov. 13, 2019), Motion to Compel Entry (filed Dec. 3, 2019), and Petition for Contempt (filed on May 12, 2021).

239.    For the same reasons the filing/pursuit of the tax/PUFTA matters was not legitimate the City's actions within the litigation were not for purposes of enabling the City to recover on its claims, but rather were to facilitate the proxy war.  In particular, in February 2021,

pursuant to the Motions to Foreclose Upon Lien and to Compel Entry, the City obtained Orders which, *inter alia*, authorized the Sheriff to: a) conduct a public sale of plaintiff's interest ELS; b) gain entry to the Market Street property; and c) carry out a personal property levy. Pursuant to the Petition for Contempt, the City sought plaintiff's incarceration. However, none of these events actually took place.

240.    The City's true purpose in filing the Motions/Petition and in engaging in the related proceedings was to facilitate the proxy war, specifically: a) to harass, intimidate, oppress, coerce, threaten, instill fear, and punish plaintiff in connection with his anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' wrongful/unlawful activities; and b) to retaliate against plaintiff for engaging in protected activity.

**The Proxy War - Part 5 (The Vanguard Writ)**

241.    According to the plain language of the Complaints, the purpose of the tax/PUFTA claims was to recover past due taxes that supposedly were due and owing.

242.    On or about October 2, 2019, the day after the City filed the PUFTA Complaint, the City filed (in the tax case) a Writ of Execution addressed to Vanguard in connection with an individual retirement account (IRA) plaintiff maintains at Vanguard (the Vanguard Writ).

243.    Pursuant to Pa.R.C.P. 3106(d), such Writs expire ninety (90) days after they are filed unless reissued by the filing party.

244.    Although the City did not reissue the Vanguard Writ, which therefore expired in January 2020, Vanguard continued to restrict the account for an additional 17 months.

245.    On or about June 23, 2021, the City filed a Praecipe to Discontinue Garnishee Attachment purportedly for purposes of dissolving the Vanguard Writ.  Pursuant to the City's Praecipe, Vanguard released the funds that same day even though the Vanguard Writ already had expired and there was no legal process of any kind encumbering the account.

246.    Although the Vanguard IRA contained sufficient funds to satisfy the City's claims/judgments, the City never levied the account.  At a hearing conducted on July 7, 2021, defendant Cullin explained the City's reason(s) for "dissolv[ing]" the Vanguard Writ:

> [T]he City dissolved the [Vanguard Writ] because we have alternate avenues in which to collect this money. And it was a strategic decision to pursue a sheriff sale that is quicker, easier. Again, a strategic decision made by the City. Mr. Silverberg doesn't get to choose how the City collects its money. That's the plaintiff's decision to make, not Mr. Silverberg's.

247.    Contrary to defendant Cullin's statement, the City did not "dissolve[] the [Vanguard Writ]" - the Writ expired on January 1, 2020, 90 days after it was issued.

248.    Since there was no existing attachment, there was no legal basis to file the Praecipe to Discontinue, and in fact, the Praecipe to Discontinue did not serve or further the City's interests in any respect - the City's legal position/interests were precisely the same both before and after the Praecipe was filed.

249.    Both the filing of the Praecipe to Discontinue and defendant Cullin's explanation, individually or collectively, effectively admitted the City knew that Vanguard had continued to restrict the account even after the Vanguard Writ had expired, notwithstanding that Vanguard released the funds the same day the Praecipe was filed.

250.    Defendant Cullin's statements that it was a "strategic decision" to "dissolve" the Writ, and to do so "because [the City had] alternate avenues in which to collect this money," effectively admitted that the City was executing a "strategy" whereby its goal/objective was to encumber but not actually obtain plaintiff's funds.  Accordingly, defendant Cullin admitted that execution/enforcement proceedings in the PUFTA matter were not for purposes of actually obtaining funds the City claimed were due and owing; otherwise, the Vanguard account would have been levied, the City's claims/judgments satisfied, and the tax/PUFTA matters terminated.

251.    Defendant Cullin's statement that plaintiff "doesn't get to choose how the City collects its money. That's the plaintiff's decision to make," further admitted it was a deliberate decision to encumber but not to levy the Vanguard account.

252.    Because the Vanguard account contained sufficient funds to satisfy the City's claims/judgments, the Vanguard Writ undercut further pursuit of the tax matter and the filing of the PUFTA Complaint altogether - within 24 hours of filing, the City had the legal ability to recover the full amount it was seeking.  Therefore, further pursuit of the tax/PUFTA matters only could have been for reasons other than the recovery of taxes and/or to satisfy the City's claims/judgments, and in fact, was for purposes of the proxy war.

**The Proxy War - Part 6 (The Tax/PUFTA Defendants' Agreement
to Pay the Full Amount the City Claimed was Due and Owing - Part 1)**

253.    On or about May 17, 2021, the following email exchange took place between plaintiff and defendant Cullin:

**From:** Richard Silverberg <rjs@rjsilverberg.com>
**Sent:** Monday, May 17, 2021 10:28 AM
**To:** Brian Cullin <Brian.Cullin@Phila.gov>
**Subject:** City v. Silverberg

Mr. Cullin –

With respect to the City's claims, what does the City claim is due and owing?

Richard Silverberg

---

**From:** Brian Cullin <Brian.Cullin@Phila.gov>
**Sent:** Monday, May 17, 2021 1:08 PM
**To:** Richard Silverberg <rjs@rjsilverberg.com>
**Subject:** Re: City v. Silverberg

Mr. Silverberg,

$345,000 to settle Tax and Fraud Transfer case, contingent on agreement that you agree to release for any and all claims against City and officers and/or employees in connection with tax collection activities or fraudulent transfer case.

Best,

Brian Cullin

---

**From:** Richard Silverberg <rjs@rjsilverberg.com>
**Sent:** Monday, May 17, 2021 2:28 PM
**To:** Brian Cullin <Brian.Cullin@Phila.gov>
**Subject:** RE: City v. Silverberg

Mr. Cullin –

Defendants will agree to pay the full $345,000 to resolve the tax and PUFTA matters, contingent upon mutually-agreeable payment terms and the City's release of the claims.

This will need to be financed. Since banks will not consider
financing until an agreement is in place and the process is removed
from the apartment and the IRA, please prepare a draft
agreement. We can discuss terms and how the City can continue
to protect its interests during this period.

With respect to the City's request for a release, defendants are not
settling the cases; we are paying what the City claims is due and
owing. Regardless, the City cannot expect both a full payment and
a release of rights/claims defendants may have.

Please advise.

Richard Silverberg

---

**From:** Brian Cullin <Brian.Cullin@Phila.gov>
**Sent:** Monday, May 17, 2021 3:56 PM
**To:** Richard Silverberg <rjs@rjsilverberg.com>
**Subject:** Re: City v. Silverberg

Mr. Silverberg,

No can do - city needs a full release from you. Non-negotiable
point. We will see things through to sheriff sale (and get what we
are due anyway), and are more than ready to rebuff any frivolous,
blustering, new action(s)/conspiracy theories you cook up.

Best,

Brian Cullin

---

254.    The rejection of the tax/PUFTA defendants' offer to pay the full amount the City

claimed was due and owing further confirmed the City was not pursuing the tax/PUFTA matters

on the basis of the allegations/claims in the tax/PUFTA Complaints, to satisfy its

claims/judgments, and/or for any legitimate purpose. Further, the threat to have the Market

Street property sold at Sheriff's Sale because of plaintiff's exercise (and/or anticipated exercise)

of his Constitutional, federal statutory, and other rights/remedies (and/or refusal to relinquish those same rights/remedies) constituted retaliation for engaging in protected activity.

255.    There are no pre-conditions to a taxpayer's legal obligation to pay taxes, nor can the government impose any such conditions.  Otherwise, the government would be able utilize its taxing authority for various reasons unrelated to the payment of taxes, including for wrongful/ unlawful purposes.

256.    The requirement that the PUFTA defendants release any claims before they would be permitted to pay their taxes not only was wrongful/unlawful, but also connected the tax/PUFTA matters and SI/SII.[53]  Further, the City specifically demanded that the PUFTA defendants release claims in connection with the City's "tax collection activities" - the same actions that were the subject of the district court's January 8, 2020 decision in SI finding that claims had been stated for Constitutional violations.

257.    On or about May 21, 2021, plaintiff sent a letter to Diana Cortes, City Solicitor, City of Philadelphia, in connection with the May 17, 2021 email exchange.  In particular, plaintiff informed Ms. Cortes that the PUFTA defendants had made a full offer, that the offer was rejected based upon the PUFTA defendants' refusal to waive their rights, and that the City's imposition of such a requirement as a pre-condition of paying their taxes was wrongful/unlawful.

258.    On or about May 26, 2021, in response to the letter to Ms. Cortes, defendant Cullin sent plaintiff a second email in which the City changed its reasoning for rejecting the

---

[53] *See ELS Realco LLC, et al. v. City of Philadelphia, et. al*., United States District Court for the Eastern District of Pennsylvania, No. 5034 (filed Oct. 12, 2020)("Silverberg II" or "SII").  On February 23, 2021, SII was voluntarily dismissed.  In numerous subsequent submissions in the tax and/or PUFTA matters and in various communications with certain defendants and/or their representatives, plaintiff stated that SII would be re-filed.

PUFTA defendants' offer.  Defendant Cullin now stated, "This was *a settlement offer* – it was *not* a statement of the total amount of the City's claims against you. I apologize for any confusion."[54] (emphasis in original).

259.    Defendant Cullin's statement cannot be reconciled with the substance of the May 26, 2021 email where he claimed there had been a miscalculation and that the City actually "was owed $351,050.73 to satisfy the judgments."  However, miscalculating the amount supposedly due and owing due does not transform the May 17, 2021 email into a "settlement offer."

260.    In the May 26, 2021 email, the City now took the position that plaintiff's offer was insufficient since the amount then-due and owing actually was $351,554.64, which was $5,000 or .017% more than the amount set forth in the May 17, 2021 email.

261.    Notwithstanding that the difference between the two amounts is legally *de minimis*, that a "discount" (purportedly for settlement purposes) of .017% is not an actual discount, and that there was no "settlement" process/offer in the first place, the May 26, 2021 email actually confirms there was no true dispute - no reasonable, rational municipality would respond that an offer that was 99.9% of the full amount due and owing was insufficient.

---

[54] There was no "confusion" - the PUFTA defendants had *not* initiated settlement talks, *not* asked the City for a settlement demand, and *not* asked the City what amount it would accept to *settle* the claims - the PUFTA defendants simply had asked what the City "claim[ed]" was due and owing in the tax/PUFTA matters.

**The Proxy War - Part 7 (The Tax/PUFTA Defendants' Agreement
to Pay the Full Amount the City Claimed was Due and Owing - Part 2**

262.    On or about July 30, 2021, the tax/PUFTA defendants again agreed to pay the full amount the City claimed was due and owing, and to satisfy the claims/judgments.

263.    In response, the City first demanded payment by September 1, 2021, and then subsequently demanded that the tax/PUFTA defendants sign a "Settlement Agreement" (and do so by August 6, 2021) which again required a release of claims.

264.    Accordingly, in order to pay the funds the City claimed were due and owing, the City once again demanded that the matter be treated as a "settlement" which required the PUFTA defendants to relinquish their Constitutional, federal statutory, and other rights/claims, even though there was no "settlement" and no agreement was legally required - the PUFTA defendants merely were paying taxes the City claimed were due and owing.

265.    The tax/PUFTA defendants determined to not make payment because the City continued to impose wrongful/unlawful conditions.

**The Proxy War - Part 8 (The Petition for Appointment of Sequestrator)**

266.    On or about July 30, 2021, approximately five weeks after the City "dissolved" the Vanguard Writ and the same day the PUFTA defendants had agreed (for the second time) to pay the full amount the City claimed was due and owing, the City filed a Petition for Appointment of Sequestrator.[55]

---

[55] Pennsylvania Rule of Civil Procedure 3114 states:

267.    The City filed the Petition since the Vanguard Writ and/or freezing of plaintiff's Vanguard account apparently had failed to achieve the desired goal/objective, including to pressure plaintiff into abandoning his book and/or publication of any account of defendants' wrongdoing and/or to relinquish his claims against the City/City officials in SI/SII.

268.    As described herein, the Petition represented an escalation in the proxy war, from freezing plaintiff's accounts/funds to seeking to forcibly remove plaintiff from his home.

269.    Pursuant to the plain language of Rule 3114, judgement creditors are provided certain limited remedies in certain limited circumstances, and specifically where a defendant possesses "powers" to collect rent and/or other funds "becoming due to the defendant." Even though the City had failed/refused to levy the Vanguard account and twice rejected the PUFTA defendants offers to pay the full amount the City claimed was due and owing (i.e., approximately $350,000), the City now sought to forcibly remove plaintiff from the Market Street property and have a Sequestrator market the property for purposes of obtaining market-rate rental payments of approximately $3,000/month.

270.    The Petition contained no facts supporting the application of Rule 3114 - the City came forward with no evidence (and did not even allege that) ELS held any of the positions/roles or possessed any of the powers identified in Rule 3114, and instead merely alleged, "The Market

---

Upon execution against any interest in real property, or a mortgage or lien thereon the court on petition of the plaintiff, may order the sheriff, or a sequestrator appointed by the court, to collect any rent, interest, principal or other sum becoming due to the defendant, to exercise any powers possessed by the defendant as landlord, mortgagee, life tenant, judgment creditor, lien holder, vendor or otherwise, and to account to the court. The court may require a sequestrator's bond in such amount and upon such terms as it deems proper.

*Pa.R.C.P. 3114.*

Street Property has the *potential* to generate rents, issues, or profits."[56]  Further, other than a reference to Rule 3114 itself, the Petition contained no legal authority of any kind.

271.    The objective of the Petition (i.e., to utilize the Market Street property as a weapon against plaintiff, including to forcibly remove plaintiff from his home or to attempt to do so) was consistent with the objectives of the proxy war more generally, to wit: a) to harass, intimidate, oppress, coerce, threaten, instill fear, and punish plaintiff in connection with his anticipated book and related activities; and b) retaliation for engaging in protected activity.

272.    On or about October 29, 2021, Gary Seitz, Esq. of Gellert, Scali, Busenkell & Brown LLC was appointed Sequestrator "with full authority as permitted by law to operate and control all aspects of ELS in connection with ELS's ownership of the Property."  Defendant Seitz had been suggested for the position by the City and specifically by defendant Cullin.

273.    On or about November 10, 2021, plaintiff sent defendant Seitz an email explaining that the City had no legitimate basis to file/pursue the tax/PUFTA matters.  Further, plaintiff explained that the City's own actions demonstrated the Petition had not been filed/pursued in good faith and/or for a proper purpose since, *inter alia*, the City failed/refused to levy the Vanguard account and twice rejected the PUFTA defendants' agreements (in May and July 2021) to pay the full amount the City claimed was due and owing and the City's wrongful/unlawful rejection of those offers.

274.    In response, defendant Seitz emailed plaintiff that same day claiming the circumstances surrounding the City's filing/pursuit of the PUFTA claim essentially were irrelevant to his appointment as Sequestrator, stating:

---

[56] Emphasis supplied.

> I am a fiduciary that owes allegiance only to the court that
> appointed me.  A sequestrator is an officer and arm of the court
> and acts under the direction and supervision of the court.  As such,
> the sequestrator only has the powers set forth by the court in the
> order and reports only to the court.

275.    Defendants Gellert Scali/Seitz proceeded with the sequestration process even they

knew/should have known there was no legitimate basis to do so.

276.    On or about January 5, 2022, defendant Seitz sent an email to plaintiff which

stated, in pertinent part:

> As you know, my mandate is to take control of the condo unit and
> monetize it in satisfaction of the City's judgment.[57]  In order to do
> so, I must also comply with the rules of the Condo
> Association.  The Property Manager and Condo Association
> require that I change the locks of the unit in the presence of law
> enforcement.  Since I was unable to arrange a mutually convenient
> time with the police department or Sherriff's office, I plan to
> utilize a security guard to remove you or anyone else present,
> exclude you from the building and change the locks.  I plan to take
> control of the unit, storage space and parking - clear out any
> contents left behind and market the unit for rental.[58]/[59]

277.    On or about January 5, 2022, defendant Cullin also sent an email to plaintiff

which stated, in pertinent part, "Mr. Seitz, thank you for providing the information. You've

outlined a solid, common sense [sic] way to approach the negotiation and settlement of these

---

[57] Defendant Seitz previously had stated a Sequestrator basically was "rent receiver."

[58] The claim by defendant Seitz that he was "unable to arrange a mutually convenient time with the police department or Sherriff's office" is at best disingenuous if not a complete fabrication, and clearly was intended to coerce/intimidate plaintiff.  The Sheriff only is authorized to "collect any rent … becoming due to the defendant, [and] to exercise any powers possessed by the defendant" as, among other things, a landlord or mortgagee.

[59] Unlike a Sheriff's Sale which involves property rights that may result in the forcible removal of owners/occupants from the premises, Rule 3114 pertains only to a judgment creditor's potential ability to recover from a debtor who may be receiving funds in connection with property ownership.

matters." Defendant Cullin also stated that the City required that $10,109.20 be paid to defendant Seitz, that plaintiff must meet the requirements set forth in defendant Seitz's January 5, 2021 email, and that the City now required $364,346.40 to "achieve satisfaction of the judgments in the City Tax Case and Fraudulent Transfer Case."

278. Defendant Seitz's January 5, 2022 email was not intended to effectuate his purported duties/responsibilities as Sequestrator or any legitimate process/procedure, but rather was for purposes of the proxy war. Further, based upon the totality of the circumstances as described herein, defendant Seitz's threats/demands that plaintiff either pay a lump sum of $7,109.20 plus $3,000/month or be forcibly removed from the premises/building by private security was itself a criminal extortion - plain and simple.

279. With respect to defendant Cullin's email of January 5, 2022, which effectively incorporated defendant Seitz's email of that same day, the City's threats/demands constituted a criminal extortion for the same reasons defendant Seitz's threats/demands constituted a criminal extortion, notwithstanding that defendants' actions in connection with the filing/pursuit of the tax/PUFTA matters more generally were both an extortion and a conspiracy to commit extortion within the meaning of 18 U.S.C. § 1951. Further, the email again confirmed there simply was no legitimate basis for the ongoing litigation - the City repeatedly had failed/refused to engage in execution/enforcement activities for a proper purpose, which included repeatedly failing/refusing to actually obtain the funds the City claimed were due and owing.

280. To avoid plaintiff's forcible removal from the Market Street property, defendant Seitz proposed, *inter alia*, a month-to-month lease whereby plaintiff would "pay into the receivership estate the monthly sum of $3,000 pending further orders of the court," and also demanded funds totaling $7,109.20 payable to his law firm.

281.    On or about January 13, 2022, as a direct and proximate result of the January 5, 2022 emails from defendants Seitz and Cullin, subsequent related emails, and the threat/fear that plaintiff would be forcibly removed/locked out from the Market Street property and/or lose his personal property, plaintiff agreed to the terms/conditions demanded by defendant Seitz in the January 5, 2022 email.

282.    On or about January 19, 2022, plaintiff sent defendant Seitz a letter enclosing money orders totaling $3,000 payable to "Gary Seitz, as Sequestrator" in payment of the January 2022 "rent."

283.    Accordingly, while the City failed/refused to levy the Vanguard account and/or accept plaintiff's offers of full payment which would have fully satisfied the City's claims/judgments and terminated the tax/PUFTA matters, the City/defendant Seitz accepted plaintiff's $3,000 "rental" payment which enabled the City to continue execution/enforcement activities, and therefore continue to utilize the tax/PUFTA matters for purposes of the proxy war.

**The Dissolution of ELS Realco LLC**

284.    On or about January 24, 2022, plaintiff emailed the relevant parties, including defendants Cortes, Cullin, and Seitz, and attached a letter notifying them that a Certificate of Cancellation for ELS had been filed with the State of Delaware and that "the City/defendant Seitz have no further authority in this matter as against ELS."

285.    On or about January 28, 2022, defendant Seitz sent plaintiff an email claiming the January 6, 2022 agreement had been breached stating, "To be clear, if certified funds totaling

$7,109.20 payable to 'GSBB Law' are not received by my office [] by close of business on February 1, 2022, our agreement is terminated[.]"

286.    On or about February 2, 2022, defendant Seitz sent plaintiff an email which stated, "I did not receive your funds yesterday. You have materially breached our agreement which is no longer in effect. … Please vacate the premises by Friday to avoid any confrontation with the security service."

287.    On or about February 2, 2022, in a separate email to plaintiff, defendant Seitz claimed the Certifate of Cancellation was void and that he had "already notified Captain Colleen Billups of the Ninth Police District of the situation."

288.    On or about February 4, 2022, defendant Cullin sent plaintiff an email which stated, in pertinent part, "Once again, you've refused to provide a copy of the dissolution paperwork you filed, despite multiple requests for it, so I am firmly of the opinion that you are blustering. If you'd like to prove me wrong, you can do so in 2 minutes by emailing me a copy of the filed dissolution paperwork."

289.    At the precise moment that ELS was dissolved, the basis for the City's Petition no longer existed.  Defendant Seitz/the City were required to bring any challenge to the dissolution in Delaware court, which they declined to do.

290.    On or about February 7, 2022, plaintiff sent defendant Cullin an email which stated, in pertinent part, that the dissolution of ELS was a matter of public record, and that the City cannot proceed against and/or recover from a company that no longer exists.  Plaintiff further stated:

> Since there is no basis for the Petition or the case itself, it remains
> apparent the City's only "strategy" is to maintain a fraudulent
> claim and behave as though it is legitimate - to engage in a ruse
> where literally nothing that is occurring has a proper basis in fact
> or law, or is a violation of it.

291.    On or about June 16, 2022, defendant Cullin filed a Withdrawal of Appearance in
both the tax and PUFTA matters, and in or around that same time, his employment with the City
of Philadelphia ended.


**The Proxy War - Part 9 (The Implications of The Petition
for Appointment of Sequestrator)**

292.    At the time the Petition was filed, the City already had failed/refused to levy the
Vanguard account and twice rejected the PUFTA defendants' agreement to pay the full amount
the City claimed was due and owing.

293.    The Petition was not filed because the City was seeking to recover funds the City
claimed were due and owing - the Petition was not designed and Rule 3114 did not allow for
such a recovery.  Rather, the true purpose of the Petition was obstruction/extortion in connection
with plaintiff's interest/residence at the Market Street property, thereby increasing the pressure
on plaintiff to abandon the publication of his book and/or any account of defendants'
wrongdoing, thus executing at the Petition-level the goals/objectives of the tax/PUFTA matters
and proxy war more generally.


**The Proxy War - Part 10 (The Implications of The Proxy War)**

294.    In the previous section titled "The Implications of the Original Case Against
Rohm and Haas Company," plaintiff alleges that the determination to make knowingly false

allegations that Jackson had attacked McCrory, and to offer altered and manufactured documentary evidence and perjured testimony to support its position [] reflected a policy/practice, operating strategy, and approach to corporate governance which was to take whatever action(s) were necessary to achieve the desired outcome and/or the Company's goals/objectives more generally, regardless of the actual facts and/or prevailing legal standards. Plaintiff further alleged:

> The policies, practices, strategies, and tactics utilized by R&H in the original state case are part of a years-long pattern and practice of wrongful/unlawful conduct by defendants and/or others whereby litigation-related decisions/activities, and business-related decisions/activities more generally, are not based upon the facts and relevant legal/regulatory/administrative standards, but rather upon whatever is required for the company, organization, entity, and/or individual to achieve the desired outcome and/or their objectives more generally.

295.    As the Jackson cases progressed through the federal courts, the defendants in those cases maintained these same policies/practices, strategies/tactics, approach to corporate governance and corporate citizenship, and views with respect to outcomes and objectives.  In effect, it was their regular way of doing business.

296.    Perhaps the strongest evidence of "wrongfulness" is that these proceedings, individually and/or collectively, have made no sense whatsoever - the City has devoted more time/resources to litigating the tax/PUFTA matters than the value of the claims, or at least more than what the City customarily would accept to resolve such a "dispute."  Therefore, as a tax collection/enforcement and/or litigation matter, the actions of the City have been directly contrary to its own pecuniary/legal interests and those of taxpayers, and therefore only could have been for purposes other than advancing/protecting the interests of the City/taxpayers.

297.    Even when plaintiff agreed to pay the ever-escalating "full amount" the City claimed was due and owing, which itself was intended to thwart rather than facilitate resolution, the City stated it would not accept payment unless plaintiff first waived his Constitutional, federal statutory, and other rights/claims as against the City/City officials in SI/SII.  In fact, had the City legitimately been seeking to recover on its claim, there would have been no PUFTA claim altogether - the City simply would have either executed upon, resolved, and/or abandoned the original tax claim, which is precisely what occurred in 2008.

298.    The City now has spent significant tax dollars to recover a lesser amount of tax dollars (which itself makes no sense), and which it never intended to actually obtain.  Since no reasonable, rational municipality and no legitimate Administration ever would engage in and/or authorize such conduct, the City did not have a right to the objective sought and/or the means used in pursuing such objective.

299.    What has emerged over the life of the litigation(s) is a clearly-identifiable pattern of conduct whereby, when faced with an allegation or claim, a core group of defendants responds precisely the same way the Core Defendants responded here - by taking whatever steps are necessary to achieve the desired outcome or their overall objectives more generally, regardless of the actual facts/legal standards, even if it means manufacturing facts and/or violating legal/regulatory/administrative standards, and even if it means committing crimes.  They are willing to break rules, violate standards, and test the boundaries of enforcement, both in the name of protecting their financial and reputational interests and to satisfy their primal need "to win," and ultimately for purposes of escaping legal responsibility for their actions.  As with the R&H defendants, it is their regular way of doing business.

300.    As part of that effort, a tactic and overall strategy has been to create a narrative and/or scenario, which has included manufacturing supporting facts, whereby regardless of the actual facts and the proper assignment of blame, including defendants' own wrongful/unlawful activities, it is their adversary who is portrayed as the wrongdoer.

301.    The conduct of the Core Defendants/other defendants has revealed is a culture of corruption, abuse of authority/office, a fraud upon taxpayers/stakeholders which has included the illegitimate use of taxpayer/stakeholder funds to support professional and personal interests/agendas, and the illegitimate use/abuse of the courts for the same illegitimate purposes, all of which has occurred/been enabled by both the participants and those with the ability, authority, duty, and/or responsibility to take remedial/corrective action but who repeatedly failed/refused to do so.

302.    Defendants' conduct has demonstrated an antipathy and lack of respect for core democratic institutions, values and norms.  At all levels, there has been a failure of leadership, character, and judgment.

303.    Despite the City's various "tax-collection activities" during the past six years, the case(s) are in the exact same position as they were when judgment was first entered in the tax case in June 2008, more than 15 years ago.

**The Role of Avantor, Inc.**

304.    In 1904, John Townsend Baker founded the chemical company J.T. Baker.  In 1985, the company was acquired by Procter & Gamble, and in 1995 was sold to Mallinckrodt.

305.    In 2010, investment firm New Mountain Capital purchased Mallinckrodt Baker Inc., which then changed its name to Avantor, Inc.  In or around that same time, Raj Gupta was named Chairman, a position he held until his May 2022 retirement from the Company.

306.    In May 2019, the Company went public with a $3.8 billion initial public offering (IPO), and which resulted in a market capitalization of $7.62 billion.

307.    Upon information and belief, at all times relevant and material hereto, defendants Gupta/Avantor authorized, ratified, participated in, and/or otherwise engaged in activities in connection with, and for purposes of, the proxy war.  For example, but not by way of limitation: a) on November 4, 2020, Avantor announced a secondary share offering of 71.3 million shares, which was upsized to 71.6 million shares, which closed on November 10, 2020; b) on July 9, 2021, Avantor drew down $1.5 billion from its credit facilities; c) on September 13, 2021, Avantor announced an offering of its common stock valued at approximately $1 billion, which closed on September 16, 2021; and d) on October 19, 2021, Avantor announced and priced $800 million in Senior Notes in a private placement.  While the transactions purportedly were for general corporate purposes, the true and/or a primary purpose of these and/or certain other transactions (which occurred consistent in time with the proxy war and/or certain/significant events related thereto) was to fund and/or otherwise facilitate the proxy war, including liabilities related thereto.

**The Role of Ballard Spahr LLP**

308.    Upon information and belief, Ballard Spahr LLP represented R&H prior to its acquisition by Dow, regularly represents the City, and also regularly has represented/represents

certain other defendants.  Accordingly, the firm has had longstanding professional relationships with certain Core Defendants/other defendants, including during the relevant time period, which the firm has viewed/views as important to its business/financial interests.

309.    From August 2010-July 2016, defendant Pratt was employed as an Associate at Ballard Spahr.

310.    Upon information and belief, in or around August 2016, and as described herein, pursuant to an agreement by and between the Core Defendants, the City/City officials, Ballard Spahr, defendant Pratt, and/or others, defendant Pratt left Ballard Spahr and was hired by the City/Law Department as Chair of the Litigation Group.  In that role, Pratt was responsible for all litigation matters and managed the 70-lawyer Litigation Group.  He also provided guidance to City officials and operating departments in creating legal policy and strategy.

311.    In March 2018, Mayor Kenney promoted Pratt to the position of City Solicitor.  In that role, Pratt served as Chief Legal Officer for the City of Philadelphia and led the 330-person Law Department, one of the largest municipal law practices in the country.  At age 33, he was the youngest person ever appointed to the position, which he held until December 2020.

312.    In January 2021, Pratt returned to Ballard Spahr where, at age 35, he was named Managing Partner of the firm's Philadelphia office.  In its Press Release announcing Pratt's return, the firm stated:

> At Ballard, Marcel stood out for his legal and leadership abilities and his personal attributes," [firm Chairman Mark] Stewart said. "Our high regard for him has only grown as we watched the skill and confidence with which he represented the City in its highest-profile litigation, advised City leaders in navigating the many challenges they face, and led a complex legal operation. His return to Ballard is a great development for clients and the firm.

…………..

> Said Philadelphia Mayor Jim Kenney: "Some of our
> administration's greatest accomplishments are tied to Marcel's
> leadership of our legal strategy and operations, especially our
> consistent success in legal matters that have defined us as a City.
> Marcel's remarkable tenure included some of the most
> consequential legal matters in recent history."

313.    In fact, at the time defendant Pratt returned to Ballard Spahr as Managing Partner, he was a named defendant in two ongoing racketeering cases involving a years-long pattern of obstruction of justice, mail/wire fraud, and other legal and ethical violations by City officials, Pratt, and certain lawyers Pratt supervised in the Law Department.  Accordingly, Ballard Spahr's Press Release cannot be reconciled with the actual facts, and instead is consistent with a prior agreement or arrangement (as described herein) to re-hire Pratt regardless of the circumstances and/or Pratt's actual qualifications.

314.    Upon information and belief, Pratt would not have returned to Ballard Spahr and/or been named Managing Partner but for the agreement as between the Core Defendants, City/City officials, Ballard Spahr, Pratt, and/or others, and/or Pratt's role in the proxy war. Pratt's return to Ballard Spahr also confirmed the firm's support for Pratt's activities as City Solicitor and its own role in connection with the proxy war.

315.    Upon information and belief, Ballard Spahr agreed to participate, and actually participated, in the proxy war in connection with defendant Pratt's employment/positions because of the importance of maintaining its business interests/relationships with the Core Defendants and/or others, and in furtherance of those same interests/relationships.

**The Role of the Lawyers**

316.    Upon information and belief, at the time the Core Defendants conceptualized the proxy war, they also understood that lawyers would need to play a central role.  In particular, because the proxy war was carried out by and through the wrongful/unlawful filing/pursuit of the tax/PUFTA matters, and because the tax/PUFTA matters were filed/pursued by use of legal process/proceedings for wrongful/unlawful purposes, the proxy war only was able to occur because lawyers were willing to engage in wrongful, unlawful, and/or unethical conduct.

317.    Lawyers swear an oath to uphold the Constitution and laws of the United States and the Commonwealth of Pennsylvania.  They also are bound by the Pennsylvania Rules of Professional Conduct (RPC), and can be subject to discipline for violations up to and including disbarment.

318.    Since 2017, there has been no legitimate basis to pursue the tax matter, and there never was a legitimate basis to file/pursue the PUFTA claim.  Where a claim/case is illegitimate, every action by counsel in furtherance of the claim/case necessarily is illegitimate as well.

319.    In effect, the City admitted that it was the City's "strategy" merely to engage in execution/enforcement activities - to pursue but not to actually obtain a remedy; in other words, simply to multiply the proceedings.  As with the tax/PUFTA claims more generally, such activities served no legitimate purpose whatsoever and instead were intended to harass, intimidate, threaten, instill fear, oppress, and coerce plaintiff in connection with the proxy war.

320.    The RPC states, in pertinent part:

> Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice.  Offenses involving violence, dishonesty, breach of trust,

or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

*R.P.C. 8.4, Comment 2.*

321.    In the instant case, defendant Cullin's various actions in connection with the tax/PUFTA matters, and defendant Seitz's actions in connection with the City's Petition for Appointment of Sequestrator, violated multiple provisions of the Rules of Professional Conduct.[60]  *See e.g. Rule 3.1 (Meritorious Claims and Defenses)*("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); *Rule 3.3(a)(1)(Candor Towards the Tribunal)*("A lawyer shall not make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]"); *Rule 3.3, Comment 2* ("This Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process. … [T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false."); *Rule 4.4(a)(Respect for Rights of Third Persons)*("[A] lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."); *Rule 8.4 (Misconduct)*("It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the

---

[60] All or nearly all of the submissions by defendant Cullin were submitted over the name of defendant O'Connell.

administration of justice[.]”); *Preamble at 5* (“A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others.  … While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.”).

322.    All lawyers who authorized, ratified, participated in, and/or were aware of the conduct and violations described herein, and/or who failed to report said conduct/violations, also violated the RPC.  Further, such reporting requirements are mandatory.  *See Rule 8.3(a)*(“A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.”).

323.    Attorneys Pratt, Cortes, O'Connell, and possibly others in the Law Department also violated the Rules based upon their respective roles as supervisors/managers.[61]/[62]  In fact,

---

[61] Defendant Pratt's violations pertained to defendants Cortes, O'Connell, and Cullin; defendant Cortes' violations pertained to defendants O'Connell and Cullin; and defendant O'Connell's violations pertained to defendant Cullin.

[62] The Rules of Professional Conduct state, in pertinent part:

> (b)  A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.
> (c)  A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:
>> (1)  the lawyer orders or, with knowledge of the specific conduct ratifies the conduct involved; or
>> (2)  the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

attorneys Pratt and Cortes have played a central role in the proxy war by wrongfully/unlawfully authorizing/ratifying the filing/pursuit of the tax/PUFTA matters - cases which have not been filed/pursued for purposes of recovering on the City's claims but rather as part of the proxy war - a corrupt plan/scheme on behalf (and for the benefit) of the Core Defendants/other defendants for purposes of, *inter alia*, extorting plaintiff in connection with the publishing of his account of the wrongful/unlawful activities of defendants and/or others.

324.    It does not matter that the Courts permitted various actions/submissions since the RPC specifically notes that "It is not a justification that similar conduct is often tolerated by the bench and bar."  There is no legitimate basis to file/pursue illegitimate claims, and/or to utilize legal process/proceedings for wrongful/unlawful purposes.

325.    Yet, it is plaintiff who is facing disciplinary Complaints, at least for now.


**Defendants Have Engaged in a Pattern and Practice of Harassment,
Intimidation, Oppression, Threats, Instilling Fear, Coercion, and Retaliation**

326.    The proxy war was not the first time that harassment, intimidation, oppression, threats, instilling fear, coercion, and retaliation were used as tactics in connection with the Jackson litigation concerning Jackson and/or his counsel, including with respect to personal safety/property.

327.    As set forth in Paragraph Nos. 139-165 of the Consolidated Amended Complaint, after the district court determined that Jackson had stated claims for violation of RICO and ERISA against R&H/R&H officials, and consistent with the Jackson III defendants' efforts to

---

*Pa.R.P.C. 5.1(b)-(c)*; *see also Pa.R.P.C. 5.1(c), Comment 1* (noting that Part (c) specifically applies to government agencies).

defeat Jackson's claims, there were multiple incidents of harassment and intimidation at

Jackson's home.  In particular, but not by way of limitation, Jackson discovered that memorial-

like flowers had been placed on his car (which was parked in his driveway) and down his

driveway, an incident where there was loud banging on his front door at 3:00 a.m., and a

"strange van" parked across the street from his home, which were reported to the police.

328.    The CAC alleged, in pertinent part:

**The Black SUV**

164.  On March 7, 2007, at approximately 9:30 p.m., while plaintiff was crossing the street from picking up his mail, a black SUV nearly struck him. The driver of the SUV stopped, rolled down his window, and then stated to plaintiff:

> I'm sorry, I almost hit you. You need to be more careful, especially in other situations when you're fucking with the wrong people.

The car then pulled away. It is apparent that the car already was on plaintiff's block, and that the driver had been waiting for precisely such an opportunity. Plaintiff perceived the incident to be a threat to his person, safety, and/or property intended to harass, intimidate, oppress, retaliate and dissuade him from continuing the litigation against the R&H/Liberty Life defendants and/or others. Further, plaintiff believed the incident was connected to the litigation since, inter alia: a) the incident occurred within days of plaintiff providing a detailed account to the district court of R&H's improper interference with, and termination of, his health insurance benefits and R&H's proffered explanation for its conduct, all of which directly implicated, among other things, defendants' various duties pursuant to ERISA; b) there had been a number of previous incidents at plaintiff's home, all consistent in time with events in the litigation, and all intended to harass, intimidate, oppress, retaliate and dissuade plaintiff from continuing with the litigations against the R&H/Liberty Life defendants and/or others; and c) the incident represented an escalation since the prior conduct had failed to intimidate plaintiff out of his claims against defendants.

329.     These events represent both the lengths that certain parties were willing to go to defeat a liability claim and the thuggish depravity of those same parties.

330.     In the instant matter, the Core Defendants, by and through the City and defendant Seitz, engaged in a different type of thuggery - wrongfully/unlawfully utilizing legal process/proceedings as a club for purposes freezing plaintiff's accounts, attempting to forcibly remove him from his home, and ruining his professional/personal reputation.

331.     Both matters have involved Fortune 500 companies engaging in a muti-year, multi-faceted pattern of criminal conduct, predicated upon case-fixing, where fraud, abuse of process, school-yard bulling, and base thuggery were used both as tactics and an overall strategy to obtain a desired outcome and to achieve defendants' overall goals/objectives.

332.     At bottom, the Core Defendants and others determined to engage in fraud, racketeering, and a RICO conspiracy in an effort to prevent the story of their fraud, racketeering, and RICO conspiracy from being told.  For its part, the Kenney Administration has failed to carry out a core function of government - to serve the public interest.

**The Conduct is Continuing**

333.     On May 17, 2023, plaintiff filed the instant lawsuit.

334.     On or about August 16, 2023, Steven Wakefield, an attorney for defendant City, proposed (on behalf of 13 defendants) a "staged" Rule 12 Motion schedule whereby defendants first would file Rule 12(b)(1) motions challenging subject matter jurisdiction, and assuming the case survived, then would proceed with substantive Rule 12 motions.

335.    On or about August 18, 2023, plaintiff rejected the proposal since, among other things, Rule 12(g) requires that all grounds for dismissal be raised at the same time.  Also, this appears to have been an effort by certain defendants to further extend the time to file Rule 12(b)(6) motions.

336.    On or about August 21, 2023, the next business day, attorney Wakefield filed a Writ to Revive Judgment in the tax case, a precursor to the attachment of plaintiff's assets. When plaintiff questioned the City's action, attorney Wakefield emailed plaintiff stating:

> The City continues to fight this case because you continue to owe us in excess of $350,000. You may always exercise your rights and pay the City in full, terminating all collection efforts.  We will accept certified funds in the form of a bank check or money order. The City's only goal in this litigation (or indeed any litigation with you) is to collect the judgment against you.  I hope this clears up any confusion on your part.

337.    In fact, this was a continuation of the proxy war, blatant retaliation/extortion, and just the latest use of legal process/proceedings for a wrongful/unlawful purpose.  Rather than wait for a decision on any Rule 12 motions, defendants sought to intimidate/extort plaintiff out of his case before motions even had been filed.

**COUNT I**
**PLAINTIFF V. CITY OF PHILADELPHIA,**
**JAMES KENNEY, MARCEL S. PRATT, ESQUIRE,**
**DIANA P. CORTES, ESQUIRE, MARISSA O'CONNELL, ESQUIRE,**
**BRIAN R. CULLIN, ESQUIRE, GELLERT SCALI BUSENKELL**
**& BROWN LLC, AND GARY F. SEITZ, ESQUIRE**
**42 U.S.C. § 1983 - VIOLATION OF CONSTITUTIONAL RIGHTS**

338.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred thirty-seven (337) as though fully set forth herein.

339.    The conduct of defendants, individually and/or through the City/Gellert Scali's employees, representatives, and/or associates, acting at all times within the course and scope of their employment and in furtherance of the City/Gellert Scali's business and interests, constitutes conduct under color of state law and/or official right within the meaning of Section 1983 and which has violated plaintiff's rights to, *inter alia*:  a) free speech/petition as secured by the First Amendment; and b) due process as secured by the Fourteenth Amendment, all to plaintiff's great detriment and loss.[63]

340.    From 2017-present, the City did not file/pursue the tax/PUFTA matters for purposes of recovering on its claims as set forth in the tax/PUFTA Complaints.  In particular, while the City has engaged in numerous litigation activities, obtained judgments, and engaged in numerous execution/enforcement activities, the City intentionally and repeatedly has failed/refused to actually obtain the funds it claims are due and owing, which has included the failure to levy the Vanguard account and the rejection of plaintiff's offers (in May and July 2021) to pay the full amount the City claimed was due and owing.  Further, contrary to the City's

---

[63] As described herein, the challenged conduct resulted in a loss or deprivation of plaintiff's rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment.

policy/practice, the City never has sought a compromise or expressed a genuine interest in resolving its claims.  Instead, the City has sought the maximum amount of principal, interest, and penalties, progressively increasing the total demand from $276,400.93 in April 2019 to $364,346.40 in January 2022, approximately nine times the principal amount of $41,009.17.

341.    Since at least 2017-present, the City's various activities in connection with the filing/pursuit of the tax/PUFTA matters, and Gellert Scali's activities in connection with the Petition for Appointment of Sequestrator, have been for purposes of the proxy war - a corrupt plan/scheme by the Core Defendants and/or others on behalf of all defendants whereby the tax/PUFTA matters were utilized to, *inter alia*: a) delay, deter, dissuade, and/or prevent the publication of plaintiff's anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with the wrongful/unlawful activities of the Core Defendants, the companies/organizations with which they were/are affiliated, and those other individuals/entities whose wrongful/unlawful conduct is encompassed thereby and/or relevant thereto, and in fact have interfered with such publication, account, and/or petition; and b) retaliate against plaintiff for engaging in protected activity, namely the filing/pursuit of SI and SII, and plaintiff's stated intention to re-file SII.  The plan/scheme was executed by the City/Gellert Scali by/through the use of legal process/proceedings for wrongful/unlawful purposes, namely the tax/PUFTA matters which were improperly utilized to harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff.  Accordingly, the City/Gellert Scali's activities in connection with the Vanguard Writ, Motion to Foreclose Upon Lien, Motion to Compel Entry, Petition for Contempt, Petition for Appointment of Sequestrator, and the filing/pursuit of the tax/PUFTA matters more generally, were not for purposes of actually

obtaining the stated remedies and/or recovering on the City's claims as set forth in the tax/PUFTA Complaints, but rather were for purposes of the proxy war.

342.    The May 17, 2021 email exchange whereby the City rejected plaintiff's offer to pay the full amount the City claimed was due and owing because plaintiff would not release his Constitutional, federal statutory, and/or other claims against the City/City officials in SI/SII constituted a discrete violation of plaintiff's rights under the First and Fourteenth Amendments, to wit:[64]  a) there are no pre-conditions to a taxpayer's legal obligation to pay taxes, nor can the government impose any such conditions; b) a lawsuit and the claims contained therein are a form of property; c) the allegations/claims as set forth in SI and SII are an exercise of, and protected by, the speech/petition clauses of the First Amendment; d) the City specifically connected the tax/PUFTA matters and plaintiff's claims in SI/SII; and e) the City specifically demanded that plaintiff relinquish his Constitutional, federal statutory, and other rights/claims against the City/City officials in connection with the City's "tax collection activities" - the same activities that were the subject of the district court's January 8, 2020 decision in SI finding that claims had been stated for Constitutional violations.

343.    Defendants' actions as described herein also violated plaintiff's right to due process.  The City and Gellert Scali defendants filed/pursued knowingly baseless allegations/claims against plaintiff and/or the LLC with which he was affiliated, for knowingly wrongful/unlawful purposes, and in an effort to obtain remedies to which they are not legally entitled, and did so without any reasonable justification in the service of a legitimate

---

[64] There are no pre-conditions to a taxpayer's legal obligation to pay taxes, nor can the government impose any such conditions.

governmental objective.  In so doing, defendants acted arbitrarily, abused their authority, and engaged in oppression.

344.    Where (as here) the government files a lawsuit and obtains a judgment but then intentionally fails/refuses to recover on its damages claim, the lawsuit (and any legal process/proceedings utilized in furtherance thereof) necessarily serves no legitimate governmental objective.  Further, where (as here) the lawsuit is utilized for purposes other than recovery for the losses claimed in the Complaint but rather for purposes of oppression, it is an abuse of power and otherwise violates due process.  For example, but not by way of limitation, the government cannot simply freeze a citizen's retirement account until such time as the government determines to no longer do so, or such action no longer fits its legal, political, business, and/or other strategic/tactical goals/objectives.

345.    Defendants engage in a policy, practice, and/or custom of utilizing legal process/procedures for wrongful/unlawful purposes, utilizing the courts for political, personal and/or other wrongful/unlawful purposes, and/or a failure to supervise.  In particular, but not by way of limitation, although the City/City officials have legal/fiduciary duties to advance and protect the interests of taxpayers and lawyers swear an oath to abide by the Constitution and laws of the United States and the Commonwealth of Pennsylvania and are required to abide by the Rules of Professional Conduct, all violated those same standards in connection with the City defendants' filing/pursuit of the tax/PUFTA matters and Gellert Scali in connection with the filing pursuit of the Petition for Appointment of Sequestrator, which actually were filed/pursued for purposes of executing and/or facilitating the illegitimate proxy war.

346.    At all times relevant and material hereto, all actions by the City defendants have been at the specific direction and insistence of defendant Kenney, and/or otherwise

authorized/ratified by defendant Kenney and the Kenney Administration for purposes of proxy war.  Further, the actions by defendant Cullin have been at the specific direction and insistence, and/or otherwise authorized/ratified by Marissa O'Connell, Divisional Deputy City Solicitor, Marcel S. Pratt, former City Solicitor, and/or Diana Cortes, City Solicitor, City of Philadelphia. In addition, at the hearing of October 26, 2021, defendant Cullin proposed/offered defendant Seitz as Sequestrator, and following his appointment, worked with defendant Seitz in connection with the City's Petition for Appointment of Sequestrator.  Therefore, all such actions constitute and/or were in furtherance of a policy, practice, and/or custom of the City of Philadelphia of utilizing legal process/procedures for wrongful/unlawful purposes, either directly and/or by and through certain third parties.  Further, based upon the circumstances of Gellert Scali's appointment as Sequestrator, and the fact that Gellert Scali was acting under "color of law," the same standards that apply to the City/City officials also apply to Gellert Scali.[65]

347.    Defendants acted arbitrarily, abused their authority, and engaged in oppression. Further, defendants' actions were intended to injure plaintiff, and did injure plaintiff, and were not justified by any legitimate government interest.  Because the Core Defendants acted on behalf of all defendants, and because the City/Gellert Scali executed the proxy war on behalf of the Core Defendants/all defendants, the actions by the City/Gellert Scali are assignable to all defendants.

---

[65] In the November 10, 2021 email, defendant Seitz stated, "I am a fiduciary that owes allegiance only to the court that appointed me.  A sequestrator is an officer and arm of the court and acts under the direction and supervision of the court."  Accordingly, the activities of defendants Seitz and Gellert Scali in connection with the Petition for Appointment of Sequestrator were under "color of law."

348.    As relief, plaintiff demands all legal and equitable remedies for all injuries, harms, damages, and losses suffered as the result of defendants' violations of plaintiff's rights as described herein.  In particular, but not by way of limitation, plaintiff demands, as appropriate, to be made whole including, but not limited to, an award of monetary damages, interest on said funds, and any and all fines, penalties, attorney's fees, interest, and costs.  As further relief, plaintiff demands:  a) an award of compensatory damages for his severe personal injuries as described herein, including but not limited to, damage to and/or loss of personal and professional reputation, severe emotional distress and/or mental anguish with associated physical symptoms, humiliation, anxiety, and stress; b) an award of punitive damages in that defendants' conduct was motivated by an evil motive or intent, and/or was in callous or reckless disregard to the rights of plaintiff and/or others, and/or was intentional and/or reckless, wanton, extreme, and outrageous, and otherwise satisfied the standard of outrageousness necessary to support an award of punitive damages; c) an order enjoining defendants from engaging in similar or like conduct in the future; and d) all fines, penalties, attorney's fees, interest, costs, and all other legal and equitable relief which may be available and the Court deems just and appropriate.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, City of Philadelphia, James Kenney, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, Gellert Scali Busenkell & Brown LLC, and Gary F. Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

**COUNT II**
**PLAINTIFF V. ALL DEFENDANTS**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**OBSTRUCTION OF JUSTICE - 18 U.S.C. §1951**

349.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three

hundred forty-eight (348) as though fully set forth herein.

350.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C.

§§ 1962(c), 1951.

351.    The conduct of the municipal, corporate, and nonprofit defendants, each acting

through their employees, associates, and/or representatives, constitutes conduct of an enterprise

through a pattern of racketeering activity.  In particular, but not by way of limitation:  a) Dupont,

Dow, Corteva, IFF, Avantor, Liberty Mutual, Vanguard, the City, William Penn, Ballard Spahr,

and Gellert Scali each constitute an association-in-fact or enterprise within the meaning of RICO

engaged in, or the activities of which affect, interstate or foreign commerce; b) in addition,

Dupont, Dow, Corteva, IFF, Avantor, Liberty Mutual, Vanguard, the City, William Penn,

Ballard Spahr, and Gellert Scali formed a joint association-in-fact or enterprise within the

meaning of RICO; c) the activities of each enterprise and the joint enterprise were operated,

managed, and/or otherwise conducted by persons who were either employed by or associated

with said enterprise/joint enterprise within the meaning of RICO; d) in addition, Dupont, Dow,

Corteva, IFF, Avantor, Liberty Mutual, Vanguard, the City, William Penn, Ballard Spahr, and

Gellert Scali each conducted their respective enterprises through the other, and therefore, were

"persons" within the meaning of RICO for purposes of doing so; and e) said persons conducted

or participated, directly or indirectly, in said enterprise's/joint enterprise's affairs through a pattern of racketeering activity. Defendants Breen, Liveris, Gupta, Fibig, Long, Buckley, Haas, Kenney, Pratt, Cortes, O'Connell, Cullin, and Seitz operated, managed, authorized, and/or administered the respective enterprises and/or the joint enterprise, authorized and/or ratified the corrupt plan or scheme to utilize the tax/PUFTA matters as part of the illegitimate proxy war, as well as any schemes within the overall scheme, and to do so by knowingly utilizing legal process/proceedings for wrongful/unlawful purposes. Each enterprise and the joint enterprise comprise an ongoing organization with a framework for making and carrying out decisions, with members that function as a continuing unit with established duties, and which is separate, distinct, and apart from the pattern of racketeering activity in which it engages.

352.    Defendants obstructed, delayed, and/or affected commerce or the movement of an article or commodity in commerce by extortion, or attempted and/or conspired to do so. Defendants have endeavored and/or conspired to obtain property from another, with his consent, induced by wrongful use of actual or threatened force, fear, and/or under color of official right, in violation of 18 U.S.C. §§ 1951(a), (b). Defendants sought to obtain/obtained from plaintiff certain funds and/or real/personal property, and/or threatened/attempted to do so, property to which defendants have no legitimate/lawful claim or entitlement. In particular, but not by way of limitation, and as described in Count I, from 2017-present, the City did not file/pursue the tax/PUFTA matters for purposes of recovering on its claims as set forth in the tax/PUFTA Complaints but rather for purposes of the proxy war - a corrupt plan/scheme conceived, organized, and directed by the Core Defendants and/or others and executed by the City/Gellert Scali defendants on behalf (and for the benefit) of all defendants whereby the tax/PUFTA matters were utilized to unlawfully extort plaintiff, or to attempt to do so, in order to, *inter alia*:

a) delay, deter, dissuade, and/or prevent the publication of plaintiff's anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with the wrongful/unlawful activities of the Core Defendants, the companies/organizations with which they were/are affiliated, and those other individuals/entities whose wrongful/unlawful conduct is encompassed thereby and/or relevant thereto.  The plan/scheme was executed by the City/Gellert Scali by/through the use of legal process/proceedings for wrongful/unlawful purposes, namely the tax/PUFTA matters, which were improperly utilized to harass, intimidate, oppress, coerce, threaten, instill fear, and retaliate against plaintiff.  Further, defendants' extortionate conduct has, in fact, interfered with and/or prevented plaintiff from moving forward with his book and/or publication of his account of defendants' wrongful/unlawful activities.

353.    The City/Gellert Scali's activities in connection with the Vanguard Writ, Motion to Foreclose Upon Lien, Motion to Compel Entry, Petition for Contempt, Petition for Appointment of Sequestrator, and the filing/pursuit of the tax/PUFTA matters more generally, were not for purposes of actually obtaining the stated remedies and/or recovering on the City's claims as set forth in the tax/PUFTA Complaints, but rather were for purposes of the proxy war, and specifically to extort plaintiff in connection with his anticipated book and/or publication of plaintiff's account of defendants' wrongful/unlawful activities.  In particular, defendants' extortionate actions included, but were not limited to: a) freezing plaintiff's Vanguard account for 19 months thereby preventing plaintiff from access/use of his retirement account/funds; b) twice refusing plaintiff's offer to pay the full amount the City claimed was due and owing in the tax/PUFTA matters based upon plaintiff's refusal to relinquish his claims against the City/City officials in SI/SII, which resulted in the City wrongfully/unlawfully continuing to pursue the tax/PUFTA claims; c) threatening to have plaintiff's personal property levied and the Market

Street property sold at Sheriff's Sale unless plaintiff complied with defendants' demands; d) threatening to have plaintiff incarcerated, and taking steps to do so; and e) threatening to have plaintiff forcibly removed from and locked out of the Market Street property where plaintiff resides unless plaintiff met defendants' demands, and which resulted in plaintiff paying defendant Seitz $3,000 in order to avoid his forcible removal.[66]

354.    The repeated obstructive/extortionate acts of defendants, as hereinbefore set forth, were not isolated or sporadic events but rather were all related in that they had the same or similar purposes, participants, victims, results and/or methods of commission, and/or otherwise were related by distinguishing characteristics.  Additionally, the actions have continued over a substantial period of time, pose a threat of continuing racketeering activity, and/or are part of defendants' regular way of doing business, all of which has and will continue indefinitely into the future to have an adverse effect upon interstate commerce.

355.    As a direct and proximate result of defendants' pattern of racketeering activity as described herein, plaintiff has suffered an injury to business or property, and otherwise has been legally injured within the meaning of RICO.  In particular, but not by way of limitation, plaintiff has suffered the following damages and losses:  a) loss of access to and/or use of retirement funds and interest thereon (i.e., the Vanguard Account) from October 2019-June 2021; b) the sum of $3,000 which was paid to Gellert Scali to avoid being forcibly removed from the Market Street property; c) great expenses, delays, and inconvenience (and/or a substantial increase thereto) in the prosecution of plaintiff's claims; d) severe damage to and/or loss of personal and professional reputation; and e) attorney's fees and costs and/or a substantial increase thereto,

---

[66] The demands included the payment of approximately $10,000, which including "rental" payments of $3,000/month.

which were required and expended as a direct and/or proximate result of defendants'
racketeering activities.

356.    As relief for defendants' violations of plaintiff's rights as secured by RICO,
plaintiff demands all legal, equitable, and/or other remedies available pursuant to RICO for all
damages, harms, injuries, and losses suffered, including all losses to business and/or property, for
the pattern of racketeering activity.  In particular, but not by way of limitation, plaintiff demands:
a) an award of all economic and/or compensatory damages for the losses as hereinbefore set
forth; b) punitive, liquidated, and/or treble damages pursuant to 18 U.S.C. § 1964(c); c) an
injunction against further violations of plaintiff's rights as secured by the Act; and d) fines,
penalties, attorney's fees, interest, costs, and all other legal and equitable relief that may be
available and that the Court deems just and appropriate.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants,
Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc.,
Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia,
William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward
Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet
Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell,
Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount
in excess of $150,000, exclusive of interest and costs.

**COUNT III**
**PLAINTIFF V. ALL DEFENDANTS**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**OBSTRUCTION OF JUSTICE - 18 U.S.C. §1512**

357.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three

hundred fifty-six (356) as though fully set forth herein.

358.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C.

§§ 1962(c), 1512(b)-(d).

359.    Defendants knowingly used intimidation, threats, or corruptly persuaded another

person, or attempted to do so, or engaged in misleading conduct toward another person, with

intent to:  1) corruptly obstructed, influenced, or impeded an official proceeding, or attempted to

do so; and/or 2) intentionally harassed another person and thereby hindered, delayed, prevented,

or dissuaded a person from attending or testifying in an official proceeding and/or reporting to a

law enforcement officer or judge of the United States the commission or possible commission of

a Federal offense.

360.    For the same reasons the challenged conduct violates 18 U.S.C. §1951,

defendant's actions also violate 18 U.S.C. §1512.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants,

Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc.,

Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia,

William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward

Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet

Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT IV
### PLAINTIFF V. ALL DEFENDANTS
### OBSTRUCTION OF JUSTICE - 18 U.S.C. §1503

361.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred sixty (360) as though fully set forth herein.

362.    The conduct of defendants, both individually and collectively, constitutes a violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C. §§ 1962(c), 1503.

363.    Defendants corruptly, or by threats or force, or by threatening letter or communication, influenced, obstructed, or impeded, or endeavored to influence, obstruct, or impede, the due administration of justice.

364.    For the same reasons the challenged conduct violates 18 U.S.C. §1951, defendant's actions also violate 18 U.S.C. §1503.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet

Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT V
### PLAINTIFF V. ALL DEFENDANTS
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### MAIL/WIRE FRAUD - 18 U.S.C. §§ 1341, 1343

365.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred sixty-four (364) as though fully set forth herein.

366.    The conduct of defendants, both individually and collectively, constitutes a violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et. seq., and in particular but not by way of limitation, 18 U.S.C. §§ 1341 and 1343 relating to mail and wire fraud.

367.    The fraudulent plan/scheme described herein was predicated upon, carried out, advanced, furthered and/or concealed by defendants' use of the mails and wires in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), including "innocent" mail/wire communications, in that there were numerous such communications concerning and/or secondary to defendants' racketeering activity.

368.    As described herein, the proxy war effectively was a fraud/fraud upon the court whereby the filing/pursuit of the tax/PUFTA matters was not for the purposes stated in the Complaints but rather to wrongfully/unlawfully deter, dissuade, and/or prevent plaintiff (by means of harassment, intimidation, threats, instilling fear, and coercion) from moving forward with his anticipated book, the publication of any account of defendants' wrongdoing, and to

retaliate against plaintiff.  Each of the cases involved numerous electronic filings in furtherance

of the fraudulent plan/scheme.  In addition, but not by way of limitation, the following email

and/or other communications occurred which were part of and/or secondary to the plan/scheme

and/or were "innocent" communications and transmitted via the mails and/or wires:  a) email of

April 22, 2016 from R. Silverberg to various counsel re: anticipated book; b) emails of August

15, 2016, March 6, 2017, and October 23, 2017 from R. Silverberg to various counsel re:

anticipated book; c) letter of June 15, 2017 from C. Dean to R. Silverberg re: renewed tax

collection effort and threatening to direct the Sheriff to "levy or seize as much of your property

[sic] to satisfy this obligation;" d) email of April 17, 2019 from D. Salaman to R. Silverberg

stating that although total principal wage tax liability was $41,009.17, the City presently was

seeking/demanding a total of $276,400.93; e) email of April 23, 2019 from plaintiff to D.

Salaman and K. Diffily attaching draft Complaint; f) email of April 29, 2019 from D. Cortes to

R. Silverberg attaching letter stating that the City regarded the proposed Complaint as baseless,

frivolous, and unreasonable and threatening sanctions; g) email of May 10, 2019 from B. Cullin

to R. Silverberg demanding 14 times the amount that had been discussed with attorney Dean to

resolve matter; h) email of June 14, 2019 from B. Cullin to R. Silverberg increasing demand

from $175,000 to $185,000; i) email exchange of May 17, 2021 between R. Silverberg and B.

Cullin re: plaintiff's agreement to pay the full amount the City claimed was due and owing; j)

email of November 10, 2021 from R. Silverberg to G. Seitz explaining that the City had no

legitimate basis to file/pursue the tax/PUFTA matters; k) email of January 5, 2022 from G. Seitz

to R. Silverberg re: Petition for Appointment of Sequestrator; l) email of January 5, 2022 from B.

Cullin to R. Silverberg re: City's demands; m) letter of January 19, 2022 from R. Silverberg to

G. Seitz enclosing $3,000 payment; n) Entry of Appearance of July 24, 2023 by G. Seitz

whereby defendant Seitz maintained and/or re-asserted his rights as Sequestrator; and o) Writ of Revival of August 21, 2023 filed by the City for the purposes of re-asserting its interests in the tax case.

369.    The mails and wires were used and were necessary to further the plan/scheme to defraud as described herein, were detrimentally relied upon as part of the plan/scheme, and resulted in great damage and loss to plaintiff.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.


### COUNT VI
### PLAINTIFF V. ALL DEFENDANTS
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### CONSPIRACY - 18 U.S.C. § 1962(d)

370.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred sixty-nine (369) as though fully set forth herein.

371.    The conduct of defendants, both individually and collectively, constitutes a violation of plaintiff's rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C. § 1962(d).

372.    The conduct of defendants constitutes an agreement or conspiracy to violate RICO within the meaning of 18 U.S.C. § 1962(d).  In particular, but not by way of limitation, in or around April 2016, the Core Defendants formed a conspiracy which ultimately included all defendants.  The purpose of the conspiracy was to wrongfully/unlawfully deter, dissuade, discourage, and/or prevent publication of plaintiff's anticipated book, any account by plaintiff of the subject matter of the book, and/or any related claims in connection with defendants' own wrongful/unlawful activities.  The conspiracy was carried out by/through the City's use of legal process/proceedings for wrongful/unlawful purposes, namely the filing/pursuit of the tax/PUFTA matters, which were not filed/pursued for purposes of actually recovering past due taxes that supposedly are due and owing but rather for purposes of the proxy war, specifically to harass, intimidate, oppress, coerce, threaten, instill fear, extort, and retaliate against plaintiff.

373.    The conspiracy has continued through to the present.  In particular, on August 21, 2023, the City filed a Writ of Revival in the tax case even though, as described herein, the City has not filed/pursued the tax/PUFTA matters for purposes of actually recovering on its claims.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell,

Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.


**COUNT VII**
**PLAINTIFF V. CITY OF PHILADELPHIA,**
**JAMES KENNEY, MARCEL S. PRATT, ESQUIRE,**
**DIANA P. CORTES, ESQUIRE, MARISSA O'CONNELL, ESQUIRE,**
**BRIAN R. CULLIN, ESQUIRE, GELLERT SCALI BUSENKELL**
**& BROWN LLC, AND GARY F. SEITZ, ESQUIRE**
**42 U.S.C. § 1983 - RETALIATION**

374.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred seventy-three (373) as though fully set forth herein.

375.    Plaintiff engaged in protected activity within the meaning of Section 1983 and the United States Constitution, defendants took a series of adverse actions against plaintiff, and there is casual link between the protected activity and the adverse actions.  In particular, but not by way of limitation, and as described herein:  a) on June 20, 2019, plaintiff filed the Complaint in SI, which was served on August 13, 2019; b) on October 12, 2020, plaintiff filed the Complaint in SII; c) on May 17, 2023, plaintiff filed the instant Complaint; d) as the result of plaintiff's Complaints, both individually and/or collectively, and which alleged violations of plaintiff's Constitutional, federal statutory, and other rights, defendants took a series of adverse actions against plaintiff, namely the various actions described herein in connection with the filing/pursuit of the tax/PUFTA matters; and e) there is a causal link between plaintiff's exercise of his rights and the adverse actions.  Further, in the May 17, 2021 email exchange, the City admitted that it

was maintaining the tax/PUFTA matters against plaintiff because plaintiff would not relinquish his rights/claims against the City/City officials in SI/SII.[67]

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, City of Philadelphia, James Kenney, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, Gellert Scali Busenkell & Brown LLC, and Gary F. Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT VIII
### PLAINTIFF V. ALL DEFENDANTS
### ABUSE OF PROCESS

376.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred seventy-five (375) as though fully set forth herein.

377.    The conduct of defendants constituted an abuse or a perversion of legal process. The conduct of defendants in connection with the improper filing/pursuit of the tax/PUFTA matters and the disciplinary Complaints constituted a perversion of the process/proceedings, that is, the use of legal/administrative process and proceedings primarily to accomplish a purpose for which the process/proceedings were not designed, a wrongful/unlawful purpose designed to obtain an illegitimate and unlawful result, all of which caused damage and harm to plaintiff.

378.    For the same reasons the challenged conduct violates Section 1983, RICO (§1962(c)), and RICO (§1962(d)), defendant's actions also constitute an abuse of process.

---

[67] Following the voluntary dismissal of SII, plaintiff repeatedly stated that SII would be re-filed.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT IX
## PLAINTIFF V. ALL DEFENDANTS
## FRAUD

379.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred seventy-eight (378) as though fully set forth herein.

380.    Defendants intentionally made a series of false and/or fraudulent misrepresentations and/or omissions, knowing such misrepresentations/omissions were false and/or in reckless disregard for whether they were true or false, which were material to the transaction at hand, with the intent to mislead another to rely on them, which were justifiably relied upon by plaintiff and/or others, and which resulted in damage or harm to plaintiff proximately caused by the reliance.

381.    For the same reasons the challenged conduct violates Section 1983, RICO (§1962(c)), RICO (§1962(d)), and constitutes an abuse of process, the challenged conduct also constitutes fraud.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT X
## PLAINTIFF V. ALL DEFENDANTS
## <u>TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS</u>

382.     Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred eighty-one (381) as though fully set forth herein.

383.     Defendants tortiously interfered with contractual relations and/or attempted to do so, to wit:  a) a contractual or prospective contractual relationship(s) existed between plaintiff and a third party(s), specifically as between plaintiff and ELS, plaintiff and the owners of the Market Street Property, plaintiff and/or others associated with the Market Street property, and plaintiff and Vanguard; 2) defendants took purposeful action, intended to harm those relationships; 3) no privilege or justification applied to the harmful action; and 4) damages resulted from defendants' conduct.

384.     For the same reasons the challenged conduct violates Section 1983, RICO (§1962(c)), RICO (§1962(d)), and constitutes an abuse of process, the challenged conduct also constitutes tortious interference with business relations.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT XI
## PLAINTIFF V. ALL DEFENDANTS
## CONVERSION

385.     Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred eighty-four (384) as though fully set forth herein.

386.     Defendants deprived plaintiff's right of property in, or use or possession of, a chattel, or other interference therewith, without plaintiff's consent and without lawful justification.  In particular, but not by way of limitation, the City/Gellert Scali's defendants' activities and conduct in connection with wrongfully/unlawfully deprived plaintiff and/or interfered with plaintiff's rights, interests, use and/or possession of the Market Street property and Vanguard account.

387.     For the same reasons the challenged conduct violates Section 1983, RICO (§1962(c)), RICO (§1962(d)), and constitutes an abuse of process, the challenged conduct also constitutes conversion.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT XII
### PLAINTIFF V. ALL DEFENDANTS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

388.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred eighty-seven (387) as though fully set forth herein.

389.    The conduct of defendants was extreme and outrageous, intentional and/or reckless, and caused plaintiff to suffer severe emotional distress with associated physical symptoms.  In particular, the individual and collective actions of defendants, including but not limited to, the intentional use of legal process/proceedings by lawyers for wrongful/unlawful purposes, including manufacturing reason(s) to freeze plaintiff's retirement account for nearly two years and to seek to forcibly remove plaintiff from his home, all as part of corrupt plan/scheme to extort plaintiff into abandoning publication of book concerning defendants' wrongdoing, meets the required standard for "outrageousness."

390.    For the same reasons the challenged conduct violates Section 1983, RICO (§1962(c)), RICO (§1962(d)), and constitutes an abuse of process, the challenged conduct also constitutes intentional infliction of emotional distress.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT XIII
## PLAINTIFF V. ALL DEFENDANTS
## CIVIL CONSPIRACY

391.    Plaintiff incorporates, by reference thereto, Paragraph Nos. One (1) through Three hundred ninety (390) as though fully set forth herein.

392.    Defendants acted with a common purpose to do an unlawful act, or to do a lawful act by unlawful means or for an unlawful purpose, and committed an overt act in furtherance of the common purpose, all with an intent to injure plaintiff and/or with malice, and which did injure plaintiff.

393.    For the same reasons the challenged conduct violates Section 1983, RICO (§1962(c)), RICO (§1962(d)), and constitutes an abuse of process, the challenged conduct also constitutes a civil conspiracy.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, Dupont de Nemours, Inc., Dow, Inc., Corteva, Inc., International Flavors and Fragrances, Inc., Avantor, Inc., Liberty Mutual Group, Inc., The Vanguard Group, Inc., City of Philadelphia, William Penn Foundation, Ballard Spahr LLP, Gellert Scali Busenkell & Brown LLC, Edward Breen, Andrew Liveris, Rajiv Gupta, Andreas Fibig, David H. Long, Timothy Buckley, Janet Haas, M.D., James Kenney, Marcel S. Pratt, Esquire, Diana Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Gary Seitz, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial concerning all claims which may be tried by a jury.

**RICHARD J. SILVERBERG**

BY: /s/ Richard J. Silverberg
    **RICHARD J. SILVERBERG**
    I.D. No. 48329
    P.O. Box 30433
    Philadelphia, PA 19103
    215-563-6369
    rjs@rjsilverberg.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 25, 2023, a copy of Plaintiff's Amended Civil Action

was served upon all counsel of record via the district court's electronic filing system.


By: <u> /s/ Richard J. Silverberg</u>
       RICHARD J. SILVERBERG


<u>September 25, 2023</u>
Date